

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN -4 PM 4: 01

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

PATRICK JOSEPH TURNER, ET AL

CIVIL ACTION
NO. 05-4206

VERSUS

CONSOLIDATED CASES

MURPHY OIL USA, INC.

SECTION "L" (2)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFFS'</u><br><u>MOTION FOR CLASS CERTIFICATION</u>

**MAY IT PLEASE THE COURT:**

Plaintiffs Patrick Joseph Turner, Phyllis Michon, Cherie Perez, Philip Hebert, James Shoemaker, D.C., Fernand Marsolan, and Robin Clark, individually and on behalf of all persons similarly situated, through the Plaintiffs' Steering Committee ["PSC"] respectfully submit this Memorandum in Support of Motion for Class Certification.

I.   **STATEMENT OF THE CASE**:

A.   **INTRODUCTION**

Between August 29 and September 3, 2005,[1] the core residential community of St. Bernard Parish neighborhood was inundated by at least 1 million gallons of toxic crude oil. This catastrophic spill occurred when a single tank was dislodged, lifted from its foundation and damaged at the Murphy Oil refinery in Meraux, Louisiana.[2] The crude oil contaminated nearby property and businesses leaving many to question when, if ever, the oil-soaked area could be safely reoccupied. This preventable tragic incident has caused significant injury to the people, property, and businesses of the area. The Class Representatives, on behalf of all persons similarly situated, are now before this Honorable Court seeking to certify this matter as a class action.

At this stage in the proceedings, the sole issue before this Court is the procedural question: Should this cause be managed and tried as a class action and, if so, how should the class be defined; or should it be tried over several years as approximately 2,000 ordinary proceedings consolidated for discovery purposes alone?

To certify this case as a class action, the Court must find that Plaintiffs have satisfied each of the requirements of Rule 23 (a) and, in addition, satisfy the requirements of Rule 23(b)(3). As shown below, Plaintiffs have satisfied the Rule 23(a) requirements (numerosity, commonality, typicality, and adequacy). In addition to the Rule 23(a) requirements, Plaintiffs satisfy the Rule 23 (b)(3) requirements (predominance and superiority). Accordingly, the Class Representatives respectfully suggest that the clear answer to the procedural question before this Court is: This cause

---

[1] On September 3, 2005, a flyover discovered a spill from the Murphy Oil tank. Ex. "1", Press Release by Murphy Oil dated September 4, 2005.

[2] Ex. "2," Agency for Toxic Substances and Disease Registry (ATSDR), statement dated November 8, 2005.

should be managed and tried as a class action thereby avoiding multiple suits with varying results, most importantly, varying and delayed clean-up results to the detriment of the entire community.

### B.    THE TOXIC SPILL

On August 29, 2005, Hurricane Katrina struck the Gulf Coast region as a strong Category 3 hurricane.[3]    Hurricane Katrina first made landfall in the northern Gulf Coast region near Buras, Louisiana and made its final landfall at the mouth of the Pearl River on the Louisiana and Mississippi border, sparing the New Orleans Metropolitan and Lake Pontchartrain areas from its maximum sustained winds.  Like New Orleans, St. Bernard Parish was located on the west side of the storm wall eye and escaped the Hurricane's strongest winds.[4]  Nonetheless, this historically hurricane prone area was not left untouched.

In the wake of Hurricane Katrina, a mixed grade toxic crude oil and other contaminants began pouring into a neighborhood adjacent to the Murphy Oil refinery located at 2500 East St. Bernard Highway in Meraux, St. Bernard Parish, Louisiana.  According to the Agency for Toxic Substances and Disease Registry ("ATSDR"), Hurricane Katrina lifted and dislodged a 250,000 barrel above ground storage tank -- tank # 250-2.[5]    As the storm approached, Murphy did not take appropriate steps to stabilize the tank.  Rather, at the time, tank #250-2 was filled to only 16.3% capacity in direct violation of Murphy Oil's Hurricane preparation procedures according to Murphy's expert, Keith Baugher.  According to Murphy Oil's "Checklist for Hurricane Preparation," Murphy Oil should have filled this tank to "30% full [even using] water if necessary."[6]  Murphy retained

---

[3] Ex. "3," National Hurricane Center Report, dated December 20, 2005.
[4] *Id.*
[5] *See* Ex. "4" ATSDR Statement, dated December 9, 2005.
[6] *See* Ex. "5" Murphy Oil Checklist for Hurricane Preparation, date issued January 2001.

approximately 65,000 barrels of mixed crude oil in tank #250-2 and, ultimately, released approximately 25,110 barrels (1.05 million gallons) into the surrounding community.[7] By leaving the tank approximately 16 percent full, Murphy Oil created a foreseeable hazardous condition, since partially filled tanks are known to be subject to floating and moving during flooding.[8] The released oil and its contaminants affected numerous lives, homes, movable and immovable property, animals, and businesses in this densely populated area. The ATSDR reported that several canals were also affected by the toxic oil spill; namely, the 20 Arpent, the 40 Arpent, the Meraux, the Corinnes, the Delarond, and various unnamed interceptor canals.[9] These canals acted as preferential pathways for spreading this toxic crude oil and other contaminants to a large part of the surrounding area. In the aftermath, Murphy Oil acknowledged that its crude oil had been released into the community.[10]

Soon, Murphy began testing sites in the nearby community and, ultimately, agreed upon a limited area undeniably contaminated by its release of crude oil.[11] Murphy's admitted limited area affected by the oil spill was soon challenged when the EPA subsequently reported that a larger area had been contaminated by the Murphy Oil spill.[12] Later, the EPA increased the size of the area that it believed had been contaminated by the oil spill.[13]

To assist Plaintiffs in identifying the area impacted by the oil spill, Marco Kaltofen, P.E., performed a series of GC/FID chromatograms and GC/MS spectra to identify the individual components and groups of petroleum components in the Murphy Oil product released into the

---

[7] *See* Ex. "4" ATSDR Statement dated December 9, 2005.
[8] *See* Ex. "6"  Affidavit of Dr. Paul Templet, paragraph 3.
[9] *See* Ex. "4"  ATSDR Statement, dated December 9, 2005.
[10] *See* Ex. "7" Murphy Oil letter to citizens, dated September 28, 2005.
[11] *See* Ex. "8" Murphy Oil map
[12] *See* Ex "9" EPA map
[13] *See* Ex. "10" EPA Press Release dated December 5, 2005.

community.[14] This scientifically accepted fingerprinting method was used to identify what properties were affected by Murphy's crude oil and its contaminants versus locations with other petroleum based products. [15]  The results were documented on a map which depicts the area impacted with petroleum and its contaminants from the Murphy Oil refinery.[16]  According to Dr. Vincent Wilson, Ph.D., toxicologist, "the properties impacted by the Murphy Oil release contain levels of toxicants that pose a significant health threat to individuals and animals that live or work on or near these properties."[17]  Murphy Oil's Material Data Safety Sheet[18] also evidences that its crude oil poses a danger to humans and animals in both inhalation and skin irritation.  When inhaled, crude oil may cause headaches, nasal and respiratory irritation, nausea, drowsiness, breathlessness, fatigue, central nervous system depression, convulsions, and loss of consciousness.  Various other chemicals either found in the crude oil released or in other substances released or transported to the affected area as a result of the spill and flooding of Defendant Murphy Oil's refinery pose environmental and human health hazards.  Some of the substances found by Plaintiffs' experts include:

> *Arsenic* - Arsenic has been listed as a Group 1 carcinogen by the International Agency for Research on Cancer ("IARC")  (carcinogenic to humans) and the National Toxicology Program ("NTP") of the United States National Institutes of Health (known to be human carcinogen).

> *Benzene*[19] - is a known cancer hazard which can cause kidney, liver and blood disorders, including anemia and leukemia.  The United States Department of Health and Human Services ("DHHS") classifies benzene as a human carcinogen.

---

[14] *See* Ex. "11" Marco Kaltofen, P.E. affidavit dated December 1, 2005, paragraph 3.1.
[15] *Id.*
[16] *Id.*, at paragraph 3.2; *see also,* Ex. "12" Kaltofen map.
[17] *See* Ex. "13" Affidavit of Vincent Wilson, PhD., dated December 16, 2005, paragraph 3.
[18] *See* Ex. "14" Murphy Oil's Material Safety Data Sheet.
[19] Benzene is confirmed to be present by Plaintiffs' Experts Drs. Paul Templet and Vincent Wilson, *see* Ex. "6," Ex. "13", and Ex. "14".

*Chromium* - Chromium VI compounds are listed as a Group 1 carcinogen by IARC (carcinogenic to humans) and National Toxicology Program of the (known to be human carcinogen). As of this date, the nature of the chromium found has not been established.

*Polycyclic Aromatic Hydrocarbons* (PAH) - The Department of Health and Human Services (DHHS) has determined that benz[a]anthracene, benzo[b]fluoranthene, benzo[j]fluoranthene, benzo[k]fluoranthene, benzo[a]pyrene, dibenz[a,h]anthracene, and indeno[1,2,3-c,d]pyrene are known animal carcinogens. The International Agency for Research on Cancer (IARC) has determined the following: benz[a]anthracene and benzo[a]pyrene are probably carcinogenic to humans; benzo[b]fluoranthene, benzo[j]fluoranthene, benzo[k]fluoranthene, and indeno[1,2,3-c,d]pyrene are possibly carcinogenic to humans; and anthracene, benzo[g,h,i]perylene, benzo[e]pyrene, chrysene, fluoranthene, fluorene, phenanthrene, and pyrene are not classifiable as to their carcinogenicity to humans. The EPA has determined that benz[a]anthracene, benzo[a]pyrene, benzo[b]fluoranthene, benzo[k]fluoranthene, chrysene, dibenz[a,h]anthracene, and indeno[1,2,3-c,d]pyrene are probable human carcinogens. The widespread toxicity and impact on a wide array of human anatomical systems can be verified by the Toxicolgical Profile of PAH's maintained by the ATSDR and the Center for Disease Control and Prevention.

PAHs specifically found on the affected properties include:

*Benzo(a)anthracene*
*Benzo(b)fluoranthrene*
*Benzo(a) pyrene*
*Dibenzo(a,h) anthracene*
*Indeno(1,2,3-c,d)pyrene*

*Toluene* - According to the ATSDR, toluene can cause headaches, confusion, and memory loss. Low-to-moderate, day-after-day exposure can cause tiredness, confusion, weakness, drunken-type actions, memory loss, nausea, and loss of appetite.

*Xylenes* - According to the ATSDR, short-term exposure of people to high levels of xylene can cause irritation of the skin, eyes, nose, and throat; difficulty in breathing; impaired function of the lungs; delayed response to a visual stimulus; impaired memory; stomach discomfort; and possible changes in the liver and kidneys. Both short- and long-term exposure to high concentrations of xylene can also cause a number of effects on the nervous system, such as headaches, lack of muscle coordination, dizziness, confusion, and changes in one's sense of balance.

The hazardous conditions created by the presence of these toxic substances in the community cannot be alleviated by clean-up efforts occurring on an individualized basis.[20]  Rather, to avoid cross-contamination from one property to the next, the entire community must be uniformly restored and monitored to ensure that any contaminants absorbed in structures, the ground, or water pathways do not leech and recontaminate the area.[21]  Such homogenous restoration of an entire community requires consistent and cohesive action.  To return this community to a safe place to visit, live, attend school, and work — without the health hazards associated with toxic crude oil and other petroleum hydrocarbons — requires the people of this community to go forward with one voice, one action: the present class action.

## C.    PROCEDURAL HISTORY

In response to the release of crude oil into the community, numerous Named Plaintiffs filed 26 class actions which have been consolidated before this Honorable Court.  Thereafter, on November 28, 2005, the Named Plaintiffs filed an Administrative Master Complaint consolidating the various claims raised in the pending class actions.  The Administrative Master Complaint sets forth the causes of action in Counts I through VIII and *Seeks* damages and other relief for the injuries identified.  On December 2, 2005, Plaintiffs filed a Motion for Class Certification *Seeking* to certify a class for the claims asserted in the Administrative Master Complaint.  The Motion identified six proposed Class Representatives: Phyllis Michon, Cherie Perez, Philip Hebert, James Shoemaker,

---

[20] *See* Ex. "6" Dr. Paul Templet affidavit paragraph 8; Ex. "11" Marco Kaltofen affidavit paragraph 3.4.

[21] *See* Ex. "6" Dr. Paul Templet affidavit paragraph 8.  Previously, Murphy Oil stated that it will go in with water pressure hoses and clean the oil out of the houses.  Where will it go? Into the yard? Soak into the soil that their children may be playing in six month from now?  Into the public sewer system, only to resurface when the drains over flow into the streets during a heavy rain?

D.C., Fernand Marsolan, and Robin Clark. On December 22, 2005, this court dismissed, in part, Count VI[22] and dismissed Count VIII.[23] Further, this court granted Defendant's Rule 12(b)(6) Motion to Dismiss Plaintiffs' claim for damages resulting from fear/risk of future disease. Accordingly, the proposed Class Representatives, on behalf of all persons similarly situated, *Seek* to certify a class action for Counts I through V and Count VII[24] and for the damages and other relief requested in the Administrative Master Complaint. [25]

---

[22] Count VI notified the Court of the Plaintiffs' intent to assert CERCLA and RCRA claims at the appropriate time. Additionally, Count VI set forth a cause of action under OPA. Finding the Defendant's Rule 12(b)(6) Motion to Dismiss Plaintiffs' CERCLA and RCRA claims premature, this Motion was denied in part as moot. RCRA claims in individual cases were dismissed as premature. CERCLA claims in individual cases were not dismissed. The Court granted in part the motion to dismiss Plaintiffs' OPA claims finding them premature.

[23] Count VIII fraud allegations asserted by the class were dismissed; however, the court reserved the right of individuals to pursue their fraud claims.

[24] *See* Ex. "15" Class Action Administrative Master Complaint: Count I (negligence), Count II (absolute liability pursuant to Louisiana Civil Code articles 667 and 2315), Count III (negligence, intentional conduct, and strict liability pursuant to common law, including the recovery of actual and punitive damages), Count IV (strict liability pursuant to Louisiana Civil Code articles 2317 and 2322), Count V (nuisance and trespass), Count VII (civil liability for ground water contamination pursuant to Louisiana Revised Statute §30:2015.1) and Prayer for Relief excluding, as a result of this Court granting Defendant's Rule 12 (b)(6) Motion to Dismiss, Plaintiffs' claim for damages for fear/risk of future disease or illness.

[25] The class representatives, on behalf of all persons similarly situated, also *Seek* to recover the damages and other relief requested in the Class Action Administrative Master Complaint including: (1) both actual damages and punitive damages as set forth in Count III; (2) for all compensatory damages which are reasonable in the premises, as well as punitive damages, together with legal interest thereon from the date of judicial demand until paid, all costs and expenses of these proceedings, and attorneys' fees as set forth in the Prayer for Relief paragraph D; (3) damages and relief further prayed for in the Prayer for Relief paragraph E, specifically, (a) damages for contamination of property (both movable and immovable), (b) the cost of homogenous restoration, (c) the loss of use of property, (d) increased living expenses, (e) extended displacement costs, (f) diminution of property value, (g) ecological damages, (h) loss of income, (i) lost profits, (j) lost business opportunity, (k) inconvenience, (l) mental anguish, (m) emotional distress, (n) bodily harm, (o) past and future medical expenses, (q) appropriate injunctive relief to protect against further harm to Plaintiffs and class members, and (r) all other damages as are reasonable in the premises; (4) Penalties under the applicable statutes as requested in the Prayer for Relief paragraph F; (5) payment into the registry of this court of all damages or payments awarded solely for the evaluation and remediation of contamination or pollution that impacts or threatens usable ground water as requested in the Prayer for Relief

8

## D.    CLASS DEFINITION

Application of Federal Rules of Civil Procedure Rule 23 to the present claims arising out the Murphy Oil spill supports certifying two subclasses:

### (a)    Personal Claim Subclass:

All persons in the Parish of St. Bernard, State of Louisiana, within the geographical boundaries set forth below who/which have sustained injuries, loss, and/or damages as a result of the release of crude oil and other petroleum hydrocarbons and contaminants, on or subsequent to August 29, 2005, together with the known hazardous components of those substances, from a storage tank or otherwise stored upon the premises of the refinery owned and/or operated by Defendant, Murphy Oil, U.S.A., Inc. and/or Murphy Oil Corporation in Meraux, Louisiana, specifically excluding from the class definition claims for damages or loss compensable under a flood insurance policy.

### (b)    Business Claim Subclass:

All businesses or persons affiliated with a business in the Parish of St. Bernard, State of Louisiana, within the geographical boundaries set forth below who/which have sustained injuries, loss, and/or damages as a result of the release of crude oil and other petroleum hydrocarbons and contaminants on or subsequent to August 29, 2005, together with the known hazardous components of those substances, from a storage tank or otherwise stored upon the premises of the refinery owned and/or operated by Defendant, Murphy Oil, U.S.A., Inc. and/or Murphy Oil Corporation in Meraux, Louisiana, specifically excluding from the class definition claims for damages or loss compensable under a flood insurance policy.

---

paragraph G; and (6) all other general, equitable, injunctive and further relief as the Court may deem just and proper and requested in the Prayer for Relief paragraph H.

The Plaintiffs' evidence to be introduced at the class certification hearing will support the following geographical boundaries for the class:

> Beginning North, from the 40 Arpent Canal with its intersection in the West with the railroad track which runs in a North-South direction in Arabi, and which lies between Aycock Street and Alexander Avenue, and traveling along the railroad track in a southerly direction to its intersection with West Judge Perez Highway; then heading East from this intersection along West Judge Perez Highway to its intersection with Paris Road; then heading South from this intersection to St. Bernard Highway; then heading East along East St. Bernard Highway to what is known as the Meraux Pasture, which is due East and adjacent to the Cypress Gardens and Lexington Subdivisions in Meraux; then heading North along the western boundary of the Meraux Pasture to the 40 Arpent Canal; and, finally heading from this intersection West along the 40 Arpent Canal to its intersection with the railroad track in Arabi.

Using laboratory analyses, including GC/FID and GC/MS data, of samples taken as of the time this matter is being submitted for class certification, as well as visual observation, Plaintiffs' expert, Marco Kaltofen, P.E., determined an area which unequivocally depicts the area where Murphy-related crude oil contamination exists. This area is depicted in the map attachment to Mr. Kaltofen's affidavit (hereinafter referred to as the "Kaltofen impact area") which Plaintiffs intend to introduce into evidence in connection with class certification. However, Plaintiffs are respectfully requesting that this Honorable Court certify a class with boundaries beyond that area depicted on Mr. Kaltofen's map for the following reasons.

First, Plaintiffs' experts have testified that surface water runoff, whether due to flooding or as a result of normal conditions, from contaminated properties within the Kaltofen impact area will affect neighboring, previously uncontaminated properties.

Second, Plaintiffs' experts have testified that airborne contaminants from soils and dusts within the Kaltofen impact area will contaminate neighboring properties, either through remediation or construction, which may not have been affected by Murphy Oil originally. Thus, these

neighboring properties which may have been originally unaffected are at an increased risk of being impacted by the toxic chemicals present within the Kaltofen impact area.

Third, Plaintiffs' experts have testified that cross-contamination from an affected area to a non-affected area is highly likely. In addition to the modes of transportation of the chemicals beyond the boundaries of the Kaltofen impact area, discussed above, human traffic is capable of spreading the toxic chemicals present within the Kaltofen impact area.

Fourth, Plaintiffs' experts have testified that the "stigma" associated with contamination of properties, whereby buyers in the marketplace avoid or devalue properties because of perceived negative possible effects of contamination in an area impacted by contamination, may extend to areas capable of being impacted through methods of cross-contamination discussed above, and/or to areas which are immediately adjacent to contaminated properties. Accordingly, the geographic boundaries outlined above present the most suitable parameters for use under the circumstances of this case.

At the hearing of this matter, Plaintiffs will introduce the following evidence and exhibits to support Plaintiffs' proposed boundaries:

- Expert Testimony

- Expert reports

- Lab results

- Photographs of the Murphy Oil refinery and surrounding area

- Kaltofen map

- EPA map

- Murphy Oil map

- Class Representative Testimony

11

- Photographs of the Impacted Community

- Various Murphy Oil, EPA, LDEQ, ATSDR documents and photographs, and

- Documents produced in discovery

A class definition with geographic boundaries is appropriate. The purpose for such a boundary is to ensure that the claims of all persons and/or entities reasonably anticipated to be asserted, arising from this single catastrophic and preventable event, are brought before this Court in one manageable proceeding so as to avoid needless repetitive litigation of common issues of law and fact. Another purpose of the geographic boundary is to give potential class members enough information to ascertain whether they are in the class definition and to enable them to decide whether to opt out. Those that do not choose exclusion will be bound, under principles of *res judicata*, by those decisions to be made on a class-wide basis.

To achieve these purposes, class definitions should be "precise, objective, and presently ascertainable."[26] The definition should not depend on subjective criteria or the merits of the case, or require extensive factual inquiry to determine who is a class member.[27] "Such definitions frustrate efforts to identify class members, contravene the policy against considering the merits of a claim in deciding whether to certify a class, and create potential problems of manageability."[28] A definition that uses objective characteristics of class members, like the one used in this case, "avoids problems of circular definitions which depend on the outcome of the litigation on the merits before class members can be ascertained...." [29] Definitions like the one submitted herein do not "require

---

[26] Manual for Complex Litigation, Fourth § 21.222 (2005).
[27] Herbert B. Newberg, Newberg on Class Actions § 6:14 at 614-15 (4th ed. 2002).
[28] *Id.* quoting Manual for Complex Litigation, Third, § 30:14.
[29] Herbert B. Newberg, Newberg on Class Actions, § 6:14 at 614 – 15 (4th ed. 2002).

the court to engage in an impermissible consideration of the merits of the claims in connection with its class certification determination."[30]

It is anticipated that Murphy Oil will argue that Plaintiffs' geographic boundaries are too broad. However, a broader geographic boundary than that identified in Murphy Oil's map makes sense. The class should include all members required for the fair and efficient "resolution of common questions of fact and law in a single proceeding. If the definition fails to include a substantial number of persons with claims similar to those of the class members, the definition of the class may be questionable. A broader class definition…may be more appropriate."[31] Those definable class members will be bound by decisions made on class-wide issues, such as liability and the other common issues of law and fact addressed below.

II.   **FEDERAL RULE OF CIVIL PROCEDURE 23**:

The class action device is designed to conserve the resources of both courts and parties by permitting issues potentially affecting numerous claimants to be litigated in an economical fashion. *See General Telephone Co. of Southwest v Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In furtherance of this goal, and in an effort to streamline the guidelines for certification, Federal Rule of Civil Procedure 23 was amended in 1966. *See* Fed. R. Civ. P. 23, Advisory Committee Notes, 1966 Amendment; *see also, Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614-15, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

In applying Rule 23, the court does not evaluate the merits of the case but considers only whether the requirements of the Rule are met. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78, 94 S.Ct. 2140, 46 L.E.2d 732 (1974). The court has substantial discretion in determining

---

[30] *Id.*
[31] Manual for Complex Litigation, Fourth, § 21.222.

whether the criteria of Rule 23 are established. *See Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). Furthermore, the court may consider materials beyond the pleadings, such as relevant facts, the claims of the parties, and the applicable substantive law. *See Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

Under Rule 23, a class of plaintiffs *Seek*ing certification must satisfy four threshold prerequisites: (1) numerosity (that the class is so numerous that joinder of all members is impracticable); (2) commonality (that there are questions of law or fact common to the class); (3) typicality (that the claims of the representative parties are typical of the claims or defenses of the class); and (4) adequacy (that the representative parties will fairly and adequately protect the interests of the class). *See* Fed. R. Civ. P. 23(a); *see also Amchem Products, Inc. v. Windsor, supra*, 521 U.S. at 613 (1997). In addition to satisfying Rule 23(a)'s prerequisites, a class proposed under Rule 23(b), such as the one proposed herein, must meet certain additional requirements. Specifically, pursuant to Rule 23(b)(3), Plaintiffs must show that:

> [q]uestions of law or fact common to the members of the class <u>predominate</u> over any questions affecting only individual members, and that a class action is <u>superior</u> to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3) [emphasis added].

A.      **Rule 23(a): Numerosity, Commonality, Typicality, and Adequacy**:

1.      *Numerosity*:

To establish numerosity, Plaintiffs must provide some evidence or reasonable estimate of the number of purported class members. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001). Although a specific minimum number of members in a proposed class is not controlling in determining whether joinder is impracticable, it has been noted that any class consisting of more than

forty members does "raise a presumption that joinder is impracticable." *See Mullen v. Treasure Chest Casino, L.L.C.*, 186 F.3d 620, 624 (5th Cir. 1999). Obviously, when class size reaches substantial proportions, the impracticability requirement may be satisfied by numbers alone. Newberg, §3.05 at 3-26 (3rd ed. 1992). In addition, factors relevant to the numerosity inquiry include the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. *See id.* at 624 [citing *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997)].

### 2.   Commonality:

A common question of law or fact is one that, when answered as to one class member, "will affect all or a significant number of the putative class members." *James v. City of Dallas, supra*, at 570; *See also Lightbourn v. County of El Paso, supra*. The United States Fifth Circuit has noted that the "threshold of commonality is not high." *Bertulli v. Independent Ass'n of Continental Pilots*, 242 F.2d 468 (5th Cir. 1986) (citing *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468 (5th Cir. 1986)). The fact that some of the plaintiffs may have different claims, or have claims that require individualized analysis, will not defeat commonality. *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993). Thus, the commonality requirement is satisfied if the named plaintiffs share with the proposed class at least one question of fact or law. *See James v. City of Dallas, supra*, at 570; *See also Mullen*, 186 F.3d at 625 [stating that commonality "ordinarily is considered in connection with the Rule 23(b)(3) predominance inquiry because the court can usually find at least one issue that can be said to be common under the liberal wording of Rule 23(a)(2)"].

### 3.   Typicality:

Typicality does not require a complete identity of claims within the proposed class, but

simply that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23 (a)(3) (West 2005). The test is not considered demanding; it is satisfied when the claims of the named and unnamed plaintiffs share a common source and rest upon the same legal and remedial theories. *See Mullen v. Treasure Chest Casino, supra*, 186 F.3d at 625 (5th Cir. 1999). The focus on the similarity of claims is more important than the relative strength of the claims on their merits. *See Lightbourn*, 118 F.3d 421, 426 (5th Cir. 1997). Generally, when it is alleged that the same conduct was directed at or affected both the named plaintiffs and the class sought to be represented, the typicality requirement is met irrespective of varying fact patterns which may underlie individual claims. *See* Newberg, §313 at 3-77 (3rd ed.). Hence, if the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality. *See Mullen*, 186 F.3d at 625 (typicality satisfied when plaintiff-employees asserted the same theories of liability, despite defendants' argument that each class member's allegedly resulting "respiratory illness" may differ).

4.    *Adequacy of Representation:*

The adequacy requirement applies to both the class representatives and their respective counsel. *See Jenkins v. Raymark, Indus., Inc., supra*. The requirement exists because a final judgment in a class action is binding on all class members, and accordingly mandates that class representative interests be aligned with, and not antagonistic to, unnamed class members. *See Mullen v. Treasure Chest Casino, supra*, at 625-66. A sufficient alignment exists when "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class." *In re: Corrugated Container Antitrust Litigation*, 643 F.2d 195, 208 (5th Cir. 1981). Differences between the named plaintiffs and class members render the named plaintiffs inadequate

representatives only if those differences create conflicts of interest between the named plaintiffs and class members. *See Mullen v. Treasure Chest Casino, supra,* at 626. It has been observed that the adequacy of representation requirement "tends to merge" with the commonality and typicality requirements, to the extent all such criteria "serve as guideposts for determining whether the maintenance of a class action is economical and whether the named plaintiffs and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem v. Products, Inc. v. Windsor, supra,* 521 U.S. at 626 n. 20.

### B.   Rule 23(b)(3): Predominance and Superiority

Rule 23(b)(3), promulgated by the 1966 class-action amendments, encompasses "opt-out class actions, superseding the former 'spruious' class action which had generally functioned as permissive joinder, or "opt-in." The provision applies to cases for which a class action would achieve economy of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. *See Amchem Products, Inc. v. Windsor, supra.* Rule 23(b)(3) requires the court to determine (1) whether common issues predominate, and (2) whether a class action is a superior method to resolve the controversy. Taken together, these two requirements ensure that a proposed class has "sufficient unity, so that absent class members can fairly be bound by decisions of the class representatives." *See id.,* 521 U.S. at 615. Determining whether common issues predominate and whether the class action is a superior procedural vehicle requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case. *See Berger, supra,* at 483.

### 1.   *Predominance*:

In order to "predominate," common issues must constitute a significant part of the individual

cases. *See Jenkins v. Raymark Industries, Inc., supra,* at 472. The purpose of the predominance requirement is to ensure that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem v. Products, Inc. v. Windsor, supra,* 521 U.S. at 623. The standard "does not require that all issues be common to all parties," but, rather, mandates that "resolution of the common questions affect all or a substantial number of the class members." *Watson v. Shell Oil Co.,* 979 F.2d 1014, 1022 (5th Cir. 1992). Thus, for example, individual questions on issues such as damages which do not predominate over common issues will not prevent certification. Wright, Miller & Kane, Federal Practice and Procedure, § 1780 at 576-77 (2nd ed. 1986).

2.    *Superiority*:

With respect to the superiority inquiry, Rule 23(b)(3) identifies for consideration four factors which are meant to be illustrative, not exhaustive: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class. Fed. R. Civ. P. 23(b)(3)(A)-(D); Newberg, §4.28 (4th ed.).

The "interest" factor requires more than the desire of certain individuals to have their own separate lawsuits. Rather, such an interest exists where the individual has "special issues which require separate litigation," as, for example, an issue of reliance in a case of misrepresentation. 7A, Wright, Miller & Kane, *Federal Practice & Procedure,* § 1780. Presumably, this factor pertains to the interests of most or all class members, rather than the interests of a few individual members; for when a small segment of class members has a strong interest in individual litigation, that interest

18

may be served by opting out. *See* Newberg, § 4.29 (4th ed.). Furthermore, the Advisory Committee notes with Rule 23 direct the court to ascertain whether any stated "interests" may be theoretic rather than practical. *See id.*

The second factor suggests that the court consider "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." Fed. R. Civ. P. 23(b)(3)(B). This serves the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits. Ordinarily, a class action will be superior to repetitive individual suits. Newberg, § 4.30 (4th ed.).

The third consideration suggests that the court assess "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). The inquiry is whether the forum chosen for the class action represents an appropriate place to settle the controversy, given the location of the interested parties, the availability of witnesses and evidence, and the condition of the court's calendar. In the class action context, the desirability of concentrating claims in a particular forum is relevant only when other class litigation has already been commenced elsewhere. *See* Newberg, § 4.31 (4th ed.).

The fourth factor, manageability, addresses the "difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3)(D). The rule lists management difficulties as a matter to be considered when comparing the class action device to other methods of adjudicating the controversy, and it is only when such difficulties make a class action less fair and efficient than some other method, such as individual interventions or consolidation, that a class action is improper. Newberg, § 4.32 (4th ed.).

III.   **ANALYSIS**:

A.   **Rule 23(a)**:

1.   *Numerosity*:

In the instant case, numerosity is easily established. At the outset, there currently exist 113 Named Plaintiffs in this litigation.[32] More importantly, the class of persons that those named plaintiffs and Putative Class Representatives *Seek* to represent encompasses a large geographical area in St. Bernard Parish.[33] Federal courts have certified classes of far fewer putative class members than exist herein, including classes of members as few as 13, 17, and 18. *See Arkansas Education Ass'n v. Bd. of Education of Portland Arkansas School District*, 446 F.2d 763 (8th Cir. 1971); *Cypress v. Newport News General & Nonsectarian Hospital Ass'n*, 375 F.2d 648 (4th Cir. 1967); *Dole Electronics, Inc. v. RCL Electronics, Inc.*, 53 F.R.D. 531 (D.N.H. 1971).

Specific numbers aside, the practical difficulty of joining and managing all of the proposed class member claims in this case as individual, consolidated claims, is obvious. Due to Hurricane Katrina, for example, many of the residents of St. Bernard Parish in the impacted area have been geographically dispersed. *See Mullen v. Treasure Chest Casino, supra*, at 625 (affirming the district court's finding of numerosity where the court reasonably inferred from the nature of plaintiffs' employment that class members would be geographically dispersed).

Hence, given both the number of putative class members involved herein and the impracticability of a mass joinder of claimants who have been geographically dispersed, the numerosity prerequisite of Rule 23 is satisfied.

---

[32]*See* Affidavits of Plaintiffs' Counsel, attached (in globo) and hereinafter referred to as Ex. "16".

[33]*See* Ex. "8," "9," and "12."

2.    *Commonality*:

All of the claims herein proceed from a common event, which dispersed the same chemical substances throughout the same community.  The questions why and how this occurred, what was released, and what area was impacted, are common questions.  Defendant Murphy's conduct or fault in releasing crude oil and other contaminant substances into the homes, businesses, and environment of the putative class members, is a central and common issue.  The scientific nature and behavior of the chemicals released, likewise, are common issues of fact.  Even the variability and discrepancies of expert opinions concerning the amount and "footprint" of the release are common questions because they must be addressed and developed as to all parties.  These issues, and others discussed *infra* in regard to the "predominance" requirement, are managed most effectively and uniformly in a class action which applies to and binds all claimants.[34]

3.    *Typicality*:

The third prerequisite, typicality, is also clearly established in the case at bar.  It is undisputed that the injury to each and every member of the class arises from the same operative facts and actions of the defendant:   the release of hazardous materials from the refinery and property of Defendant Murphy Oil.

Further, as stated, typicality focuses less on the relative strength of the named plaintiffs' and the putative class members' cases than on the similarity of the legal and remedial theories between their claims.  *See Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir. 1986).   This is because one of the purposes of the typicality requirement is to ensure that the class representative's interest is "aligned with those of the represented group, and in pursuing his or her own claims, the

---

[34]*See* 7A Wright, Miller & Kane, *Federal Practice and Procedure*, § 1763 at 227 (2d ed. 1986) (noting the partial redundancy of Rule 23(a)(2)'s commonality requirement, given that the analysis is essential to Rule 23(a)(3)'s predominance requirement.

named plaintiff will also advance the interests of the class members." *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996). In making this determination, most courts have looked to the elements of the cause of action that the class representative must prove in order to establish the defendant's liability. If they are substantially the same as those needed to be proved by the class members, the representative's claim is typical. *See* Newberg, § 3:15, 359-60, and cases cited therein.

In this matter, named plaintiffs, individually and on behalf of the putative class, are asserting various legal theories of liability all directed at Defendant Murphy Oil's failure to secure, inspect, maintain, and contain oil in a large capacity above ground storage tanks on their property associated with the events surrounding the landfall of Hurricane Katrina on August 29, 2005. The named class representatives, on behalf of the putative class, have asserted the following causes of action against Defendant Murphy Oil: (1) negligence and intentional conduct in the improper storage of and failure to prevent/mitigate damage from the release of petroleum hydrocarbons and other hazardous and toxic materials from their property[35]; (2) absolute/strict liability under Louisiana Civil Code articles 667 and 2315 for the failure to prevent/mitigate damage from the release of petroleum hydrocarbons and other hazardous and toxic materials from their property; (3) strict liability under Louisiana Civil Code articles 2317 and 2322; (4) nuisance and trespass; and (5) contamination of ground water under La. R.S. 30:2015.1. In each of these causes of action, the claims asserted are typical of all putative class members and the class representatives. Each is predicated on the conduct of Defendant Murphy Oil in allowing the release of hazardous materials from its property on to the property of the

---

[35]Negligence claims are asserted under both civilian principles founded in Louisiana law and common law principles. In addition to other relief and damages requested in the Administrative Master Complaint, punitive damages are sought by the class representatives on behalf of all persons similarly situated as permitted by common law.

putative class members.

None of the asserted claims involves burdens of proof or elements of causation that are unique to individuals or businesses within the proposed class definition.[36]

Moreover, not only are the claims asserted typical of all members of the class and the class representatives, but the injuries suffered are also typical.   Dr. Vincent A. Wilson will testify that the contaminants present in the substances released from Defendant Murphy Oil's property contain toxic levels of various chemicals.  Moreover, these contaminants are persistent and migratory in nature.  This means that all residents, business owners, property owners, or persons otherwise damaged in the affected spill area are subject to the same types of injuries from the materials released into the spill area by Defendant Murphy Oil, regardless of their individual location.[37]

Dr. Paul Templet will testify that all properties affected by the spill would have to be equally remediated to avoid cross contamination.   Individual cleanup efforts would result in affected properties becoming contaminated again.  Because all of the properties must be collectively remediated, all proposed class members are equally denied access to their properties, effectively being evicted from their "legal possession" of their property.[38]

With respect to questions involving diminution of property value, Dr. John Kilpatrick will

---

[36]The causes of action asserted by the class representatives involve basic questions typical of the class under Louisiana duty-risk analysis:   (1) did Defendant Murphy Oil have a duty to prevent the release of hazardous materials from its refinery and property? (2) was the risk of injury to the members of the class within that duty? (3) was the release of the hazardous material the legal cause of the injury? And (4) were the class members injured by the breach of that duty?  The difference between the various causes of action asserted involves the legal duty of the Defendant Murphy Oil; the differences in the causes of action do not change the manner in presentation of the plaintiffs' claims as to each of the class representatives and the class members individually. If each class member were allowed to proceed individually the exact same facts would be introduced to support the same duties owed by Defendant Murphy Oil to each person in the proposed class.

[37]*See* Ex. "13" Dr. Vincent L. Wilson affidavit.

[38]*See* Ex. "6" Dr. Paul Templet affidavit.

testify that there are common themes running through the nature of the properties affected which would, from an evaluation perspective, outweigh their idiosyncratic factors.[39] Dr. Kilpatrick notes that in evaluating the affected properties and the subsequent diminution in value he focuses on (1) the large number of properties affected, (2) the locational commonality, (3) the common event affecting them, and (4) the common features of the structures and property located in the affected area.[40] Accordingly, in determining the injuries suffered by the class members, a mass appraisal model in which all properties are evaluated together is the preferred way to appraise the spill's impact upon real estate.[41] As explained by Dr. Kilpatrick:

> "And let's assume for a moment that we are challenged with appraising some large number of houses, be it a thousand or 1,500 or 1,800 one at a time without the benefit of a mass appraisal model. Then the individual appraiser doing individual appraisals of 1,800 houses is eventually going to recognize: Hey, I'm doing the same houses over and over again. I will use the same comps, I will use the same sales adjustment grid, I will just use the same URAR form, which is the common individual home appraisal form that's used by residential appraisers. And I will just copy it over and over again, wiggle the numbers a little bit. In effect, the large number of comparable properties or similar properties being appraised by the one appraiser would so overwhelm the idiosyncrasies that ultimately that appraiser would de facto be running a mass appraisal model anyway."[42]

It is anticipated that Defendant Murphy Oil will argue that the differences in the amount of damages due each named plaintiff and putative class member will make the claims atypical. However, as explained by Professor Newberg:

> "If differences in amounts of individual damages would make a class action improper, a class action for damages would never be possible, because variations in amount of damages among class members are inevitable unless they happen to be factually identical, which is not required under Rule 23. The existence of a class action provision for damages actions itself indicates that the drafters of the rule contemplated certifications for classes raising common liability issues, even where

---

[39]*See* Ex. " " Deposition of Dr. John Kilpatrick, pp. 22, 35.
[40]*Id.,*pp. 40-41, 42.
[41]*Id.,* at 41.
[42]*Id.,* at 46.

the amounts of damages claimed varied among class members." [43]

In this case, the representatives' claims arise from the exact same course of conduct and share the same legal theory, as do the claims of the putative class.   Furthermore, the class representatives will continue to advance the interests of all the class members.  Accordingly, typicality is established.

### 4.      *Adequacy of Representation*

The final Rule 23(a) prerequisite to a class action, adequacy of representation, is also met in the instant case.  As stated, this element requires that the interests of the named plaintiffs be aligned with the putative class members to ensure that the class representative has an incentive to pursue and protect the claims of the absent class members.  *See Amchem Products, Inc. v. Windsor*, 117 S.Ct. 2231, 2251, n. 20 (1997).  Accordingly, the two factors that are now predominately recognized as the basic guidelines for the Rules 23(a)(4) prerequisite are (1) absence of conflict and (2) assurance of vigorous prosecution.  *See* Newberg, § 3:22, at 409.

Here, both the plaintiffs and their counsel will adequately represent the class.  Furthermore, the interests of the plaintiff representatives do not conflict in any manner with the interests of the members of the class they seek to represent, as all seek similar relief.  Persons injured as a result of the release of oil and other toxic materials from the Murphy Oil refinery share the same claims for property damage, business interruption, injunctive relief, eviction from their homes or businesses, mental anguish and personal injury.  The proposed class representatives collectively have claims for all of the types of damages that would be expected to be claimed by members of the putative class. Moreover, the class representatives named herein have a strong interest in prosecuting this action, and they each seek to represent and diligently prosecute this action on behalf of themselves and all

---

[43] Newberg, § 3:16, at 370.

other persons similarly situated.

Furthermore, regarding the adequacy of counsel requirement, this Court has appointed class counsel, the Plaintiffs' Steering Committee (PSC) and the Plaintiffs' Executive Committee (PEC), to coordinate the representation of all plaintiffs in this matter.   Both committees are comprised of experienced attorneys who have aggressively pursued, and will continue to pursue,  the interests of all potential claimants.  These efforts include preparing appropriate pleadings, motion practice, propounding and responding to discover, retaining experts, conducting extensive testing and evaluation of the claims presented herein, interacting with defendants and state and federal regulatory agencies to insure the protection and preservation of evidence, monitoring the claims and settlement practices of the defendants, court appearances, and extensive legal research into the claims and defenses presented herein.  The PSC and PEC consists of counsel who regularly engage in major complex litigation, and have had extensive experience in class action law suits involving mass torts and complex litigation similar in size, scope and complexity to the present case.  Thus, class counsel satisfy the adequacy requirement of Rule 23.

> B.      **Rule 23(b)(3)**:

> 1.      *Predominance*:

The common issues of fact and law herein surely predominate over individual issues such as causation and quantum.  First, each Plaintiff's loss flows from a single source (Defendant Murphy) and from a single event (the release).  Second, Plaintiffs plead the same legal and remedial theories under the same state law with respect to Defendant's conduct, requiring class-wide proof of the significant common elements of recovery.  Third, Plaintiffs primarily claim property damages, and their emotional distress/mental anguish damages are derivative of the property damage claims.

Fourth, the case does not involve extensive conflicts of law analysis (save for the issue of punitive damages), as there are no nationwide class management problems. Indeed, in the unlikely event the Court finds certain individual issues not manageable as joined, Your Honor is permitted under Rule 23(c)(4) to bifurcate such issues. Fed. R. Civ. P. 23(c)(4); *See* Newberg, § 4.23 (4th ed.) [stating that the predominance test of Rule 23(b)3(3) must be read with a recognition of the power of the court to uphold a class with respect to particular issues under Rule 23(c)(4)].

Since this case does involve a single defendant's singular course of conduct, it necessarily implicates the kind of nucleus of common issues commonly considered ripe for class certification in toxic tort and personal injury litigation. For example, in *Bentley v. Honeywell International*, Inc., 223 F.R.D. 471 (S.D. Ohio 2004), the court granted plaintiffs' motion for class certification because the claimants alleged a single course of conduct (the defendant-manufacturer's contamination of a shared water supply). Similarly, in *Olden v. LaFarge Corp.*, 383 F.3d 495, 508-09 (6th Cir. 2004), the court found the predominance requirement satisfied where common issues of emission of pollutants and causation of harm could be determined on a classwide basis, reserving individual damages issues. Plaintiffs' motion for certification aligns with such precedents as these, and like them arises from a common cause involving plaintiffs' complaints in tort about the environmental misconduct of a single defendant in a definable geographical area.

Moreover, Plaintiffs *Seek* compensatory damages based upon the same legal and remedial theories under the same state's law with respect to Defendant's conduct. This assures class-wide proof and resolution of all significant, common elements of compensatory damage recovery, save for individual causation.[44] The specific legal theories pled are: (1) Property damage under Civil

---

[44]*See, e.g.,* discussion of typicality and adequacy, *supra.*

Code Articles 667-669[45]; (2) Negligence under Civil Code Article 2315[46]; (3) Intentional Conduct under Civil Code Article 2315[47]; (4) Strict Liability under Civil Code Articles 2316 and 2317.1[48]; and (5) Groundwater Contamination under Louisiana Revised Statute 30: 2015.1.[49]

As to punitive damages, the unitary standard of common (Arkansas) law in this litigation is defendant's "conscious indifference" or "reckless disregard...." The potential imposition of punitive damages certainly does not serve to defeat class certification; Murphy's conduct not only occurred in a single incident, but is legally identical as to each Plaintiff in terms of punitive damage liability. *See In re Shell Oil Refinery*, 136 F.R.D. 588 (E.D. La. 1991).

A list of the most significant class-wide issues of fact and law in this matter, therefore, would include the following:

- Whether Murphy Oil failed to properly inspect the tank;

- Whether Murphy Oil failed to monitor the tank to assure that it was fit for its

---

[45]*See* La. Civ. Code Art. 667 (requiring a demonstrating that Murphy Oil knew, or reasonably should have known, that the activity would cause damage, that the damage could have been prevented by reasonable care, and that Murphy failed to exercise reasonable care).

[46]*See Hill v. Lundin*, 256 So.2d 620 (La. 1972) (providing that under Louisiana Civil Code Article 2315's duty-risk analysis, plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached).

[47]*See Bazley v. Tortorich*, 397 So.2d 475, 482 (La. 1981) (requiring the plaintiff alleging an intentional tort to demonstrate that the defendant either "desired to bring about...the results of his act or believed they were substantially certain to follow from what he did").

[48]*See* La. Civ. Code Art. 2317.1 (requiring proof that Murphy Oil had custody of a thing containing a vice or defect that Murphy knew, or should have known, created an unreasonable risk of harm); *See also, Kent v. Gulf State Utilities*, 418 So.2d 493, 498 (La. 1982) (requiring proof that Murphy's conduct created an unreasonable risk of harm to impose strict liability for ultra-hazardous activity).

[49]*See* La. Rev. Stat. Ann. § 30:2015.1 (requiring proof that Murphy Oil contaminated plaintiffs groundwater in a way that poses a threat to the public health).

intended purpose;

- Whether Murphy Oil breached the standard of care owed to Plaintiffs as adjacent property owners;

- Whether Murphy Oil's actions constituted a nuisance;

- Whether Murphy Oil's actions contaminated Plaintiffs' groundwater;

- Whether Murphy Oil's contamination of Plaintiffs' groundwater poses a threat to public health;

- Whether Murphy Oil failed to promulgate, implement, and enforce rules and regulations pertaining to safety which would have prevented or mitigated the release;

- Whether Murphy Oil failed to promulgate, implement, and enforce rules and regulations pertaining to storage which would have prevented or mitigated the release;

- Whether Murphy Oil failed to enforce incident prevention rules and/or policies which would have prevented or mitigated the release;

- The nature and/or constituents of the chemical release;

- Whether the chemical composition of the discharge was hazardous to Plaintiffs' health;

- Whether the chemical composition of the discharge was hazardous to Plaintiffs' environment;

- The geographical area impacted by Murphy Oil's oil release;

- The number of households and businesses impacted by Murphy Oil's oil

release;

- Whether Murphy Oil acted with conscious indifference or reckless disregard.

All of the common questions listed above constitute a "significant part" of each individual case, and form the common predicate for each claimant's proof of individual harm and recovery. Class action management of these issues thus will assure fairness and uniformity. Conversely, individual proceedings as to these issues would invite inconsistent results, not to mention unnecessary repetition and the waste of judicial and litigant resources.

Furthermore, Plaintiffs individually and as a class *Seek* damages for property loss, the diminution of property value, personal injury (including physical harm and mental anguish), loss of use, loss of business, groundwater contamination, and punitive damages (under Arkansas law). Obviously, these compensatory damages will vary in amount from case to case. But it is well-settled that even a wide disparity among class members as to the amount of damages suffered does not preclude class certification. *See, e.g., Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 798 (10th Cir. 1970); *Watson v. Shell Oil Company*, 979 F.2d 1014, n.37 (5th Cir. 1992) (clarifying the Advisory Committee Notes to the Rule and holding that common issues predominated where many people suffered injury resulting from a common disaster and sought recovery on identical theories); *Mejdrech v. Med-Coil Systems Corp.*, 319 F.3d 910, 912 (7th Cir. 2004) (granting class certification as to allegations that defendant's leaking storage tank contaminated the soil and groundwater beneath the plaintiffs' homes); *Mullen v. Treasure Chest Casino, LLC, supra* (certifying a class action of former casino employees alleging injury from the casino's defective ventilation system where the issues to be tried commonly were significant and predominant); *Andry v. Murphy Oil, U.S.A., Inc.*,1997-0793, *8 (La. App. 4 Cir. 4/1/98), 710 So.2d 1126 (certifying a class action with respect

30

to a fire, explosion, and subsequent emissions at an oil refinery).

This case does not feature the type of individuated issues of fact and law presented by long-term exposure cases as in *Amchem Products, Inc. v. Windsor, supra*. Nor is this a complex products liability case involving millions of plaintiffs scattered throughout the country, such as in *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996). As a case which stems from a common disaster, one which impacted only Louisiana plaintiffs within a definable geographic area of St. Bernard Parish, and as a case governed solely by Louisiana law as to compensatory damages,[50] this case presents the very scenario envisioned for handling as a class action under Rule 23.

Finally, to the extent that the court later finds certain individual issues to exist, Your Honor may exercise the authority under Rule 23(c)(4) to bifurcate such issues. Fed. R. Civ. P. 23(c)(4); *see also,* Newberg, § 4.23 (4th ed.). Rule 23 grants this inherent power to the courts so that even cases involving individual damages' issues may benefit from the superior efficiency of a class action procedure to allow common questions of fact and liability to be tried once only, in a common and binding proceeding.

2.    *Superiority*:

The "superiority" factors to be considered under Rule 23(b)(3) also weigh in favor of class certification. First, there is no known or foreseeable "interest" on behalf of a significant number of class members to individually prosecute their claims. Second, all cases filed with respect to this incident have been filed in Louisiana and have been consolidated before this Court, eliminating the need to consider both the extent and nature of the litigation already commenced and the desirability of concentrating Plaintiffs' claims in this forum. Finally, any "management" difficulties that this

---

[50]    Louisiana choice-of-law principles also apply to Plaintiffs' argument for punitive damages under Arkansas law.

31

Court should encounter in the handling of this litigation as a class action will be minimal, and certainly nothing on the order considered by the Fifth Circuit to be present in the *Castano* case. Plaintiffs are all Louisiana residents, the class is easily discernible by geographical boundaries, and common issues of law and fact predominate with respect to this common disaster.

III.    **CONCLUSION**:

It is tempting for Plaintiffs in any dispute over class certification to emphasize the anticipated case for defendant's fault and the recovery of damages, just as a defendant might wish to promote its likely success in the trial of questionable claims. But Rule 23 is concerned with management, not merit. It provides a unique vehicle for the fair and efficient disposition of common issues, regardless of outcome, and – especially in a mass tort context – it safeguards the resources of the judicial system in litigation where thousands of claims arise from a catastrophic event.

This case satisfies the prerequisites of Rule 23(a) and the criteria of Rule 23(b)(3). Plaintiffs accordingly ask the Court to certify the matter as a class action.

Respectfully submitted,

LAW OFFICES OF SIDNEY D. TORRES, III
*A PROFESSIONAL LAW CORPORATION*

BY: _____
SIDNEY D. TORRES, III, Esq.
La. Bar No. 12869
1290 7th Street
Slidell, Louisiana 70458
Telephone: (985) 661-8910
**LIAISON COUNSEL
ON BEHALF OF THE COURT
APPOINTED PLAINTIFFS' STEERING
COMMITTEE:**

Mickey P. Landry,  La. Bar No. 22817
Hugh "Skip" P. Lambert,  La. Bar No. 7933
Scott R. Bickford,  La. Bar No. 1165
Joseph M. Bruno,  La. Bar No. 3604
N. Madro Bandaries,  La. Bar No. 25339
William E. Bradley, La. Bar No. 22266
Ronnie G. Penton, La. Bar No. 10462
Robert Becnel, La. Bar No. 14072
Walter John Leger, Jr.,  La. Bar No. 8278
Donni Elizabeth Young, La. Bar No. 19843
Darleen M. Jacobs, La. Bar No. 7208
E. Carroll Rogers, La. Bar No. 11421
Salvador E. Gutierrez, Jr., La. Bar No.1401
Michael Hingle, La. Bar No. 6943
Walter C. Dumas, La. Bar No. 5163

AND

**COURT APPOINTED PLAINTIFFS'
EXECUTIVE COMMITTEE:**
Richard J. Arsenault, La. Bar No. 02563
Daniel E. Becnel, Jr.,  La. Bar No. 2926
Val P. Exnicios,  La. Bar No. 19563
Michael G. Stag, La. Bar No. 23314
Sidney D. Torres, III, La. Bar No. 12869

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served on all counsel of

record by placing same in the United States Mail, properly addressed and postage prepaid, this

____4____ day of January, 2006.

_____
SIDNEY D. TORRES, III

# SEE RECORD FOR

# EXHIBITS

# OR

# ATTACHMENTS

# NOT SCANNED