December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 21

techniques to the area as defined by the plaintiffs or the area as defined by Murphy?

A.    I haven't employed it to either area yet.

Q.    All you are saying at this stage is is that's an appropriate technique for looking at diminution of land values?

A.    I would say that's the appropriate technique for looking at diminution of land value in this case.

Q.    Based upon the photographic evidence that you reviewed that you didn't rely on and/or your physical inspection of the area, do you agree that there are homes in the affected area with contamination on a scale of one to ten and also homes on a scale of ten to ten contamination and homes with contamination at all levels in between?

A.    I wouldn't be an expert in that regard, wouldn't be able to proffer that opinion.

Q.    Have you formulated an opinion as to whether the homes in the affected area are all contaminated in identical levels?

A.    No.  I wouldn't have any expertise

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 22

in that area.

Q.   Well, is it your contention that the concept of large scale mass appraisal techniques should in this case lead to a set percentage diminution number that would then be applied across the board to every home in the affected area?

A.   May or may not.  That would be endogenously determined by the model itself.

Q.   I don't know what you said.

A.   Endogenously determined by the model itself.

Q.   You are using some big words on me, Doctor.  I don't know what that means. What does endogenously determined mean?

A.   It would be determined as part of the investigatory process.

Q.   What does endogenously determined mean?

A.   In empirical investigation we say that something is endogenously determined if the solution to that question is part of what we are studying within the model itself.

Q.   So if I ask you whether a fixed

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 23

personal diminution number should apply across the board to every home in the affected area as defined, let's say, by the EPA map, your answer presently is that hasn't been determined yet, correct?

A.    Correct.

Q.    And it remains one possibility that you will conclude that the diminution number in terms of the value reduction caused by contamination may vary widely from house to house, correct?

A.    Again, that would be something which would be determined within the model itself.

Q.    Presently you are not able to rule out the possibility that your model would suggest applying disparate numbers for diminution from home to home within the affected area, correct?

A.    That's correct.

Q.    Well, have you been asked as part of your ongoing work in assisting the plaintiffs in this case to conduct the empirical investigation necessary to determine what diminution numbers to apply

December 20, 2005                                                John A. Kilpatrick
                           Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 24

to which houses within the affected area?

A.   No.

Q.   Is that something within your field of expertise, Dr. Kilpatrick?

A.   Yes.

Q.   And you would not rule out doing that in this case if you are asked after this deposition by one of these fine lawyers to assist in that respect?

A.   That's correct.

Q.   You say that real estate is an observational type endeavor and that you went down there to observe the situation in St. Bernard.  But what bearing did your observations have on the opinions that you have issued in this report?

A.   My personal observations supported the contentions that are in the report. They weren't -- I wouldn't say that I relied on my personal observations as much as my personal observations confirmed those things which we know from the appraisal literature.

Q.   Confirmed what things from the appraisal literature specifically?

A.   Well, if you look at, I would say,

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 27

A.   And as such, their common factors from an evaluation perspective would certainly outweigh their idiosyncratic factors.

Q.   Well, when you say that they are in a common boundary, you are looking at an area -- you understand that a number of homeowners have settled and compromised their settlements against Murphy and are not participating in the class action?

A.   I'm aware of that.

Q.   Do you know roughly how many homes there are in the affected area as defined by the plaintiffs?

A.   I have heard a number in the range of 1,800.  I have yet to confirm that through any personal investigation.

Q.   What number of homes in the affected area as defined by Murphy?

A.   Oh, I don't know.

Q.   What number in terms of the affected area as defined by EPA, what numbers of homes?

A.   I don't know.

Q.   So you are reaching conclusions

Page 28

about commonality between and among homes in the affected area but you will allow you don't know what the total number of homes is, correct?

A.    Correct.

Q.    And you don't know out of the total number of homes how many of those homes are removed from the litigation by settlement, correct?

A.    Correct.

Q.    And you don't know out of the total number of homes whether the affected area as defined as the plaintiffs' map, the EPA map or the Murphy map involve homeowners who simply have no interest in participating either in a Murphy settlement or litigation by way of class action?

MR. BECNEL:

Let me enter an objection, Counsel, unless you are more specific about which EPA study.

EXAMINATION BY MR. MC SHANE:

Q.    You can answer the question.

MR. BECNEL:

Counsel, wait.  I'm going to

December 20, 2005                                   John A. Kilpatrick
                          Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 30

objections.

MR. BECNEL:

That's what I just did.

MR. MC SHANE:

No, it's not.

EXAMINATION BY MR. MC SHANE:

Q.    Now, in terms of the area of impact as defined by the plaintiffs, you don't know the extent to which homeowners within that area have opted to refrain from participating either in the Murphy settlement program or in this class action proceeding; agreed?

A.    Agreed.

Q.    And in terms of the area as defined by Murphy, the same question:  You don't know what percentage of homeowners within that area have opted not to participate either in the Murphy settlement or the class action litigation; agreed?

A.    Agreed.

Q.    So when you are doing your observational work in the field, when you walked into nine homes give or take three, when you said six to 12 homes, is that the

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 57

the same individual appraisal over and over and over again.

Q.   Well, you say that, Doctor, but as you sit here today, you don't have any idea how many properties are at issue in this case; isn't that true?

A.   Well, I have an idea.

Q.   What would your idea be?

A.   Well, it's certainly better than a hundred, and I think that tells us that we have something that's clearly statistically robust.

Q.   How many is it?

A.   Is it 500, is it a thousand, is it 1,850?  I don't know precisely the number, but that again is something which is best developed endogenously in a mass appraisal model.

Q.   But in formulating your expert opinions in this case, you cannot say whether the number of homes involved are closer to a total of a hundred or closer to a total of 2,000; isn't that true?

A.   It's both true and irrelevant.

Q.   Well, I'm asking you whether the

December 20, 2005                                      John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 58

fact is true, and then you can explain your

answer if you like.  It's true, isn't it?

A.   I will say it's true, but I will

also say it's irrelevant.

Q.   Well, if you have an affected area

that has a total of 2,000 homes in it, let's

say, and everybody is settled but a hundred

folks, you would need to know where those

homes are before you could reasonably opine

to Judge Fallon in this case that there is

any locational commonality between and among

the remaining hundred homes; isn't that

true?

A.   Actually, that's extraordinarily

false and I will tell you why.  The fact

that some individuals in the area may have

opted out of a legal matter and chosen to

negotiate settlement with Murphy has nothing

to do with the appraisal determination of

the diminution value of their property.  So

let's assume for a moment we had 2,000

houses in the neighborhood, and 1,900 of

them had settled with Murphy leaving 100

which had not settled with Murphy.  Those

1,900 are still impacted by this event and

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 59

would still be part of the study.  We would still look at 2,000 houses which had been impacted in some fashion by this oil spill. And then we would leave it to the courts to make a determination or leave it to the class settlement people after the case had been handled to make a determination as to which property owners were compensated and which property owners were not compensated. But the fact is from a real estate analysis perspective, the decision made by property owners to go ahead and collect a check versus not collect a check has utterly nothing to do with the analytical process or the model by which we would develop that analytical process.

Q.    Do you agree that Hurricane Katrina with its associated storm surge and property damage is a characterizable phenomenon which impacted a statistically large number of individual properties in St. Bernard Parish?

A.    I'm not sure that I understand that question.

Q.    I'm using the phraseology that you

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 60

used in your report.  I will ask you again. Do you agree that Hurricane Katrina with its associated storm surge and property damage is a characterizable phenomenon which impacted a statistically large number of individual properties in St. Bernard Parish?

A.    Seems reasonable.

Q.    And is it a negative externality for those property owners who were impacted by that characterizable phenomenon, i.e. the storm?

A.    It's not part of what we are studying here.

Q.    I'm asking you whether the storm is a negative externality for the homes in St. Bernard Parish that were impacted by the storm surge and flood waters?

A.    It certainly seems not unreasonable, but it's not the point of my study.  In other words, I'm not -- I'm looking at the Murphy Oil spill and the purpose of my affidavit and my testimony here is with respect to the Murphy Oil spill.  Now, I think it's a matter of my understanding the fact that the Murphy Oil

December 20, 2005
John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 61

spill occurred several days after Katrina, but I'm not here to study Katrina, per se, or any widespread impact of Katrina.  I'm trying to narrow the focus of my study on Murphy and, in fact, right now I'm not even studying the damages, per se, regarding Murphy or the damages, per se, regarding anything else that's happened in this area, but very narrowly focusing my testimony on what sort of model would be best to characterize these.

Q.   I'm not asking you about reasonableness, Doctor, I'm asking you whether Hurricane Katrina with its associated storm surge and property damage was a negative externality impacting the homeowners in St. Bernard Parish?  Yes, no, I don't know.

A.   I hadn't thought about it.

Q.   Well, I'm asking you now as a real estate expert who looked at photographs and conducted physical on-site inspections of between six and 12 homes and read all of the expert reports submitted by the physical scientists, by the plaintiffs and Murphy

Page 62

whether the storm was a negative externality that bears on real estate market prices in St. Bernard Parish?

A.    I have to tell you I have not given it any thought.

Q.    All right.  So as you sit here, if I ask you was Katrina and the storm surge and property damage a negative externality for the homeowners who are plaintiffs in the Murphy case impacting their property value, the answer is, I don't know?

A.    The answer is, I haven't given it any thought.

Q.    So you are not expressing an opinion, you don't have any opinion as you sit here today on whether the storm is a negative externality for the homeowners who are plaintiffs in the Murphy cases?

A.    That's correct.

Q.    All right.

A.    I'm being proffered here as a real estate expert and I'm not in a position to provide off-the-cuff opinions, so the fact that I don't have an opinion in anything is a little different from the idea of I don't

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 63

know.

Q.    Let me ask you whether you recognize that there is a diminution of property value in St. Bernard Parish associated with market recognition by homeowners there and potential buyers there, that the flood protection was woefully inadequate for a storm like Katrina?

A.    I haven't proffered any kind of opinion.

Q.    That wasn't my question.

A.    What was your question?

Q.    I was asking you to assume that there is a market recognition that flood protection was woefully inadequate for a storm like Katrina.  Is that a characterizable phenomenon which impacts a statistically large number of individual properties in St. Bernard Parish?

A.    I haven't given it any thought.

Q.    You don't have an opinion on that; is that right?

A.    That's correct.

Q.    You recognize generally from the many cases that you have worked on that

December 20, 2005

John A. Kilpatrick<br>Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 64

there can be such a phenomenon where there is an awakening by a community that flood protection isn't as great as the residents thought it was, and that there can be an associated diminution in property value for that area as a consequence?

A.    I haven't given that any thought. As I sit here today, that's not the focus of my thinking in this matter.

Q.    Is that a notion that's been addressed by any of these articles that you have laid out in the expert report?

A.    I haven't given that any thought.

Q.    I'm asking you whether it's in the literature that you rely on?

A.    And I'm telling you I haven't given that any thought.

Q.    The answer is you don't know?

A.    No, that's not the answer.  The answer is I haven't given it any thought.

Q.    Give it some thought now and tell me whether you know that's an issue that's covered in literature that you cite in your expert report?

A.    Within the scope of this

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 65

deposition today, it's not exactly how real estate experts work. I mean, you are asking me to proffer an opinion that's going to take some extended consideration, and quite frankly, I will bring a team into my office and have a little discussion of that issue. That's how good real estate experts do their work.

So if you are asking me to provide some off-the-cuff opinion or based on literature which I have read, which admittedly I'm very familiar with but have never thought of in the context which you are proffering, I'm not ready to do that nor would I be ready to do that by the end of the day today.

Q. Simple question, Doctor: As you sit here today, you don't know whether the literature cited in your report addresses the market recognition that flood protection was not adequate? It's okay. If you don't know, you can say that. Is that the answer?

A. That's a two-part question. First you said it's a simple question. It may be for you as an attorney but it's not for me

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 66

as a real estate agent, and so the second part of it is I don't know whether this addresses that or not.  It's not something which I have studied.

Q.    Were you aware when you did an on-site inspection in St. Bernard Parish that the properties you were looking at had been impacted by a storm surge and flood waters from Hurricane Katrina?

A.    Yes.

Q.    And is the impact from the storm, that is, property damage from storm surge and flood waters, an issue that bears on your opinion that common factors overwhelm idiosyncratic variations in terms of analyzing diminution of property value from the oil spill?

A.    I haven't given that any thought.

Q.    You have not used the word "Katrina" anywhere in your report, right?

A.    I don't know if I did or didn't. I don't think I did.

Q.    And you have viewed as wholly irrelevant to the opinions you have given so far the fact that the homes which are within

Page 67

the affected area were almost without

exception flooded by Hurricane Katrina?

A.   I think I would use the words "not

relevant" as opposed to irrelevant.

Q.   You have taken the view that the

fact that all of the homes that you looked

at were impacted by the flood waters of

Hurricane Katrina is not relevant to your

assessment here that mass appraisal is

appropriate, correct?

A.   Well, that's correct.  As I

proffered earlier here today, my inspection

of the homes in the neighborhood was not

something on which I specifically relied,

but instead it supported the opinions which

I developed from the reliance material which

I have cited here.

Q.   Now, what is going to need to be

done in order for you to determine if you

are asked to whether the amount of

contamination on a house-by-house basis is

on the one hand a common factor or on the

other hand an idiosyncratic factor?

A.   I haven't developed a work plan

for that yet.

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 73

have importance for the valuation equation and which of them have no importance for the valuation equation.

Q.    Well, are you saying that it's statistically insignificant in terms of measuring diminution of property value whether a home in the affected area had its windows and doors broken in?

A.    I'm saying that this method that I'm proffering or these methods, plural, which I'm proffering are the best set of methods to determine whether that's true or not.

Q.    You are not saying yet whether you know whether having the doors open and windows open are matters which are statistically insignificant?

A.    We have not yet made that determination.

Q.    You don't know, right?

A.    That's correct.

Q.    And you don't know right now whether the fact that some of the homes had their roofs blown off and others did not is statistically significant?

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 74

A.    That's correct.

Q.    And you don't know right now whether within the affected area, the geographical proximity to the leaky tank is statistically significant?

A.    That's correct.

Q.    And you don't know any breakdown right now in terms of percentages of homes which could fairly be described as severely contaminated versus those fairly described as mildly contaminated is statistically significant?

A.    What we do know --

Q.    Correct?

A.    That's correct.  What we do know is the model that we are proffering here, or may I better say, the models which we are proffering here, are the best way of getting at that truth.

Q.    Do you know what percentage of the homes in the affected area are owned by folks who intend to tear them down and rebuild?

A.    No.  Don't know.

Q.    Do you know -- would you view in

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 75

terms of the work that you have done here

the issue of whether a homeowner would have

torn down their home and rebuilt as a

consequence of flood damage?  Excuse me,

just pretermitting the oil spill.  The

percentage of homeowners that would have

looked at that flood damage and torn down,

it is a number which is statistically

insignificant for the purposes of the

opinion of what you have espoused?

A.    I haven't studied that yet.

Q.    Well, I'm asking you in terms of

the opinions that you set forth in your

December 2nd affidavit the extent to which

homeowners intend to tear down their homes

is statistically insignificant?

A.    I don't know.  I don't know

whether it is or isn't.

Q.    And in terms of whether

homeowners, leaving aside the oil spill, the

percentage of homeowners that would have

torn down their homes given the inundation

is a number which is not factored into the

opinions that you are giving?

A.    That's correct.  It's not -- it's

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 84

Q.    Right, and no literature?

A.    Not aware of it.

Q.    Right.  Well, what you are doing here is you have actual knowledge of a catastrophic event in south Louisiana that is Hurricane Katrina which preceded a crude oil spill by a number of days, and you are segregating out the diminution of value associated with the crude oil from this storm which has been described as the worse natural disaster in North America; isn't that true?

A.    No.  I haven't segregated anything, because that goes to the heart of what we would do in the damages phase of this case if, in fact, directed to do so by our clients.  We have not been directed to do so by our clients, so we don't have any opinion on that one way or the other right now.

Q.    Well, if you are saying here that you can reach the conclusion that the common factors associated with the oil spill and contamination outweigh the idiosyncratic factors, what you are doing, you will allow

Page 89

Q.    Now, has anybody put their home up for sale down in St. Bernard Parish after the storm?

A.    I don't know.

Q.    Have there been any sales?

A.    Don't know yet.

Q.    Have you looked to see, have you investigated whether there are homes on the market and whether homes are being sold?

A.    Not yet.

MR. DANIEL BECNEL, JR.:

Counsel.  He asked questions and wanted to know that very answer.  And I told him because of the Clerk of Court's problem trying to get records from down there, because they are not fully functional yet, I can't get it.  But that Sidney had been asked to try to submit it, if he finds anything relative to that to let us know. He made the inquiry but we couldn't answer the question.

EXAMINATION BY MR. McSHANE:

Q.    You were talking earlier about the generally recognized notion among laymen that the principle of location, location,

December 20, 2005

John A. Kilpatrick
Patrick Joseph Turner, et al v. Murphy Oil USA, Inc.

Page 111

provide any indication of how that's likely to occur; is that correct?

A.    That's correct.

Q.    The storm that we are dealing with here, Hurricane Katrina, you understand that that is one of the worse natural disasters in the history of North America?

A.    Not meaning to show lack of sympathy for the area with respect to Katrina, but the focus of my study has been on the Murphy Oil spill.

Q.    I'm not asking you that.  I know.

A.    I thought I was being deposed about the Murphy oil spill.

Q.    I'm asking you about the fact that these homes had round about 12 to 15 feet of inundation in the days before the spill. I'm asking you whether you understand that that inundation stems from one of the worse natural disasters in the history of North America?

A.    I understand that one of the worse natural disasters in the history of North America was Hurricane Katrina and it affected this part of the country.