FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 JAN 25  P 4: 26

LORETTA G. WHYTE
CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PATRICK JOSEPH TURNER, ET. AL. | * | CIVIL ACTION NO. 05-4206 |
| **Plaintiffs** | * | CONSOLIDATED CASE |
| | * | (ALL CASES) |
| VERSUS | * | SECTION "L" |
| | * | |
| MURPHY OIL USA, INC. | * | MAGISTRATE "2" |
| **Defendant** | * | |
| | * | FILED: _____ |

### THIS DOCUMENT RELATES TO ALL CASES

---

### MURPHY OIL USA, INC.'S OPPOSITION TO
### PLAINTIFFS' PROPOSED JUDGMENT AND TRIAL PLAN

---

This is Murphy Oil USA, Inc.'s ("Murphy") opposition to the proposed Judgment and Trial Plan submitted by the plaintiffs on January 19, 2006. The plaintiffs' proposed Judgment and Trial Plan should be rejected for the reasons set forth below:

**A.      The proposed Judgment is legally deficient under Fifth Circuit precedent.**

As an initial matter, the proposed Judgment is legally deficient under Fifth Circuit law, which requires that any judgment certifying a class be supported by evidence and reasons. *Vezina v. Union Pacific RR. Co.*, 360 F.3d 496 (5th Cir. 2004). In *Vezina*, the Fifth Circuit reversed a district court's judgment certifying a class where the judgment was not supported by reasons or evidence showing that the FRCP 23 requirements were met.

___ Fee_____
___ Process_____
_X_ Dktd_____
_/_ CtRmDep_____
___ Doc. No._____

**B.     The proposed Judgment is not supported by the evidence.**

The primary reason the plaintiffs' proposed Judgment is legally deficient is that the proposed Judgment certifying a class simply does not comport with the plaintiffs' obligation to meet their evidentiary burden of proof. As set forth by Murphy in previous filings and at the Class Certification Hearing, it is the plaintiffs' burden to prove that there is an objectively ascertainable class and, in a pollution case like this, that burden obligates the plaintiffs to prove from a scientific standpoint a perimeter of the affected area.  Plaintiffs have offered no competent proof that their proposed class boundaries properly outline the affected area.  On all fronts, including physical evidence, chemistry/fingerprinting, hydrology, toxicology, air modeling and environmental science, plaintiffs' proposed boundary lacks factual or scientific underpinning.  For this reason, Murphy submits that the class certification inquiry need go no further because plaintiffs failed to establish the threshold point that a class can be objectively ascertained.

**1.     Physical Evidence.**

In their motion and at the Class Certification Trial, plaintiffs produced no eyewitness accounts or other physical evidence (pictures or videos) of oil reaching vast areas of plaintiffs' proposed class perimeter.  Plaintiffs offered no evidence of oil west of Paris Road, east of the Refinery or anywhere near St. Bernard Highway.  Thus, the eyewitness accounts of Carl Zornes, Ben Badon and Glenn Millner about where they observed the presence of oil in the days immediately following Katrina are irrefuted.

Mr. Zornes, the gentleman who discovered the leak on September 3, testified that since his return to the affected area on August 31, 2005, he has walked, driven and ridden in boats over basically the entire affected area proposed by plaintiffs.  According to Mr. Zornes, at no point

2

did he observe oil west of Paris Road, east of the Refinery and in the vast areas between Judge Perez and St. Bernard Highway to the south that are in plaintiffs' proposed area. Additionally, Mr. Zornes testified that his residence was not impacted by oil and he lives east of Paris Road and four blocks outside of the perimeter of the Murphy settlement area.

Mr. Badon, who headed up the oil recovery operation, testified that he arrived at the affected area on September 5, 2005. On this date, Mr. Badon videoed various areas from the air and the ground. Mr. Badon's video showed no oil at all along St. Bernard Highway and no oil on Paris Road. The video shows that the first sign of oil (i.e., the farthest westward sighting of oil) occurred at the intersection of DeLambert and Judge Perez Drive; this finding is entirely consistent with maps of the Murphy settlement area and the affected area outlined by the EPA. The daily incident action maps presented during Mr. Badon's testimony showing the presence of oil in streets and canals are also consistent with the Murphy and EPA maps. Mr. Badon was working under the direction of the U.S. Coast Guard and EPA and these two agencies had teams of investigators scouring the area for oil. When oil was found, these locations were reported to these agencies and to Mr. Badon for clean-up. As Mr. Badon testified and as demonstrated by the EPA map of the affected area, the EPA and the Coast Guard never found oil west of Paris Road, east of the Refinery or in vast areas to the south between Judge Perez and St. Bernard Highways, which are within the area proposed by the plaintiffs for class certification. Dr. Millner arrived on the scene on September 9, 2005 and his observations concerning what areas were affected by oil and what were not are consistent with the eyewitness accounts of Messrs. Zornes and Badon.

### 2.    Only a limited quantity of oil was released beyond the containment dike at Murphy.

Mr. Keith Baugher (an expert process engineer) testified that because of hydrostatic pressures caused by the inundation of flood waters, no oil escaped from the 250-2 tank until, at the earliest, the morning of Friday, September 2, 2005. This was at a time when the water had receded below the level of the top of the containment dikes surrounding the 250-2 tank. As the eye witnesses confirmed, the only pathway through which the oil escaped was the breach in the containment dike at the point the pipelines extended through the dike as was shown in various photographs at the Class Certification Hearing. Plaintiffs offered no evidence to refute these well established facts.

Knowing when oil began to leak (the morning of September 2, 2005) and knowing when the breach in the dike was plugged (the afternoon of September 3, 2005), Mr. Baugher performed two calculations to ascertain the amount of oil that escaped the containment dike. These two calculations produced a range of 1600-3100 barrels of crude oil that escaped from within the dikes surrounding the tank farm at issue. There was no other competent evidence as to the quantity of oil that escaped the containment. The remainder of the crude oil from the 250-2 tank was captured within the tank farm containment dikes and was recovered. Again, plaintiffs offered no evidence to refute these facts.

### 3.    Chemistry/Fingerprinting.

Plaintiffs' expert civil engineer, Marco Kaltofen, testified in support of a proposed class certification boundary of roughly 6.6 square miles and 14,000 houses based on his sampling and chemical analysis of approximately 50 samples taken from 18 unique locations in and around the Meraux refinery and surrounding neighborhood. Many of these samples were taken by a person unknown to Mr. Kaltofen. In drawing this boundary, Kaltofen analyzed samples from less than

4

.2% of the houses within plaintiffs' proposed class boundary. Such a sampling rate is much too small to draw factual conclusions as a matter of statistics, science, law or just plain common sense. The plaintiffs' reliance on Mr. Kaltofen's conclusions must be rejected on that basis alone.

Defendant's expert, Dr. Glenn Millner offered the court a thorough presentation of CTEH's sampling and chemical analysis efforts, performed in conjunction with the EPA, which contrasts sharply from the work done by Mr. Kaltofen. Dr. Millner testified that it is scientifically unjustified to determine that any one individual property or any grouping of individual properties exceeded the appropriate cleanup levels for crude oil based on a random and extremely limited analysis (18 properties out 14,000) of the properties in that area. Dr. Millner stressed that the appropriate cleanup standards were a necessary and appropriate guideline in determining if the quantity of crude oil present was consequential, *viz.*, one drop of oil would not be of any significant consequence.

Unlike the sampling conducted by Mr. Kaltofen, all of the sampling conducted by CTEH was done in conjunction with the EPA. CTEH conducted "biased" and "composite" sampling, which meant taking three different samples at each location both inside and outside the property from places where oil appeared to be present. Each CTEH sampling team was accompanied by an EPA representative and each 10th sample taken by CTEH was split with the EPA for their own testing and analysis. While Kaltofen studied 18 samples taken over a few days for a sampling rate of less than .2%, CTEH spent more than four months taking more than 200,000 samples. The statistical comparison between these investigative results cannot be ignored by the Court in assessing their validity.

The most compelling evidence with respect to boundaries surrounding the area affected by the oil spill is the fact that the areas outlined independently by CTEH and EPA are strikingly similar. The EPA affected area consists of approximately 2800 homes in a 1.11 square mile area. The CTEH affected area (created for the Murphy settlement Program) covers approximately the same number of homes in a .98 square mile area. The areas are only slightly different in shape as can be quickly noted from the exhibits on which the boundary of one is overlapped on the other. This demonstrates that with sound science comes consistent results. The extreme deviation (a factor of 6) between plaintiffs' proposed area and the areas defined by the EPA and CTEH is the best demonstration of how bad science is all that supports plaintiffs' proposed area.

Further evidence of that fact came from defendant's fingerprinting expert, Dr. Scott Stout, a specialist in the field of organic geo-chemistry, whose testimony overwhelmingly refuted Mr. Kaltofen's analysis of chromatograms from the few samples that purportedly supported plaintiffs' class boundaries. Dr. Stout conducted a fingerprint analysis of more than 6500 wipe and soil/sediment samples collected by CTEH and offered detailed testimony as to why chromatograms identified as a positive match by Mr. Kaltofen simply could not be Murphy crude oil based on the chemical compound patterns produced. Dr. Stout showed the Court a number of chromatograms which Kaltofen had identified as Murphy crude. By competent fingerprinting, he determined that these were either lubricating oil, diesel oil, or natural organic matter (peaty material brought in from the marsh with the storm surge) and were not crude oil.

4.    **Hydrology**.

Plaintiffs' expert hydrologist, Dr. Bedient, testified that the line drawn by Kaltofen "may be" the right line, but did not confirm or support it. Dr. Bedient offered no scientific evidence or

6

analysis because he had not yet performed any analysis. Perhaps most critically, Dr. Bedient, who was well aware that the area at issue is below sea level, offered only conjecture as to how the storm water may have drained from the area adjacent to the Murphy refinery, candidly admitting that during the days following Katrina he did not know what pumps or pumping stations were operating. Plaintiffs' hydrology expert provided no scientific evidence as to how, why or to what locations the oil on the water had traveled.

In contrast, Murphy's hydrology expert, Dr. Kuhlmeier, had information about significant factors relevant to the hydraulic gradient. He had researched the location of the pumps removing water over the levee along the 40 Arpent Canal back into the marsh, studied the logs from the pumping stations and had interviewed people from the pumping station to gain an understanding of how and where the oil on the water had traveled. He explained that as crude oil escaped the Murphy containment dikes on the morning of Friday, September 2, the oil moved south and west along Judge Perez Drive. Water with oil on top flowed in this direction because of a breach in the 40 Arpent levee to the west. When the No. 7 Pumping Station to the east was turned on Saturday morning, September 3 at 8 a.m., combined with a breach in the 40 Arpent levee near Pumping Station No. 7, an outlet for the storm waters was provided. This breach and the No. 7 pumping station, being closer to the oil-affected areas, controlled the pathway of the oil so it left Judge Perez Drive moving north and then east toward the No. 7 pumping station. This was plainly evident from the satellite photography shown during the testimony of Dr. Kuhlmeier. Dr. Kuhlmeier further noted that this chronology was consistent with the location of impacted homes as outlined in the EPA and CTEH maps.

Dr. Kuhlmeier emphatically supported the opinion of Keith Baugher that the hydrostatic pressures would not have allowed for the release of oil from Tank 250-2 until after the floodwater

in the community was lowered to a height below the containment dikes around the leaking tank. Although plaintiffs offered no evidence to show that the tank leaked while floodwaters were above the containment dikes, their cross-examination questioning whether he alone endorsed these opinions prompted Dr. Kuhlmeier to testify that he was joined by Messrs. Newton and Bernoulli.

     5.    **Toxicology**.

The plaintiffs called by affidavit Dr. Vincent Wilson, a toxicologist from LSU. Dr. Wilson's affidavit in sum says that cross–contamination "can occur" in a contaminated area. Dr. Wilson provided no expert opinion, though, about suitable parameters for such an affected area in this case.  He had not performed or reviewed any testing to aid in defining an appropriate perimeter.

     6.    **Air Modeling/Health Physics**.

Plaintiffs' expert, Dr. Erno Sajo, attested that particles can re-suspend in air from vehicular traffic or clean-up activities. Because Dr. Sajo provided no expert opinions specific to the St. Bernard area, this Court struck a portion of his opinions, and the remainder of his expert attestations provide no insight into whether an affected area could be objectively ascertained.  His opinions are not helpful because they broadly define movement of dust in a way that applies to the entire area affected by the storm, not to the discrete areas or parties affected by the spill.

     7.    **Environmental Science**.

Plaintiffs presented evidence from an environmental science expert from LSU, Dr. Paul Templet. This expert had done no science, and therefore had no opinions regarding the perimeter of the affected area.

8.    **Real Estate/Property Diminution**

The individualized nature of the claims asserted by the plaintiffs is further illustrated by what was not discussed during the certification hearing i.e., diminution of property values. Clearly, one of the plaintiffs' claims includes a percentage of appraised value for each home within their proposed affected areas.  While it is not clear whether the plaintiffs' claims relate to "pre" or "post" Katrina values, in either case, the individualized nature of each claim makes it abundantly clear that it is not suited for class treatment.  The values of such residences will have to be individually appraised and the hurricane damage to each structure and its contents will have to be assessed to determine actual value before the oil arrived.  This falls into the same category as personal injury claims that must likewise be individually "appraised" in order to arrive at a just result.

C.    **Plaintiffs offered no resolution plan "superior" to the Murphy Settlement Program.**

The results of the Murphy settlement program as of January 9, 2005 speak for themselves.

- ‹ **5388 individuals**
- ‹ **1839 homes**
- ‹ **$50 million paid directly to residents**
- ‹ **$13 million public property clean-up**
- ‹ **$4 million private property clean-up**
- ‹ **800 homes cleaned**
- **37 rejections**

Plaintiffs have offered no alternative that would be superior to resolve the situation. Consequently, plaintiffs' proposed Judgment is inconsistent with the "superiority" requirement of FRCP 23(b)(3).

**D.      The proposed Judgment and Trial Plan ignore plaintiffs' claims for personal injuries, mental distress and business losses.**

The Judgment and Trial Plan submitted by the plaintiffs are silent on the personal injury, mental distress and business loss claims alleged by plaintiffs.  As this Court is well aware, personal injury, mental distress and business loss claims involve individualized scrutiny and are not suitable for class treatment under the prevailing law.  Nonetheless, plaintiffs have persisted on making these allegations.

Thus, Murphy (and the Court) is in the dark regarding plaintiffs' intentions as to how they will prosecute personal injury, mental distress and business loss claims on a class-wide basis. If plaintiffs' silence about these claims in the Judgment and Trial Plan is an indication that they do not intend to pursue them on a class-wide basis, then the claims must be dismissed.  Additionally, Murphy submits that the determination on punitive damages under Arkansas law should be made at the summary judgment juncture as the Court suggested in its ruling on Murphy's FRCP 12(b)(6) motions, as that appears to be an issue of law for the Court.

As a final matter, Murphy submits that it is premature to consider a trial plan when there has been no ruling on class certification.  For these reasons, the Judgment and Trial Plan submitted by plaintiffs should be rejected.

Respectfully submitted,

LIAISON COUNSEL

KERRY J. MILLER (#24562)
**FRILOT, PARTRIDGE, KOHNKE
  & CLEMENTS, L.C.**
1100 Poydras Street Suite 3600
New Orleans, LA 70163
Telephone: (504)599-8000

GEORGE A. FRILOT, III (#57478)
ALLEN. J. KROUSE, III (#14426)
PATRICK J. McSHANE (#19055)
FRILOT, PARTRIDGE, KOHNKE
  & CLEMENTS
1100 Poydras Street, Suite 3600
New Orleans, LA 70163
Telephone:  (504) 599-8000
Fax:  (504) 599-8100

And

DANIEL L. DYSART (#5156)
DYSART & TABARY
3510 No. Causeway Blvd., Suite 600
Metairie, LA 70002
Telephone:  (504)271-8011


**Attorneys for Defendant Murphy Oil USA, Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading has been served upon plaintiffs'

liaison counsel via e-mail and/or United States Mail, properly addressed and postage pre-paid on

this _25_ day of January, 2006.