IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

PATRICK JOSEPH TURNER, ET. AL.  *     CIVIL ACTION NO. 05-4206
      Plaintiffs  *      CONSOLIDATED CASES
          *
VERSUS       *     SECTION "L"
          *
MURPHY OIL USA, INC.   *     MAGISTRATE "2"
      Defendant *

**JOINT MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF THE
CLASS ACTION SETTLEMENT AND OPPOSITION TO OBJECTIONS**

**MAY IT PLEASE THE COURT:**

  Murphy Oil USA, Inc. ("Murphy") and the Settlement Class through the Class

Representatives and the  Plaintiffs' Steering Committee ("PSC") submit this Joint

Memorandum in Support of Final Approval of Class Action Settlement and Opposition to

Objections.

  On October 9, 2006, Murphy and the PSC entered into a class action settlement

agreement ("Settlement") over claims involving the Murphy oil spill that occurred in

Meraux, LA shortly after Hurricane Katrina.  On October 10, 2006, the Court granted

preliminary approval of the Settlement.[1]  A fairness hearing is set for January 4, 2007.

---

[1]  The Court has previously certified a litigation class in this case on January 30, 2006.  A certification hearing preceded the Court's ruling, occurring on January 12-13, 2006.  Substantial evidence regarding the Rule 23 requirements was admitted into the court record during the certification hearing.  The parties hereby request that the Court adopt and incorporate the record from the January 12-13, 2006 certification hearing in its consideration of the Joint Motion in Support of Final Approval of the Class Action Settlement.

In connection with the fairness hearing, and for the reasons set forth herein, the Class Action Settlement between Murphy and the Class should receive final approval, and the filed objections to the Settlement should be rejected.

## I.    The Law Favors Settlement

Class action litigation allows for innovative settlement procedures and an infinite number of claims and distribution plans.  The general rule is that settlement plans must be fair and reasonable overall and court approval is essential.  Where a court finds a settlement meets those guidelines, a settlement in a class action may be approved despite the opposition of a minority of the class members.[2]

It has been long held that "[c]ompromises of disputed claims are favored by the courts."[3]  This is especially true of class actions.[4]  This settlement was reached after arms-length negotiations.[5]  The negotiations were conducted by the parties' lawyers in a number of face-to-face meetings, a formal mediation proceeeding and telephone conversations.[6]  The fact that the settlement was reached after arms-length negotiations by experienced counsel creates a presumption that the settlement is fair, reasonable and adequate.[7]

---

[2] *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987).

[3] *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910).

[4] See *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned") and *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("Particularly in class action suits, there is an overriding public interest in favor of settlements.").

[5] See Affidavit of Perry, attached hereto as Exhibit E.

[6] *Id*.  Mr. Perry conducted a formal mediation and had numerous conversations over the course of the litigation with representatives of the plaintiff class and Murphy.

[7] See, e.g., *Duhaime v. John Hancock Mutual Life Ins. Co.*, 177 F.R.D. 54, 68 (D.Mass. 1997) ("In general, a settlement arrived at after genuine arms length bargaining may be presumed to be fair."); 2 Herbert Newberg & Alba Conte, *Newberg on Class Actions* § 11.41 (3d ed. 1998) ("There is usually an initial presumption of fairness when a proposed settlement, which was negotiated at arm-length by counsel for the class, is presented for court approval"). See also, *Manual for Complex Litigation*, 3d § 30.42 (1995).

Courts cannot modify a proposed class action settlement.  The only option available to a trial court when presented with a pre-trial class action settlement is to either approve the proposed settlement or reject the proposal.[8]  In determining whether a proposed class action settlement is fair, reasonable and adequate, federal courts in Louisiana, analyzing Rule 23(e), have evaluated the following factors:

   i.    The existence of fraud or collusion behind the settlement;

   ii.   The complexity, expense, and likely duration of the litigation;

   iii.  The stage of the proceedings and the amount of discovery completed;

   iv.  The probability of plaintiffs' success on the merits;

   v.   The range of possible recovery; and

   vi.  The opinions of the class counsel, class representatives, and absent class members.  (the "Reed factors").[9]

The Court should take into account the compromise process, in which both sides made substantial concessions in order to reach a fair settlement that provides the maximum benefits to both sides in light of the risks in pursuing the litigation.  In doing so, the Court can consider a "range of reasonableness" for the settlement and should "guard against demanding too large a settlement based on its view of the merits of the litigation."[10]  Thus, the Court "should be slow to substitute its own judgment for that of experienced counsel who … have arrived at a settlement after extensive litigation and a

---

[8] *State v. Sprint Communications Co.*, 2003-1264 (La.App. 1st Cir. 2004), 897 S.2d 85, 92, citing, *Evans v. Jeff D.*, 475 U.S. 717, 726-727, 106 S.Ct. 1531, 1537, 89 L.Ed. 2d 7474 (1986).

[9] See *In re Combustion, Inc.*, 968 F.Supp. 1116, 1124 (W.D.La. 1997) (citing *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983); *Feinberg v. Hibernia Corp.*, 966 F.Supp. 442, 444 (E.D. La. 1997); *In re Shell Oil Refinery*, 155 F.R.D. 552, 559 (E.D.La. 1993).

[10] See *General Motors*, 55 F.3d at 806 ("[A]fter all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.")

careful assessment of the risks and potential rewards involved in a full trial and appeal."[11]

In making a final determination of the settlement's fairness and adequacy, the Court's function is to be guided as follows:

> [T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned. Therefore, the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor the [appellate] Court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators. *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 614, 625 (9th Cir. 1982).

Thus, the Court's focus should be on the terms of the settlement, not what might have been. As the court in *In re Shell Oil Refinery*, 155 F.R.D. at 559, declared, in language equally applicable here, "[t]here is no dispute that this case is one of the most procedurally complex, expensive, and potentially lengthy cases in this district." In granting final approval of a class action settlement arising from an oil refinery explosion, that Court noted that settlement would be preferable given that i) the estimated trial time of between six months to twenty years would cause enormous "expense for the parties, the claimants, and the judicial system"; ii) "counsel would have relentlessly pursued this battle to the end"; iii) the costs and fees incurred in defending the litigation "would no doubt consume the amount offered in settlement"; iv) unfavorable rulings would probably

---

[11] *Walsh v. Great Atl & Pac. Tea Co.*, 96 F.R.D. 632, 642-43 (D.N.J.), aff'd, 726 F.2d 956 (3d Cir. 1983).

lead to appellate review; and v) the "motion practice has been the most massive and persistent the Court has ever encountered." *Shell*, 155 F.R.D. at 559-60.

Many of these factors are present here and militate in favor of granting final approval of the class settlement. Given the legal and factual complexity of the issues, the sheer number of claimants, and the scale of this litigation, continuing to conduct discovery and a trial (or many trials) on the merits would be incredibly complicated, tremendously expensive and extraordinarily lengthy—factors certainly not lost on the Court. If this case were to go to trial, a final disposition may not be reached for ten years or more. The initial trial alone would involve the testimony of countless experts in a variety of technical fields. Moreover, valuable judicial resources would be consumed in the process.

This settlement, by comparison, will provide class members with a reasonable sum certain, without the outrageous expense and substantial delay of further litigation. As the court in *In re Shell Oil Refinery* aptly noted:

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush." *Shell*, 155 F.R.D. at 560, citing and quoting, *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 614 (D.Colo. 1974) (citations omitted).

But for the proposed settlement, the Court would have to decide numerous issues, which would be strenuously litigated by the settling parties every step of the way.

Even if plaintiffs prevailed on some of these issues, the parties could anticipate "lengthy appeals and [related] expenses."[12]

"As a backstop, the law requires that the trial court evaluate whether the settlement is fair, adequate and reasonable and is not the product of fraud or collusion."[13] "Against these concerns must be weighed the general policy of the law to favor settlements and to uphold them whenever possible because they produced an amicable resolution of disputes and minimize demands on judicial time and resources." *Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1980).[14]

## II.    The Class Settlement Notice Complied with this Court's Orders and Applicable Legal Standards

On October 10, 2006, this Court issued an Order Granting Preliminary Approval of Class Settlement.  In that Order, the Court approved and required the dissemination of the Legal Notice of Class-Wide Settlement, the Decision to Rejoin Class form, and the Legal Notice of Opportunity to Rejoin Plaintiff Class.  Every effort was made to provide notice to Class Members wherever they may now reside—within the Class geographic area and beyond.

**Notice by Direct Mail**

Due to the unprecedented displacement of many of those in the Class, an exhaustive search for updated mailing addresses was conducted, resulting in the best

---

[12] *Batchelder*, 246 F.Supp.2d at 528.
[13] Citing *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1169 (5th Cir. 1978); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428-29 (5th Cir. 1977); and *Young v. Katz*, 447 F.2d 431, 433 (5th Cir. 1971).
[14] Citing *Pettway*, supra, at 1214 and *Miller*, supra, at 428.

possible address database.[15]  Based on those efforts, multiple mailings were sent to all known class members' addresses.[16]

First, a mailing referred to as the Decision to Rejoin Package ("DRP") was conducted to allow those that previously opted out of the Class, and remained opted out at the time of settlement, to rejoin the class.[17]  Over 1300 DRPs were mailed immediately after preliminary approval of the settlement to 307 Class area addresses and 280 Class area properties.[18]  An additional 777 DRPs were mailed to 41 different law firms which represent clients for approximately 300 other properties who had previously opted out and had remained opted out at the time of the settlement.[19]  After the completion of all of these DRP mailings and subsequent remailings to updated addresses, only 2 Class area addresses representing 2 Class area properties were not successfully mailed, representing a mere 0.6% of the Class area addresses or .07% of the Class area properties unpresented by lawyers.[20]

Second, the Settlement Notice Package ("SNP"), which included a summary of the Notice of Settlement, a cover page summary of the detailed Notice, the actual Notice, a Class Area map, the Proof of Claim form, and a carefully designed outside envelope, was sent immediately after the preliminary settlement approval.[21]  Approximately 6600 SNPs were mailed to 3658 Class area addresses and 3321 Class area properties who remained unsettled from Murphy's voluntary settlement program.[22]

---

[15] Affidavit of Hilsee, attached hereto as Exhibit A.
[16] Id.
[17] Id.
[18] Id.
[19] Id.
[20] Id.
[21] Id.
[22] Id.

After the packages were sent, it was determined that approximately 80% of all addresses within the Class Area were individually reached and notified.[23]

Third, a Supplemental Mailing Package ("SMP"), including information regarding the Allocation Plan, fee requests, and the Closure Plan, was mailed.[24]  Approximately 5100 SMPs were mailed to 2635 Class area addresses and 2447 Class area properties who had not thus far sent in proof of claim forms.  After the completion of these SMP mailings and remailings, only 187 Class area addresses representing 170 Class area properties were not successfully mailed, representing only 7% of the Class area addresses or 6.9% of the Class area properties, who had not filed proof of claim forms at the time of the SMP mailing.[25]

The ability to reach people through mailings clearly benefited from the extraordinary search and address update steps that the parties undertook at various stages of this litigation and settlement.[26]  The parties' efforts resulted in more than 80% of the originally certified Class area being individually informed of the settlement and Murphy's voluntary settlement program by mailings, a figure that in many circumstances would not require any other methods of notice.[27]

**Notice by Newspaper Publication**

In order to further effectuate Rule 23 and due process, the notice achieved by mail was supplemented by extending efforts to remaining unknown Class members via publication in the following newspapers on the stated dates:

---

[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*

a.  New Orleans Times Picayune (October 29 and November 2, 2006);

b.  Baton Rouge Morning Advocate (October 29 and November 2, 2006);

c.  St. Bernard News (November 8 and November 15, 2006);

d.  St. Bernard Voice;

e.  USA Today (November 8, 2006);

f.  Hammond Daily Star (November 9 and 10, 2006);

g.  Lafayette Daily Advertiser (November 9 and 10, 2006);

h.  Biloxi-Gulfport Sun Herald (November 9 and 10, 2006);

i.  Hattiesburg American (November 9 and 10, 2006);

j.  Jackson Clarion Ledger (November 9 and 10, 2006); and

k.  Pascagoula Mississippi Press (November 9 and 10, 2006).

These publications were selected as it was determined that approximately 85-90% of the residents of St. Bernard have returned to St. Bernard or relocated in southern Louisiana and Mississippi.[28]  The remaining 10-15% of residents are likely dispersed throughout several states.[29]

Overall, the above newspapers had a daily circulation within the State of Louisiana of 464,873 and provided more than 2 million notice exposures among Louisiana adults.[30]  When the non-Louisiana newspapers are included, total daily circulation climbs to 2.8 million, providing U.S. adults with over 8 million opportunities to

---

[28] *Id.*
[29] *Id.*
[30] *Id.*

view the notice.  It has been estimated that these publication efforts provided an estimated 60-80% of the Class members with notice.[31]

In this instance it is mathmatically impossible, given the disparity of available data and the uncertainty of the precise geographical location of the unknown Class members, to combine the 70-80% reach of the mailings with the incremental reach provided by the 60-80% local reach achieved through the local publication placements.[32]  Certainly, the incremental reach provided by the hundreds of thousands of readers of the other additional media outside the immediate local area, but within the areas where displaced St. Bernard Parish residents most likely moved to, and the reach of the press announcements and news stories, all added immeasurably to the overall reach of the Notice program.[33]

**Notice by Internet**

As an additional supplemental safeguard, notice was provided on the internet at three official sites.  Since Class Certification, the United States District Court for the Eastern District of Louisiana's site, www.laed.uscourts.gov, has posted all notices and court filings.  At www.murphyoilcorp.com, Murphy's website, the following documents are posted for public access:

- Class Action Settlement Supplemental Notice;
- Class Action Settlement Allocation Plan;
- Class Action Summary Notice;
- Class Action Settlement Agreement;

---

[31] *Id.*
[32] *Id.*
[33] *Id.*

- Class Action Settlement Proof of Claim Form;

- Class Action Settlement Area Map;

- Notice of Opportunity to Rejoin Plaintiff Class; and

- A link to the Eastern District of Louisiana's site.

Lastly, the St. Bernard Parish website, www.sbpg.net, has continuously provided the public with the latest information associated with the Murphy oil spill, lawsuit, and settlement proceedings.

**Media Coverage**

The enormous outreach by the parties and the overall national significance of the Murphy oil spill and its aftermath has resulted in press coverage in numerous publications, including eight articles in the *New Orleans Times Picayune,* three in the *New Orleans CityBusiness,* two in the *Arkansas Democrat-Gazette,* as well as an article in *The Wall Street Journal, Atlanta Journal Constitution*, *Massachusetts Telegram & Gazette*, and *National Petroleum News,* all appearing since September 28, 2006.[34] In total, based on newspaper circulation reports from the Audit Bureau of Circulation ("ABC") and newspaper readership data from Mediamark Research Inc. ("MRI"), adults were exposed to information about the class action settlement more than 9.9 million times from these article appearances alone.[35]

Notably, the press coverage has included local broadcast media. For example, after the Allocation Plan was filed and notices were issued, a report broadcast on the noon and nightly news shows of the local WWL-TV station.[36] It is estimated that this

---

[34] *Id.*
[35] *Id.*
[36] *Id.*

broadcast alone reached about 120,000 local New Orleans area households and 150,000 adults.[37] Similarly, stories concerning the Settlement ran on WDSU-TV (NBC affiliate) and WVUE-TV (Fox affiliate).

As a result of the above actions, the notice provided to the Class complied with this Court's Orders and met all applicable legal standards, including the requirement set forth by FRCP 23 that the Notice be provided by the best practicable means.

III.  **Class Member Response to the Notice Favors Final Approval of the Settlement**

The best proof of the adequacy, reasonableness and fairness of the Settlement is its overwhelming acceptance by the Class. The following passage from a recent district court decision is persuasive on this point:

> It is established that the absence of a large number of objectors to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members.[38] [Internal citations omitted]

In the case at bar, of 3,800 potential claimant properties, only 28 properties have filed objections to the Settlement and, as of December 19, 2006, only 251 potential claimants have opted-out of the Settlement.[39] As a result, approximately 92%[40] of potential class members have accepted the Settlement, raising a strong presumption that the Settlement's terms are favorable to the Class.

---

[37] *Id.*

[38] *In re Heritage Bond Litigation*, 2005 WL 1594403 (C.D.Cal.).

[39] Perullo Affidavit, attached hereto as Exhibit F.

[40] This figure is reached when the 251 opt-outs are added to the 28 objectors and that sum is divided by the 3,800 potential claimant properties. The resulting 7.3%, when subtracted from 100%, equates to approximately 92%.

Further evidence of the Settlement's reasonableness is that as of December 19, 2006, 4,065 proof of claim forms[41] have been receieved, with 3,997 being approved as accurate and 88 being corrected.[42]  The deadline to submit proof of claim forms is January 31, 2007.[43]  These proof of claim figures illustrate the overwhelmingly positive response from the Class to the Settlement Agreement.

## IV.  The Settlement is Fair, Adequate, and Reasonable and Achieves Overall Fairness to the Community

Pursuant to Rule 23, the Settlement at issue is in fact fair, adequate and reasonable, achieving overall fairness to the community, as it addresses not only the remediation of the spilled area and the compensation of those affected, but also establishes a buyout program for those Class members situated in the immediate vicinity of the Murphy refinery.  An examination of the three types of benefits illustrates the Settlement's reasonableness.

### 1. Comprehensive Remediation

In November of 2005, Murphy submitted a remediation work plan to the Environmental Protection Agency ("EPA") and the Louisiana Department of Environmental Quality ("LDEQ"), and those agencies reviewed the plan to ensure it adequately addressed environmental impacts of the spill.[44]  EPA and LDEQ then requested the Agency for Toxic Substances and Disease Registry ("ASTDR") and the

---

[41] The fact that there are only 3800 potential claimants and over 4,000 proof of claim forms is due to the fact that certain properties have multiple owners, tenant issues, or other circumstances necessitating multiple proof of claim forms.

[42] Perullo Affidavit.

[43] *Id.*

[44] Affidavit of Wallwork, attached hereto as Exhibit G.

Louisiana Department of Health and Hospitals ("LDHH") to review the work plan for human health effects.[45]

After a lengthy review and comment process, all four state and federal agencies concluded that Murphy's program was protective of the environment and human health, and this conclusion lead to the documentation of the Closure Plan that was jointly authored by the agencies and Murphy.[46]  The agency-approved Closure Plan addresses significant human exposure pathways, discusses pathways that did not pose a significant human exposure, provides the performance standards for the response, and identifies the acceptable confirmation methods.[47]

In addition, Murhpy has entered into a Cooperative Agreement with the LDEQ to effectuate the Closure Plan pursuant to an Activity Schedule that will be attached to the Cooperative Agreement.[48]

Generally, the extent of the oil spill was determined by environmental sampling and analysis.  Murphy has collected and analyzed approximately 16,375 samples from 5,413 addresses with agency oversight.[49]  EPA has collected and analyzed approximately 911 split samples.[50]  These test results were used to determine the Area of Concern, as agreed by the EPA and LDEQ.[51]

In the Area of Concern and Class Area, the Closure Plan requires the evaluation of pathways for dermal, inhalation and ingestion exposures.[52]  Dermal exposures are

---

[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.* and Affidavit of Templet, attached hereto as Exhibit D.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.* and Affidavit of Templet.

split into soil/sediment, exterior surfaces, interior surfaces and debris categories and each category is assessed.[53] Inhalation exposures are evaluated for ambient air, indoor air, soil vapor intrusion, and groundwater vapor intrusion.[54] The ingestion pathways evaluated are soil and groundwater.[55]

Under the Closure Plan, dermal exposure to soil or sediment containing crude oil is evaluated by comparing analytical test results to standards established in the LDEQ's Risk Evaluation and Corrective Action Program (RECAP).[56] RECAP Management Option 1 (MO-1) was chosen as the standard for the evaluation of potential long-term health risks, and MO-1 is the most stringent option of the three RECAP management options.[57] Concentrations of diesel range organics (DRO), oil range organics (ORO) and Polynuclear Aromatic Hydrocarbons (PAH) below their respective RECAP MO-1 standards are highly unlikely to pose acute or chronic health concerns.[58] Locations above a MO-1 standard require additional assessment or response work.[59]

Soils or sediments on a property whose sample test result is above one or more of the applicable MO-1 standards are remediated using the following measures:

- Secure rights of access to the property;

- Remove all visible crude oil and all soils or sediments above an applicable MO-1 standard;

- Backfill the excavation with clean soil; and

---

[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.* and Affidavit of Templet.
[58] *Id.* and Millner Affidavit, attached hereto as Exhibit H.
[59] *Id.*

- Conduct an inspection with EPA and/or LDEQ.[60]

Confirmation soil samples are collected at four discrete locations at each property, and all four samples must be below all applicable MO-1 standards prior to backfiling.[61] This confirmatory sampling is done with oversight from the EPA and LDEQ.[62]

Exterior surfaces are cleaned to a visual cleanliness standard by power washing with a warm detergent solution.[63] The rinsate is collected and disposed of properly offsite. All visible curde oil is removed, but if persistent staining is present after power washing, confirmation that all dermally transferable oil is removed is done by pressing a white paper towel on the stain and rubbing.[64] Stains that do not visually transfer to the paper towel are not considered a signficant exposure pathway.[65]

Interior surfaces are observed to have a lighter and less frequent contamination when compared to exterior surfaces.[66] The local government requires that all structures within the flooded area, which includes the entire area of concern, must have all interior contents such as wall board, insulation, floor coverings, cabinets, furniture and personal items removed so that bare 2x4 studs and sub-floors are exposed.[67] Interior surfaces that have detectable crude oil on them are power washed using a warm detergent solution once all interior contents are removed by the property owner, and the rinsate is

---

[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*
[66] *Id.*
[67] *Id.*

collected for proper disposal.[68]  Post-cleaning visual inspections by the EPA and LDEQ are done to confirm the surfaces are properly cleaned.[69]

Debris that is visually contaminated with oil is collected and removed for proper off-site disposal.[70]  Visual inspections are used to confirm that all oiled debris is removed.[71]

Inhalation of ambient air is a potential exposure pathway.[72]  Most of the light ends[73] from the crude oil evaporated within eight hours of the spill occurring, and many residents were evacuated form the area due to the hurricane, resulting in minimal exposure.[74]  According to the EPA and LDEQ-approved Closure Plan, this exposure pathway is not considered to be significant.[75]

Indoor air exposures are exptected to be similar to ambient air since most, if not all, structures experienced significant damage to doors, windows, and roofs allowing for free transfer of ambient air into the structures.[76]  Removal of interior contents and power washing to remove all visible crude oil reduces or eliminates potential exposure.[77]  Thus, according to the EPA and LDEQ-approved Closure Plan, this is not considered a signficant exposure pathway.[78]

---

[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] "Light ends" are the low molecular weight compounds in crude oil that evaporate first, often within hours of release.
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.* and Affidavit of Templet.
[78] *Id.*

Another potential indoor air exposure pathway is from soil vapor intrusion.[79]  Soils and sediments may absorb crude oil, and the volatile fractions of the oil may evaporate over time.[80]  However, for this spill even the volatile fractions evaporated while they were floating on the surface of the floodwater before the waters receded.[81]  The residual crude oil penetration into the soil was minimal as confirmed by field inspections that indicate that the penetration was less than one inch.[82]  According to the EPA and LDEQ-approved Closure Plan, the potential for soil vapor intrusion is considered insignificant.[83]

Groundwater vapor intrustion is another potential exposure pathway.[84]  The crude oil did not penetrate the soil deep enough to reach groundwater, and analytical test results of samples collected from monitoring wells installed within the area of concern confirm that groundwater was not impacted by the spill.[85]  According to the EPA and LDEQ-approved Closure Plan, the potential for groundwater vapor intrusion is considered insignificant.[86]  As a result, the LDEQ recently dismissed its Complaint in Intervention against Murphy regarding alleged groundwater contamination after the agency was satisfied with a monitoring program overseen by LDEQ.

There are two potential pathways for exposure to crude oil from ingestion:  soil and groundwater ingestion.[87]  Collection and removal of soils and sediments that exceed one of the applicable MO-1 standards as previously described for dermal exposure to

---

[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] *Id.*
[87] *Id.*

soils and sediments reduces or eliminates this exposure pathway.[88]  The applicable

RECAP standards are developed to be protective of children who represent a sensitive

subpopulation for soil exposure, and the standards are protective of adults for a long

term (30 year) exposure.[89]  Since the spill did not impact groundwater, ingestion of

groundwater is not considered a significant exposure pathway according to the EPA and

LDEQ-approved Closure Plan.[90]

Murphy initiated clean up of the oil spill on September 4, 2005, completing

collection and removal of free crude oil from public lands, streets, and canals by the end

of October 2005 under the direction of the U.S. Coast Guard.[91]  Murphy then

transitioned to the clean up of private residential and commercial properties in early

November 2005.[92]

Preliminary information indicates that there are approximately 1100 additional

affected properties that did not give Murphy permission to clean.[93]  These properties are

comprised of residential and commercial properties.[94]  Murphy anticpates that once legal

access is fully granted to those properties, some will not have physical access issues

while others will.[95]  Murphy intends to begin cleaning these newly available properties

without access issues in accordance with the Closure Plan beginning in January 2007.[96]

For properties with access issues, Murphy will actively work with the property owners,

their lawyers (PSC and non-PSC), and the Court, if need be, to resolve the issues and

---

[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*

will begin cleaning those properties once they are accessible.[97]  The goal is to start cleaning these properties in January 2007 as well.[98]

In summary, Murphy either has cleaned or will clean and test as soon as practicable all properties in the Class Area in accordance with the agency-approved Closure Plan.[99]  Any potential health problems that may have been created by the spilled Murphy oil will be completely and permanently remedied by the conventional cleaning techniques outlined in the Closure Plan.[100]

### 2. Compensation Program

All 1) residents and residential and commercial property owners in the Class Area who have not previously settled with Murphy; and 2) residents and property owners in the Buyout Zone, including those that previously settled, will receive a settlement award that is fair and equitable to all.[101]  The total amount to be distributed under the Compensation Program will be $120 million.

The parties, after much analysis by expert consultants, Court review and approval, and arms-length negotiations, have determined that the most appropriate way to effectuate the Compensation Program is through an Allocation Plan that is fair, reasonable and adequate to all Class members.[102]

In creating the Court-approved Allocation Plan, the Parties relied upon the following information:

---

[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] Millner Affidavit and Affidavit of Templet.
[101] Affidavit of Kilpatrick, attached hereto as Exhibit B.
[102] *Id.*

- Environmental sampling, analyses and regulatory oversight conducted by the Environmental Protection Agency and the Louisiana Department of Environmental Quality;

- Environmental sampling and analyses conducted by CTEH on behalf of Murphy and Marco Kaltofen on behalf of the Plaintiff Class;

- Property records obtained from the Assessor's office;

- Property records obtained through several independent resources and databases;

- Property records obtained during the Murphy Voluntary Settlement Program;

- Extensive evaluation done by the PSC and Murphy in counting and evaluating properties in the Class Area, including manually counting the properties on several occasions;

- Quantitative analyses performed on behalf of the PSC by Bourgeois Benett LC, a local public accounting firm;

- Quantitative analyses on real estate prices and sales performed on behalf of Murphy by Dr. Wade Ragas, a local economist and expert in the St. Bernard real estate market and by Dr. John Kilpatrick, an expert in real property damage claims, retained on behalf of the Plaintiff Class; and

- Quantitative analyses compiled by Global Risk Solutions, the Court appointed disbursing agent in this case. [103]

This information resulted in an Allocation Plan that is broken into four geographical zones.[104] Zone 1, referred to as the Buyout Zone, is discussed in detail below in the section entitled Buyout Program.

Zone 2 provides that owners of residential property will be compensated at a rate of $14.39 per square foot of living area plus $3,375 per occupant for each occupant residing at the property as of August 29, 2005. Non-owner occupants living in Zone 2 as of August 29, 2005 will receive $3,375 per person. There is a $27,000 minimum per

---

[103] Memorandum in Support of Joint Motion and Order for Approval of Allocation Plan, p. 2.
[104] *Id.* at Exhibit 2.

household in Zone 2. Compensation payments will also be offered to owners of commercial property in Zone 2. Values of raw land, improved real estate and movables as of August 28, 2005, are all factored into the commercial entity compensation payment.

Zone 3 provides owners of residential property with compensation at a rate of $10 per square foot of living area plus $2500 per occupant for each occupant residing at the property as of August 29, 2005. Non-owner occupants living in Zone 3 as of August 29, 2005 will receive $2500 per person. There is a $20,000 minimum per household in Zone 3. Compensation payments will also be offered to owners of commercial property in Zone 3 based upon raw land, improved real property, and movable values commensuarate with zone 3 residential values.

In Zone 4, persons owning residential and commercial property as of August 29, 2005 will receive a flat payment of $15,000 per property. The only additional compensation will be for tenants who were paying rent as of August 29, 2005, who will receive $2500 apiece. For commercial properties with multiple ownership interests, i.e., lessee/lessor, the $15,000 will be shared among the interested parties.

### 3. Buyout Program

As stated above, Zone 1 is referred to as the Buyout Zone. The Buyout Zone encompasses an area where the majority of the properties that tested above the MO-1 cleanup standards are located.[105] Stated differently, this area contains the bulk of highly impacted properties that are closest to the failed tank.[106]

---

[105] Millner Affidavit, section II and III.
[106] *Id.* at section V; Affidavit of Kilpatrick; and Affidavit of Templet.

The Settlement's Allocation Plan provides that persons owning residential property in Zone 1 will be compensated at a rate of $19.25 per square foot of living area plus $3,375 per occupant for each occupant residing at the property as of August 29, 2005. Persons in the Buyout Zone who already settled with Murphy will receive the above formula minus amounts already paid by Murphy.

Additionally, Murphy will offer to purchase all residential properties in the Buyout Zone for $40.00 per square foot of living space. Real estate studies indicate that the 2005 Chalmette-area average price of $77.95 per square foot declined to $27.38 per square foot for storm-surge damaged housing in 2006.[107] In the Buyout Zone, where storm-surge damage and oil spill damage combined, typical market prices were calculated from post-Katrina sales prices per square foot were found to be between $25 and $40 per square foot of living area.[108] As a result, a Buyout Zone price of $40 per sqare foot of living area is reasonable compensation as it represents the upper-end of market value.[109] Class Members in the Buyout Zone, however, are not obligated to sell their property to particpate in the Compensation Program.

Non-owner occupants living in the Buyout Zone as of August 29, 2005 will receive $3,375 per person. Buyouts of property and compensation payments will also be offered to owners of commercial property in the Buyout Zone.

The buyout program presents a tremendous benefit to the community. First and foremost, it will create a buffer zone between the Murphy refinery and the community. Second, it removes the most heavily contaminated properties from residential use.

---

[107] Affidavit of Ragas, ¶ 43, attached hereto as Exhibit I.
[108] *Id.* at ¶ 50.
[109] *Id.* and Affidavit of Kilpatrick.

Third, property owners in the buyout area will be offered top dollar for their properties, which will allow these class members to relocate to other areas of St. Bernard or elsewhere if they so choose and move on with their lives.

## V.    None of the Objections Attack the Overall Fairness of the Settlement

As stated above, only 28 objections to the Settlement have been filed.  With 3,800 potential claimant properties, the 28 objectors represent a mere .7%[110] of the claimants.  Stated differently, 99.3% of the potential claimant properties have not objected, raising a strong presumption that the Settlement's terms are favorable to the Class.[111]  Such a small minority of the Class simply should not be an impediment to expeditiously providing relief to the overwhelming majority of the Class that is satisfied with the Settlement terms.

Furthermore, none of the 28 objections attack the overall fairness of the Settlement.  Rather, as the following objection summaries indicate, the objectors seek modifications based on their individual situations:

1.    Arthur Arseneaux -- 3504 Pecan Drive.  Mr. Arseneaux's objection is that his property should be classified as Zone 2 instead of Zone 3 because of the alleged oil contamination present.

2.    Terrence Myers-- 3509 Pecan Drive.   Meyers is the next door neighbor of Arthur Arseneaux.  Myers' objection (filed pro se) is the same as Arseneaux's -- he wants to be compensated at Zone 2 levels instead of Zone 3 because of the alleged presence of oil on his property.

3.    Michael, Alice and Julie Ginart -- 3416 Jacob (Zone 1), 2404 Blanchard (Zone 2), and 413-15 Dubarry (Zone 3). The general complaint is that the benefits provided by the settlement are inadequate.  The Ginarts claim that their properties should be bought out at pre-Katrina values by Murphy.

---

[110] This figure is reached when the 28 objectors are divided by the 3,800 claimant properties.
[111] *In re Heritage Bond Litigation*, 2005 WL 1594403 (C.D.Cal.).

4.    Jules Dixon and Jacob Borrouso -- 2912 Decomine and 3504 Charles -- The complaint is very general, i.e., that the settlement is unfair. As an alternative to pursuing their objection, these objectors seek to opt-out of the class.

5.    Mr. and Mrs. Bernie Deschamp - 3121-23 Jacob Drive -- The claim is that the settlement does not compensate property owners of rental property, which is not accurate. They also question the environmental remediation to be provided under the settlement.

6.    Raymond Albert -- 3528 Ventura (Zone 2). Mr. Albert wants to be compensated at the Zone 1 rate since he is one block removed from Zone 1.

7.    Ryan Casey -3925 Jacob Drive (zone 2)- Mr. Casey wants to be bought out, yet he lives outside of the Buyout Zone.

8.    Peter Harrison --2716 Corinne (Zone 2)—Mr. Harrison is unhappy with Zone 2 compensation because it does not take into account that his house is on an oversized lot and his house was custom built.

9.    Glenn Gabb – Mr. Gabb seeks test results only. The test results have been provided to Mr. Gabb's attorney and it is believed that this objection is resolved.

10.    Howell Robertson, III – 2304 Myrtle Grove Drive, Lot #33 – Mr. Robertson's objection is improper as Mr. Robertson is not a class member. The class boundary stops short of the trailer park in which Mr. Robertson resides. Only class members can file objections.

11.    Blaise and Sandra Sauro – 2625 Paris Road, Units A-E. The Sauros claim to live on the border of Zones 3 and 4 and want to be treated as Zone 3 claimants.

12.    Gregory Faia – 2428 Volpe Drive (Zone 2). This property was settled during the voluntary settlement program with the record order of the property, Georgia Valenza, who was Mr. Faia's secretary. Ms. Valenza received a settlement check and confirmed on video that she was the owner of the property. GRS's review of the property records confirmed Ms. Valenza as the record owner. Mr. Faia claimed that he purchased the property from Ms. Valenza in 2003, but did not record the sale until 2006, after Ms. Valenza had already settled with Murphy. Ms. Valenza has moved to Alabama and will not turn over the settlement proceeds to Mr. Faia. Mr. Faia thus seeks his own settlement for the property at 2428 Volpe Drive.

13.    Wayne Duchmann – Mr. Duchmann apparently seeks pre-Katrina value for the buyout zone. Regardless, Mr. Duchmann's objection is improper as he does not have standing to object in this matter. The Legal Notice of Class-Wide Settlement requires objectors to be Class Members that can "provide proof of residency and/or property

ownership in the Class Area as of August 29, 2005." [112] Mr. Duchmann did not reside or own property in the Class Area on August 29, 2005. Instead, Mr. Duchmann purports to represent his mother, who did own property within the Class Area, but is recently deceased. Prior to her death, Mr. Duchmann did not have power of attorney with respect to his mother's affairs. And, Mr. Duchmann has presented no evidence that at this time he is the appropriate succession representative of his mother's estate.[113] As a result, because Mr. Duchmann is not a Class Member and does not legally represent a Class Member, he has no standing to object to the Class Settlement.

14.    Daniel Bourgeois,  Evyes Bourgeois and Coleen Bourgeois – 3004-06 Jacob Drive (Zone 1).    The Bourgeois seek to have their property classified as commercial instead of residential.  It was a duplex in which they had tenants.  They are under the misunderstanding that compensation would be higher as a commercial property than as a residential.    Under the settlement program, duplexes are considered residential property.  The Bourgeois also want to retain mineral rights to the property.

15.    Daniel Bourgeois and Carey Bourgeois – 3205 Golden Drive.  This property is a four-plex and will be classified as commercial.    The objection also seeks to retain mineral rights, but since Murphy is not buying this property, this is not an issue.

16.    Daniel Paul Bourgeois – 2908/2910 Jacob Drive – This is again a duplex and Mr. Bourgeois wants it regarded as commercial.  He also wants to retain the mineral rights.

17.    William and Sheri Follette – 3921 Campagna.  This property is near the Forty Arpent Canal.  The objection expresses concerns over the environmental remediation around the canal bank.

18.    James Philpott, 3409 Volpe Drive.   This is a pro se objection and seeks compensation for slab removal, home elevation and the loss of two vintage automobiles.

19.    Ronald J. Caruso, Sr., 2612 Rosetta Dr.   Mr. Caruso questions the extent of compensation and remediation.

20.    Cheryl Migliore, 3008-10 Jacob Dr.  Ms. Migliore questions the buyout amount and the loss of future income.  She also seeks to reserve her mineral rights to the property.

---

[112]    Legal Notice of Class-Wide Settlement, pp. 9-11.

[113]    See La.C.C. art. 935: "... Prior to the qualification of a succession representative only a universal successor may represent the decedent with respect to the heritable rights and obligations of the decedent."  See also, La.C.C.P. art. 685 ("Except as otherwise provided by law, the succession representative appointed by a court of this state is the proper plaintiff to sue to enforce a right of the deceased or of his succession, while the latter is under administration. The heirs or legatees of the deceased, whether present or represented in the state or not, need not be joined as parties, whether the action is personal, real, or mixed." and art. 734.

As the Court is well aware, in handling class actions, it is impossible to look at each individual's situation. On the contrary, the purpose is to find an effective and expeditious way to fairly and reasonably resolve the controversy as a whole. The above objections address individual concerns, and therefore, the objecions should not affect the Court's determination as to the overall fairness of the Settlement.

Aside from the 20 objections mentioned above, the following six objections were apparently received by the Court: 1) Objection of Elizabeth and Michael Kreck; 2) Objection of Kim Lapera; 3) Objection of Kevin Karcher; 4) Objection of Donna Lebouf; 5) Objection of Cahtleen Bowers; and 6) Objection of Tommy and Kerilyn Imbraguglio.[114] These six objections, however, were never served on or received by the Parties, and therefore should not be considered by the Court as written notice of each objection was required to "have been filed with the Court and served upon counsel for the Parties not later than 20 days before the date of the Fairness Hearing, as specified in the Preliminary Approval Order and Notice."[115]

Despite the limited number of objections and the fact that none attack the overall fairness of the Settlement, Special Master Klees has been appointed and will meet separately with each objector in an attempt to resolve the objections before the January 4, 2007 Final Approval hearing. Judge Klees will be meeting with each objector on January 2-3 so that their concerns may be heard and hopefully resolved. Judge Klees

---

[114] Edwin and Melissa LaCoste and Daniel and Nathalie Frederick also filed correspondence with the Court that have been classified as "objections" to the settlement. These letters, however, do not qualify as objections because they are not objecting to any provision of the settlement. Rather, the Fredericks and LaCostes settled with Murphy outside of the class and had 7% of their settlement withheld pursuant to this Court's set aside ruling. Murphy and the PSC are working toward an agreement that would return the 7% set aside amounts to the claimants; the set aside amounts are currently contained in an escrow account.

[115] Settlement Agreement, ¶ 3, p. 19.

will report to the Court at the fairness hearing regarding the outcome of his meetings with the objectors.

**CONCLUSION**

This class action settlement has been reached in record speed through the hard work of many to aid and assist in the recovery of St. Bernard Parish. The settlement benefits are creative, yet proper under truly unique circumstances. Proper and prompt remediation, timely compensation, and the creation of a buffer zone are real, tangible benefits to a community in desperate need of support. The settlement has received virtually unanimous acceptance from the 3800 settlement properties. Only 251 properties remain opted out and only 20 objections have been properly filed. This should serve as persuasive evidence that overall fairness has been achieved through this Class Settlement. Consequently, the parties request Your Honor promptly give final approval to the settlement so the distribution of benefits can begin.

Respectfully Submitted,

LIAISON COUNSEL

KERRY J. MILLER (#24562)
**FRILOT PARTRIDGE, L.C.**
1100 Poydras Street Suite 3600
New Orleans, LA 70163
Telephone: (504)599-8000
Facsimile: (504)599-8145

**FRILOT PARTRIDGE, L.C.**
GEORGE A. FRILOT (#57478)
EDWARD F. KOHNKE, IV (#7824)
A. J. KROUSE (#14426)
PATRICK J. McSHANE (#19055)
PAUL C. THIBODEAUX (#29446)
1100 Poydras Street, Suite 3600

New Orleans, Louisiana 70163
PH:  (504) 599-8000
FAX: (504) 599-8100

And

DANIEL L. DYSART (#5156)
DYSART & TABARY
#3 Courthouse Square
Chalmette, LA  70043
Telephone:  (504)271-8011
Facsimile:  (504)271-8020

**Attorneys for Defendant Murphy Oil
USA, Inc.**

And

**PLAINTIFFS' LIASON COUNSEL**

**SIDNEY D. TORRES, III, ESQ. (# 12869)**
**Law Offices of Sidney D. Torres, III**
1290 7th Street
Slidell, Louisiana  70458
Telephone (985) 661-8910
On Behalf of the Court Appointed
Plaintiffs' Steering Committee

## CERTIFICATE OF SERVICE

I  hereby  certify  that  a  copy  of  the  foregoing  pleading  has  been  served  upon

plaintiffs'  liaison  counsel  via  e-mail  and/or  United  States  Mail,  properly  addressed  and

postage  pre-paid  on  this  3rd  day of  _____ , 2007.