# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PATRICK JOSEPH TURNER, ET AL. | * | CIVIL ACTION |
| | * | |
| VERSUS | * | NO. 05-4206 |
| | * | CONSOLIDATED CASE |
| | * | |
| MURPHY OIL USA, INC. | * | SECTION "L" (2) |

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

## AFFIDAVIT OF TODD B. HILSEE
## ON SETTLEMENT NOTICE PROGRAM ADEQUACY

I, TODD B. HILSEE, have personal knowledge of the matters set forth herein, and I believe them to be true and correct. After being duly sworn under penalty of perjury, I state as follows:

     1.     I am the President of Hilsoft Notifications, a company located near Philadelphia, in Souderton, Pennsylvania that specializes in designing, developing, analyzing, and implementing large-scale, un-biased, legal notification plans.

     2.     I have been asked by co-lead counsel for the plaintiffs to study all of the efforts to notify Class members of their rights under the proposed settlement and to provide opinions on the adequacy and sufficiency of all aspects of notice.

     3.     After a review of the extraordinary efforts that both plaintiffs and defendants have undertaken, I find that the notice provided was most certainly the best practicable, in my opinion, given the fact that the attorneys faced what is quite likely the most difficult notification circumstances ever faced in class action litigation history—one where virtually every Class member was displaced from a Class defined on the basis of geography.

     4.     Despite those daunting circumstances, through relentless and multi-source

efforts, plaintiffs and defendants—pre-certification, after certification/pre-settlement, and during the settlement—searched for Class members and their current addresses; and their extraordinary efforts paid off: not only were multiple individual notices sent to and received by Class members, as evidenced by non-returned mail, the calculable "reach" of the mailings and the media placements. Of course, the extraordinarily large and positive response to notice of the settlement through the submission of proof of claim forms— well before the deadline for claims—is additional evidence that notice was certainly received, but more importantly indicates sentiment in favor of the adequacy of the settlement itself.[1]

5.      In addition to a comprehensive multi-contact approach to reaching Class members, as this report will detail and analyze below, the information provided was noticeable, sufficient, informative, and certainly adequate.   This is because Class members benefited from the Court's approval to disseminate a mailed effort with clear, concise summary notices, in plain, easily understood language, just as Fed. R. Civ. P. 23(C)(2) now requires.

6.      I base this report on: my review of, and involvement in, the creation of the settlement notices and notice plans; my involvement as the expert to develop for the plaintiffs the exhaustive address updating and Class member location protocol employed by Class counsel during Class certification (*See* Affidavit of Todd B. Hilsee on Class Certification Notice Protocol, dated February 15, 2006); my review of affidavits filed by

---

[1] I define "reach" as an opportunity for exposure to notice – the percentage of a given 'target audience' that is exposed to a notice—e.g., by receipt of a mailing, or by opening or reading a publication or media vehicle containing a notice.  Opportunity for exposure is the watchword for the notice expert.  "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314 (1950).

the plaintiffs' counsel upon their completion of the Class certification notice program, including the Affidavit of Jerald N. Andry, Jr., dated July 18, 2006 and exhibits thereto; data and information provided to me on defendant Murphy Oil USA's ("MOUSA") efforts to locate and identify Class members during the voluntary settlement program; and the settlement mailing, response, and claims data provided to me by Global Risk Solutions ("GRS"), the claims administration firm hired by defendants in the matter.

7.    I will first describe and provide the Court with my credentials as a notice expert that allows me to opine on the issues I review here, and then I will detail the steps to obtain addresses and locate Class members, mail notices to Class members, publicize notice to Class members, and, finally, I will provide my conclusions on the adequacy of the combination of those efforts both in quantitative terms on the extent of the outreach, and in qualitative terms on the information and design of the notices that reached them.

## OVERVIEW OF RELEVANT CREDENTIALS AS NOTICE EXPERT

8.    I have served as a recognized notice expert in many of the most significant class action lawsuits. My staff and I are familiar with, or have been directly responsible for, many of the largest class action notice programs, involving all aspects of notice dissemination. Hilsoft Notifications' c.v., attached as **Exhibit 1**, identifies many of our more than 220 major cases, in the course of which our notices have appeared in 209 countries, and in 52 different languages, and contains numerous judicial comments citing our expertise, as well as our articles and publications on the subject of the adequacy and design of legal notice efforts.

9.    The c.v. identifies many of the matters, including global matters, in which I have been recognized and/or appointed by courts as the notice expert in many of the

largest and most significant cases in history, including *In re Holocaust Victim Assets Litig.*, No. CV-96-4849 (E.D. N.Y.); *In re Royal Ahold Securities and ERISA Litig.*, MDL 1539 (D. Md.); *In re Domestic Air Transp. Antitrust Litig.*, MDL 861 (N.D. Ga.); *Cox v. Shell Oil*, No. 18, 844 (Tenn. Ch.); *In re Dow Corning Corp.*, No. 95-20512-11-AJS (E.D. Mich.); *Thompson v. Metropolitan Life Ins. Co.*, No. 00 Civ. 5071 (HB) (S.D.N.Y.); *Baxter v. The Attorney General of Canada*, No. 00-CV-192059 CP (Ont. Super. Ct.); *Avery v. State Farm Mutual Auto. Ins. Co.*, No. 97-L-114 (Ill. Cir. Ct. Williamson Co.); *Microsoft I-V Cases*, J.C.C.P. No. 4106 (Cal. Super. Ct. San Francisco Co.); *In re Synthroid Marketing Litig.*, MDL 1182 (N.D. Ill.); *In re Lupron Marketing and Sales Practices Litig.*, MDL 1430 (D. Mass.); and many others.

10.     More specifically, I have been recognized as a notice expert and/or have extensive experience designing notice programs that have been approved by Louisiana courts, including many of the most significant class action cases that have taken place in Louisiana. For example, besides the multinational asbestos related claims program in the *In Re Babcock & Wilcox* case (No. 00-10992, E.D. La.), we designed and implemented the court-approved notices and notice programs in the tobacco litigation pending as *Scott v. American Tobacco* (No. 96-8461, La. Civ. Dist. Ct. Orleans Parish); the crawfish farming class action *West v. G.H. Seed & Rhone-Poulenc* (No. 99-C-4984-A, 27th Jud. Dist. Ct. St. Landry Parish); the gas release cases *Thibodeaux v. Conoco Phillips Inc.* (No. 2003-481, 14th Jud. Dist. Ct. Calcasieu Parish) and *Morrow v. Conoco Inc.* (No. 2002-3860, 14th Jud. Dist. Ct. Calcasieu Parish); the gas gauge damage class action known as *In re High Sulfur Gasoline Content Litig.* (MDL 1632, E.D. La.); the breast implant litigation in *Spitzfaden v. Dow Corning* (No. 92-2589, Civ. Dist. Ct. La.); and the

teachers' test scoring error class action *In re Educational Testing Service* (MDL 1643, E.D. La.).

11.    I was the first notice expert recognized in a published decision in the United States, and I was the first notice expert recognized in Canada:

a)    Judge Marvin Shoob stated in his decision in *In re Domestic Air Transp. Antitrust Litig.,* 141 F.R.D. 534, 548 (N.D. Ga. 1992):

> *The Court finds Mr. Hilsee's testimony to be credible. Mr. Hilsee's experience is in the advertising industry. It is his job to determine the best way to reach the most people. Mr. Hilsee answered all questions in a forthright and clear manner. Mr. Hilsee performed additional research prior to the evidentiary hearing in response to certain questions that were put to him by defendants at his deposition . . . . The Court believes that Mr. Hilsee further enhanced his credibility when he deferred responding to the defendant's deposition questions at a time when he did not have the responsive data available and instead utilized the research facilities normally used in his industry to provide the requested information.*

b)    Mr. Justice Peter A. Cumming stated in *Wilson v. Servier,* (September 13, 2000) No. 98-CV-158832, "National Fen/Phen Litigation" (Ont. S.C.J):

> *[A] class-notification expert, Mr. Todd Hilsee, to provide advice and to design an appropriate class action notice plan for this proceeding. Mr. Hilsee's credentials and expertise are impressive. The defendants accepted him as an expert witness. Mr. Hilsee provided evidence through an extensive report by way of affidavit, upon which he had been cross-examined. His report meets the criteria for admissibility as expert evidence. R. v. Lavallee, [1990] 1 S.C.R. 852.*

12.    My service has included leadership in both the method and form of notice. For example:

a)      I introduced to courts the methodology they and other qualified experts now embrace to help them determine adequacy of notice: calculating the percentage of class members who will be reached with notice through audience coverage analyses.  *See In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534 (N.D. Ga. 1992); and

b)      I was asked to collaborate with the Federal Judicial Center (the "FJC"), as a result of my testimony to the Advisory Committee on Civil Rules of the Judicial Conference of the United States, to write and design the illustrative, "model" forms of notice, to embody the satisfaction of the new plain language requirements of Federal Rule of Civil Procedure 23(c)(2).  To assist judges and attorneys, in state as well as federal courts, the FJC has posted, at www.fjc.gov, (click on the class action notices item) the notices which my Hilsoft Notifications colleagues and I designed.  Judge Lee H. Rosenthal, now Chair of the Advisory Committee on Civil Rules of the Judicial Conference of the United States, stated to me at the January 22, 2002 public hearing in Washington, D.C. on the proposed changes to Rule 23, upon the conclusion of my remarks when I served as the only notice expert invited to testify during those hearings:

> *I want to tell you how much we collectively appreciate your working with the Federal Judicial Center to improve the quality of the model notices that they're developing.  That's a tremendous contribution and we appreciate that very much . . . . You raised three points that are criteria for good noticing, and I was interested in your thoughts on how the rule itself that we've proposed could better support the creation of those or the insistence on those kinds of notices.*

13.     I have been appointed to serve the United States government, as well as numerous international commissions and non-governmental organizations, to develop and implement effective notice programs.  For example, I was retained in the $10 billion

Tobacco Transition Payment Program for the United States Department of Agriculture (the largest claims process in history); the German Slave Labor Fund global outreach program for the International Organization for Migration; and the Nazi-era European insurance policy international media program for former U.S. Secretary of State Lawrence S. Eagleburger's International Commission on Holocaust Era Insurance Claims (ICHEIC).

14.    My staff and I have written numerous articles on notice and due process. We believe notice and due process depend upon clear communication with the people affected—desiring to actually inform them—not just going through the motions: for example, Todd B. Hilsee, Gina M. Intrepido, & Shannon R. Wheatman, *Hurricanes, Mobility and Due Process. The "Desire to Inform" Requirement for Effective Class Notice is Highlighted by Katrina*, 80 TULANE L. REV. 1771 (June 2006); Todd B. Hilsee, Shannon R. Wheatman, & Gina M. Intrepido, *Do You Really Want Me to Know My Rights? The Ethics Behind Due Process in Class Action Notice Is More Than Just Plain Language: A Desire to Actually Inform*, 18 GEO. J. LEGAL ETHICS 1359 (Fall 2005).

15.    In *Turner v. Murphy Oil*, a key issue to establish, with evidence for a lasting and binding effect from the settlement, is the ability to provide effective notice to Class members in the wake of Hurricane Katrina. I have provided expert testimony in other court-approved settlements where I oversaw court-approved notices and notice programs where hurricane-related notice issues were present post-Katrina. For example:

a)    In *In Re High Sulfur Content Gasoline Products Liability Litigation*, pursuant to my testimony at the final approval hearing, Judge Ivan L.R. Lemelle of the Eastern District of Louisiana approved a notice plan my staff and I had designed that contemplated similar address updating efforts as was

undertaken in this case, for example using the United States Postal Service's National Change of Address Database ("NCOA"), supported by broad and wide media placements owing to the large size of that class.[2]  After approving the settlement and notice, and upon considering a collateral attack from a *pro se* objector, Judge Lemelle stated in his Order and Reasons on November 8, 2006:

> *The Notice Plan for this Class Settlement was consistent with the best practices developed for modern-style "plain English" class notices; the Court and Settling Parties invested substantial effort to ensure notice to persons displaced by the Hurricanes of 2005; and as this Court has already determined, the Notice Plan met the requirements of Rule 23 and constitutional due process.*

b)      In *Froeber v. Liberty Mutual Fire Insurance Co.* (No. 00C15234, Cir. Ct. Ore.), the Circuit Court of Marion County, Oregon ordered that addresses be updated using NCOA, and further, that any mailing that was returned as undeliverable be remailed to any updated address provided by the post office or through additional reasonable means to find a better address.[3]

c)      In *In re Educational Testing Service*, Judge Sarah S. Vance of the Eastern District of Louisiana found that our protocol of clear and concise, easily understood notices sent to teaching candidates, which included a vigorous address updating and re-mailing effort, constituted the best practicable notice.  When granting final approval to the settlement Judge Vance stated on August 31, 2006:

> *At the fairness hearing, the Court received testimony from the Notice Administrator, Todd Hilsee, who described the forms and procedure used to notify class members of the proposed settlement and their rights with respect to it. The Notice Administrator*

---

[2]  *In Re High Sulfur Content Gasoline Prods. Liability Litig.*, E.D. La., MDL 1632, Preliminary Approval Order, January 20, 2005.
[3]  *Froeber v. Liberty Mutual Fire Ins.*, Case No. 00C15234, the Cir. Ct. Marion County, Or., Third Amended Order Preliminarily Approving Settlement, November 30, 2005.

*testified that the notice was mailed and actually delivered to 96%*
*of the approximately 27,000 class members, which, according to*
*Hilsee, was one of the highest success rates with direct mail he had*
*ever been able to achieve. The Notice Administrator also described*
*the other steps taken to give notice, including designing the notice*
*forms in clear, plain language, according to the sample forms*
*developed by the Federal Judicial Center; developing a neutral*
*web site containing information about the proposed settlement;*
*issuing a national press release about the proposed settlement;*
*and providing numerous educational associations, state*
*departments of education, and teachers' associations with*
*information about the settlement. The Court is satisfied that notice*
*to the class fully complied with the requirements of Rule 23.*

16.     In addition to expert testimony provided in these hurricane-impacted

classes (none of which dealt with as difficult circumstances as this *Turner* Class), among

my numerous articles is my most recent one in the TULANE LAW REVIEW.[4]  The article

focuses on the problems faced by courts which must inform displaced people who have

rights at stake in class action lawsuits pending on their behalf.  It also reviews the high

standards that class action notice efforts must meet in order to truly satisfy due process

considerations, the added difficulties that a mobile population with certain demographic

characteristics place on the notice expert, and the solutions employed in several cases

before and since those fateful late summer days of 2005.

17.     My other recent article, in the GEORGETOWN JOURNAL OF LEGAL ETHICS,

focuses on the need to 1) reach people with notices, 2) ensure that notices come to their

attention, and 3) allow them to understand the notices and respond easily, by creating

them in clear, concise, plain language.[5]

---

[4] See Todd B. Hilsee, et al., *The 'Desire To Inform' Requirement For Effective Class Action Notice Is
Highlighted By Katrina*," 80 TULANE L. REV. 1771 (June 2006).
[5] *See* Todd B. Hilsee et al., *Do You Really Want Me to Know My Rights?  The Ethics Behind Due Process
in Class Action Notice Is More Than Just Plain Language:  A Desire to Actually Inform*, 18 GEO. J. LEGAL
ETHICS 1359 (Fall 2005).

18.    I have spoken on notice adequacy at law schools, judges' "roundtables," and national and state bar association symposiums.    My notice and due process educational materials have been utilized at Columbia Law School, New York University School of Law, Temple Law School, Cleveland-Marshall College of Law, and the Georgetown Law School.    I have also been informed that they have been incorporated into the teaching at Harvard Law School.[6]

## EFFORTS TO OBTAIN CURRENT ADDRESSES FOR CLASS MEMBERS

19.    In connection with the Court's Class Certification Ruling, my staff and I studied the issues surrounding notice to Class members from St. Bernard Parish, and I discussed the issues and worked extensively with Class counsel.  I suggested that Class counsel:

a)    Compile a list of names and the original St. Bernard Parish addresses of Class members in the defined Class area from public records.

b)    Compare the original list to any current names and addresses of resident and business databases provided to the St. Bernard Parish government as part of its efforts to resettle its populations and provide information to other residents and business about their plans to return to the area.

c)    Further compare the list of names and original addresses with any recent current addresses contained in any databases that Murphy Oil created and maintained through any individual settlement process it was undertaking, including updating any current addresses known for those within the Class area.

d)    Seek more current addresses that cannot be obtained through steps

---

[6] Professor Arthur R. Miller, Bruce Bromley Professor of Law, Harvard Law School, stated in a letter addressed to me dated June 2, 2004: "I read your piece on *Mullane* with great interest and am delighted to learn the details.  Indeed, I will probably incorporate some of it in my teaching next fall.  I think your analysis is rock solid."

(b) or (c) by comparing the original names and addresses of Class members to the NCOA.[7]

    e)      Mail notices to all current/updated addresses.

    f)      Mail notices to any remaining original addresses in order to achieve postal service forwarding to temporary-forward addresses which may not be reflected in the NCOA database.[8]

20.    Studying the Andry Affidavit on steps actually undertaken, it is clear that these, plus other reasonable steps, were undertaken to the best of Class counsel's ability. They:

    a)      Obtained through a mailing vendor a list of the entire Chalmette area.

    b)      Obtained from MOUSA its lists of names and addresses for non-settled cases.

    c)      Obtained a database of all tax rolls for St. Bernard Parish.

    d)      Employed an expert to run a "geocoding" program which obtained the addresses in the Court defined Class area.

    e)      Worked with a leading claims administrator, Poorman-Douglas, to further update and remail notices, and update address databases through the use of a third-party credit-bureau based product (without accessing personal credit record data or in any way compromising personal data or raising privacy issues) to glean newer, more current addresses, beyond those which the Postal Service

---

[7] Built from submissions of change of address cards, the "NCOA" allows businesses to compare a mailing list with the NCOA database and obtain an updated address if a new address is contained in the NCOA. *See* http://www.usps.com/ncsc/addressservices/moveupdate/changeaddress.htm last visited 12/21/06.
[8] The NCOA only contains permanent COAs. *Id.*

had access to at the time.

21.    These extensive efforts by plaintiffs' Class counsel to develop addresses and updates pursuant to Class certification benefited the settlement notice program because some 1,400 additional addresses were provided to the defendants to help effectuate the settlement notice mailing program.  It is well worth noting that in addition to the protocol for address searching followed, and additional mailing steps undertaken by plaintiffs, the database of names and addresses available for settlement notice mailings was enhanced by other steps beyond that which were required during the certification notice by plaintiffs, including the generation of additional potential Class member names and addresses through:

a)    Publication by defendants of the Class certification notice in the *New Orleans Times Picayune,* and *St. Bernard Voice.*

b)    Posters produced and placed in the St. Bernard FEMA trailer in Wal-Mart's parking lot; and

c)    Posters produced and placed at the Parish courthouse together with 8 ½ x 11 copies of the Class certification notice.

22.    Based on information provided to me by defendants, additional sources of addresses were tapped during settlement, or before settlement during MOUSA's voluntary settlement program, and were undertaken by MOUSA and GRS on its behalf, to the great benefit of the effectiveness and comprehensiveness of the individual notice mailing effort in this case.  These additional sources included:

a)    Inbound telephone calls and data collected by Crawford XPressLink, in the course of gathering information to allow for property testing

prior to Class certification or the voluntary settlement program;

b)      The use of services to handle inbound calls through local and toll free numbers with personnel knowledgeable in spill and remediation issues;

c)      Onsite verifications of addresses, vacant lots and properties;

d)      Tax assessor ownership searches in addition to those undertaken by plaintiffs;

e)      A search of 250,000 resident and 19,000 business records in Polk's July 2005 New Orleans City Directory;

f)      The use of address verification tools of a sort used in marketing to determine the validity of addresses within the Class area, including for commercial entities;

g)      The use of contacts made during the clean up efforts to the Class area to date;

h)      Inbound phone calls from advertisements regarding the class action;

i)      Data gleaned from satellite maps of the Class area; and

j)      Multiple local community gatherings held to facilitate question and answer sessions.

23.     It is clear, from what I have reviewed, that the volume of addresses to which mailed individual notices was eventually provided benefited from all of these efforts, and, therefore, compliance with the letter and spirit of Rule 23's requirements, as well as those inherent in due process, was bolstered.

## IMPLEMENTATION OF THE INDIVIDUAL NOTICE MAILINGS

24.    I have studied the efforts to disseminate notice by mail, and they can be summarized as follows according to statistics and data from GRS:

25.    In this case, not one, but multiple mailings were sent in order to inform people about the settlement pursuant to the preliminary approval hearing, including:

a)    A mailing to allow those who previously opted out of the Class, and remained opted out at the time of settlement, to rejoin the Class. *See* attached **Exhibit 2** for a copy of the "Decision to Rejoin Package" (the "DRP") mailing.

b)    Notice of the settlement and all of the Class members' rights and options. See attached **Exhibit 3** for a copy of the "Settlement Notice Package" (the "SNP") mailing.

c)    A follow up mailing to provide even more information about the plan of allocation and Class counsels' attorneys' fee application. See **Exhibit 4** for a copy of this "Supplemental Mailing Package" (the "SMP") mailing.

### *The Decision To Rejoin Package (DRP)*

26.    The DRP included: a notice of the opportunity to rejoin the Class; a form to exercise the right to rejoin the Class;  a Summary Notice of the Settlement; a cover page summary for the Detailed Notice; a Detailed Notice; a Class area map; the proof of claim form; and a carefully designed outside envelope.  The contents and effectiveness of the information disseminated is discussed in paragraph 53 below.

27.    I understand that 1,364 DRPs were mailed in a timely fashion immediately after preliminary approval of the settlement to 307 Class area addresses and 280 Class

area properties.[9]  Accordingly, there were an average of 4.4 DRPs mailed per address and 4.9 DRPs per property, because, out of an abundance of caution, a DRP was mailed individually to adults at each address and for each property.

28.    An additional 777 DRPs were mailed to 41 different law firms which represent clients for approximately 300 other properties who had previously opted out and had remained opted out at the time of the settlement.   These notices were sent by FedEx in sufficient quantities to the lawyers to then distribute to each adult client that they represent.

29.    It is my understanding that 281 packages were returned as undeliverable, but 54 packages were re-mailed to even more current addresses following a study of address updates available from the post office.

30.    Accordingly, after the completion of all of these DRP mailings and remailings, only two Class area addresses, representing two Class area properties, were not successfully mailed, representing a mere 0.6% of the Class area addresses or 0.7% of the Class area properties unrepresented by lawyers, and an even lower, almost insignificant, percentage when taking into account the 777 additional notices sent to the lawyers for their clients.

### *The Settlement Notice Package (SNP)*

31.    The SNP included: a Summary Notice of the Settlement; a cover page summary for the Detailed Notice; a Detailed Notice; a Class area map; the proof of claim form; and a carefully designed outside envelope.  The contents and effectiveness of the information disseminated is discussed in paragraph 53 below.

---

[9] Class area addresses differ from Class area properties because of multi-unit housing, and vacant lots.

32.    I understand that 6,631 SNPs were mailed in a timely fashion immediately after preliminary approval of the settlement to 3,658 Class area addresses and 3,321 Class area properties who remained unsettled from Murphy's voluntary settlement program at the time of preliminary approval of the settlement.  Accordingly, there were an average of 1.8 SNPs mailed per address and 2.0 SNPs per property, because, out of an abundance of caution, a SNP was mailed individually to adults at each address and for each property.

33.    Understandably, owing to the unique circumstances of the St. Bernard Parish dislocations (*See* the extraordinary address location efforts earlier in this report), 2,796 SNPs were returned as undeliverable, but 87 packages were re-mailed to more current addresses following a study of address updates available from the post office.  It is not surprising that more updated addresses could not be found, since thorough updating efforts had already been undertaken earlier.

34.    Accordingly, after the completion of all of the SNP mailings and remailings, only 1,319 Class area addresses, representing 1,137 Class area properties, were not successfully mailed, representing 36% of the Class area addresses or 34% of the Class area properties.

35.    Notably, including the approximately 2,954 Class area addresses representing 2,804 Class area properties which had previously settled with Murphy, or which were opted out and thus received a DRP instead of an SNP, the SNP mailings together with the Murphy voluntary settlements reflect that an astonishing 80.1% of all addresses within the originally certified Class area were individually reached and notified in the matter, and similarly 81.5% of all properties within the Class area were individually reached and notified in the matter.

### The Supplemental Mailing Package (SMP)

36.    The SMP included: a cover letter explaining the SMP mailing; the summary Notice of the Settlement; a supplemental Notice about the allocation plan, the lawyers' fee request, and the clean-up plan; a Class area map; and a carefully designed outside envelope.    The contents and effectiveness of the information disseminated is discussed in paragraph 53 below.

37.    I understand that 5,147 SMPs were mailed to 2,635 Class area addresses and 2,447 Class area properties who had not thus far sent in proof of claim forms. Accordingly, there were an average of 2.0 SMPs mailed per address and 2.1 SMPs per property, because, out of an abundance of caution, a SNP was mailed individually to adults at each address and for each property.

38.    It is my understanding that only 722 SMPs were returned as undeliverable, but that 128 were re-mailed to more current addresses following a study of address updates available from the post office.

39.    Accordingly, after the completion of all of these SMP mailings and remailings, only 187 Class area addresses, representing 170 Class area properties, were not successfully mailed, representing only 7.1% of the Class area addresses or 6.9% of the Class area properties who had not filed proof of claim forms at the time of the SMP mailing.

40.    Overall, according to GRS, only 1,276 Class area addresses (representing 1,093 properties), or 29.9% of 4,274 addresses, have not received any of the mailings. In other words, mailings were delivered to 70.1% of the Class.

## PLANNING FOR SUPPORTING MEDIA PLACEMENTS

41.    In addition to the extensive mailing effort, the Settlement Agreement properly called for publication support to locate and inform those who, despite best efforts, could not be notified individually.  To extend reach to Class members within the certified Class area, according to the defendants, notice appeared in the leading and *only daily* newspaper with circulation within St. Bernard Parish—the *New Orleans Times Picayune*—as well as St. Bernard's two weekly newspapers, the *St. Bernard News* and *St. Bernard Voice.*[10]

42.    The publication Notice efforts did not stop there.  As a result of the effects of Hurricane Katrina, additional efforts were necessary to extend coverage to displaced hurricane victims.  We studied data on the relocation of displaced Class members and, according to FEMA, displaced victims of Hurricane Katrina filed for disaster assistance in nearly every county in every state; however, of the 1,360,000 individual applicants who registered with FEMA, the majority (91.5%) filed in nearby areas: Louisiana (38.6%), Mississippi (28.3%), Texas (11.6%), Alabama (8.1%), Georgia (2.6%), and Florida (2.3%).[11]  We also studied other post-Katrina mobility reports, which indicated the importance of Texas, as so many New Orleans residents were evacuated there, and, according to at least early reports, many were potentially staying there for extended periods or permanently even after reconstruction began.[12]

---

[10] We have not verified a date or page number for the *St. Bernard Voice* appearance at this time.

[11] *Katrina's Exodus, Hurrican Aftermath,* TIMES-PICAYUNE (New Orleans), Oct. 13, 2005, at A18 (Sources: FEMA, Census Bureau, Queens College Sociology Department, *New York Times* reports).

[12] Gordon Russell, *New Orleans, 77054,* TIMES-PICAYUNE (New Orleans), Oct. 28, 2005, at 1: Change-of-address forms point to Houston as displaced New Orleanians' top destination….more Hurricane Katrina evacuees from southeastern Louisiana than any other area.  An analysis of change-of-address forms filed with the U.S. Postal Service shows that more than 31,000 households in the New Orleans region have requested that their mail be sent to an address in or near Houston. About one in seven displaced households has set up in the Houston area, slightly more than the number that moved to the Baton Rouge region, the

43.    For this particular case, we also studied the relevance of the broader FEMA data as it pertains to St. Bernard Parish, including the demographic makeup of the Parish's population and the impact of its income and education levels on likely relocation, and we considered anecdotal data, all in order to focus notice, to the greatest extent possible, on displaced Class members.    Our analysis of the area suggested a different relocation story for St. Bernard residents who are known for their community loyalty, in which generations of family continue to live in the same neighborhood, sometimes on the same block.    Our reviews suggested a more focused relocation without the emphasis on Texas, Georgia, Alabama and Florida.

44.    In fact, data from the defendant from its voluntary settlement data indicated that approximately 40% of the residents of St. Bernard Parish prior to Katrina had returned to St. Bernard and that approximately 85-90% of the residents of St. Bernard Parish who did relocate were still nearby in southern Louisiana and Mississippi.

45.    Articles that we reviewed highlight the relocation of St. Bernard residents to the North Shore.    According to the *Times Picayune*, "some former St. Bernard residents are maintaining their close ties to family and friends by buying homes on neighboring lots in new subdivisions on the north shore."[13] A prevalent trend was seen in

---

No. 2 destination.  Other findings include: 138,026 households in New Orleans and a sliver of Jefferson, which make up 59 percent of the postal customers in that sector, have filed change-of-address forms; After Houston and Baton Rouge, the most popular destinations were other parts of the New Orleans region, followed by the Dallas and Atlanta areas; Outside of New Orleans, the numbers of relocations were much smaller. In the ZIP codes that encompass the rest of Jefferson, St. Bernard, Plaquemines and the River Parishes, about 30 percent of postal customers filed change-of-address forms. On the north shore, the number was less than 10 percent; although several locations within Louisiana were popular destinations of those who filed change-of-address forms, they attracted smaller numbers than large urban areas in other states.  Of the total number of New Orleans area residents who filed the forms, nearly 60 percent had their mail forwarded out of state; In general, urbanites were much more likely to go out of state than suburbanites. More than half of the evacuees from suburban parishes stayed in Louisiana, compared with less than a third of New Orleans' evacuees.
[13] Paul Rioux, *Staying Close on the North Shore – St. Bernard families by lots side by side*, TIMES PICAYUNE, (New Orleans), Nov. 5, 2005, at A1.

St. Tammany in which sales agents for the Tallow Creek and Penn Mill Lakes subdivisions reported that former St. Bernard expatriates purchased 100 homes in a 365-lot and 90 homes in a 460-lot, respectively.[14]   Information in an article in the *New Orleans CityBusiness* also indicates that St. Bernard Parish residents have been searching for permanent homes along the North Shore—in St. Tammany and Tangipahou Parish.[15]

46.    Our analysis of household income, education, and ethnicity of surrounding areas further supports the relocation of St. Bernard residents to certain areas.  According to U.S. census data and economic indicators provided by the Department of Commerce, and the Bureau of Economic Analysis, the Louisiana Parishes of East Baton Rouge, Lafayette, St. Charles, St. James, St. John the Baptist, St. Landry, St. Tammany, and Tangipahoa, and the Mississippi counties of Forrest Hancock, Harrison, Hinds, and Jackson offer living conditions somewhat similar to that of St. Bernard Parish, thereby making them attractive areas for St. Bernard residents to relocate.[16]

47.    Efforts, therefore, were needed to provide notice to these displaced Class members who were outside the immediate St. Bernard Parish, or even outside the New Orleans area, at the time of settlement.  A newspaper analysis of these "relocation" areas indicated the following leading daily newspaper for each:

| State | Targeted Parish/County | Leading Daily Paper in Targeted Area |
|---|---|---|
| LA | East Baton | *Baton Rouge Advocate* |

---

[14] *Id.*, at A24.
[15] Deon Roberts, *Sticker Shock: Displaced residents are forced to dig deep to meet demands of a more expensive real estate market in St. Tammany*, NEW ORLEANS CITY BUS., June 1, 2006.
[16] Editor and Publishers' 2006 Market Guide provides forecasts based on data from the 2000 U.S. Census, the Department of Commerce, and the Bureau of Economic Analysis.

| LA | Lafayette | *Lafayette Daily Advertiser* |
|----|-----------|------------------------------|
| LA | St. Charles | *New Orleans Times Picayune* |
| LA | St. James | *New Orleans Times Picayune* |
| LA | St. John the Baptist | *New Orleans Times Picayune* |
| LA | St. Landry | *Opelousas Daily World* |
| LA | St. Tammany | *New Orleans Times Picayune* |
| LA | Tangipahoa | *Hammond Daily Star* |
| MS | Forrest | *Jackson Clarion Ledger* |
| MS | Hancock | *Biloxi-Gulfport Sun Herald* |
| MS | Harrison | *Biloxi-Gulfport Sun Herald* |
| MS | Hinds | *Hattiesburg American* |
| MS | Jackson | *Pascagoula Mississippi Press* |

48.     Therefore, in addition to the *Times Picayune* and the weekly St. Bernard newspapers initially approved for Notice, we went beyond the Class geographic area and utilized the *Baton Rouge Advocate, Lafayette Daily Advertiser, Opelousas Daily World, Hammond Daily Star, Jackson Clarion Ledger, Biloxi-Gulfport Sun Herald, Hattiesburg American,* and *Pascagoula Mississippi Press* to best reach displaced Class members with notice.

49.     Finally, information from MOUSA's settlement database suggested that the remaining 10% of relocated St. Bernard residents had been dispersed throughout several states, possibly as many as 25 or 30; therefore, in a reasonable attempt to reach this small percentage of Class members spread throughout the country, we considered tools to provide some exposure on a national level, including a notice placement in *USA Today*.

AFFIDAVIT OF TODD B. HILSEE ON SETTLEMENT NOTICE PROGRAM ADEQUACY

21

## IMPLEMENTATION OF THE MEDIA NOTICE PLACEMENTS

50.     Pursuant to these objectives and planning criteria, notices were planned for placement in the publications outlined in the tables below.     Several notice appearances were placed directly through the defendant with notice materials that were written, designed, and formatted by my staff and I.   The following is a summary of the publication notices that the defendant MOUSA has placed.  I have been informed that the Notice has appeared according to the table below, although I have not yet received the customary proofs of performance in the forms of tearsheets from the newspapers for these placements made by MOUSA, and for certain others I do not have verification of appearance with a page number on which the Notice appeared.   My staff is endeavoring to verify these appearances before the settlement approval hearing:

| Parish | Newspaper | Notice Size | Issue Date 1 | Positioning | Issue Date 2 | Positioning |
|---|---|---|---|---|---|---|
| New Orleans | *Times Picayune* | 7.6875" x 11" | 10/29/06 | TBD | 11/2/06 | TBD |
| St. Bernard | *St. Bernard News* | 7.25" x 11" | 11/8/06 | TBD | 11/15/06 | TBD |
| St. Bernard | *St. Bernard Voice* | 8.5625" x 11" | TBD | TBD | TBD | TBD |
| East Baton | *Baton Rouge Advocate* | 8.611" x 11" | 10/29/06 | TBD | 11/2/06 | TBD |

51.     Additionally, my staff and I were responsible for placing an approximate ¼ page Summary Notice (3 col. x 10") in main reading sections of the following newspapers on the dates and page numbers indicated below.

| State | Parish/County | Newspaper | Issue Date 1 | Positioning | Issue Date 2 | Positioning |
|-------|---------------|-----------|--------------|-------------|--------------|-------------|
| LA | Lafayette | *Lafayette Daily Advertiser* | 11/9/06 | 11A | 11/10/06 | 7A |
| LA | St. Landry | *Opelousas Daily World* | 11/9/06 | 8A | 11/10/06 | page 10 |
| LA | Tangipahoa | *Hammond Daily Star* | 11/9/06 | 8A | 11/10/06 | 10B |
| MS | Forrest | *Hattiesburg American* | 11/9/06 | 2A | 11/10/06 | 2A |
| MS | Harrison | *Biloxi-Gulfport Sun Herald* | 11/9/06 | 9A | 11/10/06 | 7A |
| MS | Hinds | *Jackson Clarion Ledger* | 11/9/06 | 6A | 11/10/06 | 4A |
| MS | Jackson | *Pascagoula Mississippi Press* | 11/9/06 | 7A | 11/10/06 | 8A |
| | National | *USA Today* | 11/8/06 | 7B | N/A | N/A |

52.    Providing proof of performance from each newspaper in the table directly above is an original copy of the page on which the Notice appeared, which is attached as **Exhibit 5.**

### FORM AND CONTENT OF NOTICE

53.    The notice program included steps to bring the Notice to the attention of Class members, as described below, as well as to ensure that Class members could receive and understand the proposed Settlement in clear, concise easily understood language.  We designed a Summary Notice that was used for mailing and publication, and a cover page of the Detailed Notice to be clearly worded with simple, plain language text to encourage readership and comprehension so that Class members could understand them.  In fact, the design of these Notices followed the principles set out in the illustrative "model" notices that my staff and I have developed in collaboration with the FJC.  All of

the mailing packages are attached to this affidavit as Exhibits 2, 3, and 4:

a)      The publication and mailed Summary Notices included a large, bold headline that captured attention and immediately alerted even casual readers that they should read the Notice and explained why it was important. The Notice focused on the benefits of the settlement. The text of the summary was written in simple and understandable language. The Notice underscored all of the important legal rights and information about the settlement, and did not omit any important or required information. A toll free phone number and a prominent website address provided simple, convenient response mechanisms for Class members to obtain more information.

b)      A Detailed Notice was also mailed to Class members. The Detailed Notice provided Class members with even more information and began with a summary page providing a concise overview of the important information and Class members' key options. The Detailed Notice contained a prominent focus on the options that Class members have and included details about the Settlement, such as who is affected and their rights. The Detailed Notice included a Class area map that provided recipients with an easy way to determine if they were included in the Class. A proof of claim form was also included in the mailing which provided a convenient mechanism for Class members seeking benefits. The package was comprehensive, clear, and understandable, owing to the simple summaries that accompanied the DRP and SNP.

c)      Those Class members who had previously opted out of the Class were mailed a DRP mailing.  The DRP explained how to rejoin the Class and included the mailed Summary Notice, Detailed Notice, and a proof of claim form. The wording was clear and understandable.

d)      Both the DRP and SNP mailed Notice packages, as produced, carried a prominent callout on the outside of the mailing which we had designed, also in accordance with our FJC models, to ensure that recipients could identify that it was an important mailing from a Court and that it affected them, thereby, supplying a reason to open and read the Notice.

e)      A SMP was sent out in November 2006 to apprise Class members about the Court-approved plan to distribute money and included information on the testing and clean-up plan as well as details on the attorneys' fee request.  We prepared a carefully worded cover letter to highlight the key information and, notably, the Supplemental Notice directly informed Class members not only of the fact that a lawyer fee application had been filed, but the amount of that request for fees and expenses.  This mailing also included a copy of the Summary Notice and the Class area map.

f)      Finally, a supplemental email message was sent to all of the email addresses held by the St. Bernard Parish government as a result of its efforts to compile and make available its residents whereabouts and return plans.  I crafted a clear, and concise plain language email to remind people who are listed as having resided in the 70043 zip code of their potential inclusion, and, if so, their ability to

submit a claim form by the deadline for proof of claim forms. The email message as I prepared it is attached as **Exhibit 6**.

## OTHER NOTICE EFFORTS

54.    MOUSA undertook other outreach activities which supported the individual notice and publication notice efforts. MOUSA:

a)    Created and printed 2,500 informational brochures describing the allocation plan as applied to the buyout zone (zone 1);

b)    Distributed buyout brochures to all of the approximately 594 residential buildings in the buyout zone.

c)    Made additional brochures available at areas businesses (e.g., Today's Ketch) as well as at the claims center in both the main reception office and the PSC counsel office.

d)    Established a telephone call center that received and placed hundreds of calls via toll free numbers about the buyout program.

e)    Held luncheons hosted by GRS about the buyout program which were attended by almost 100 people on three different dates.

f)    Posted at www.murphyoilusa.com the Notices, the settlement agreement, the settlement Class area map, and a link to the court's website page, www.laed.uscourts.gov/MurphyOil/MurphyOil.htm, which is dedicated to the Murphy Oil case, and where the Notices may also be obtained. These website addresses were included in the Notices disseminated to the Class members and prominently published in all of the publication Summary Notices.

55.    GRS also reports on the creation and printing of informational brochures

describing the allocation plan as applied to the commercial property program. This included distribution of 1,000 brochures to all addresses along Paris road, E. Judge Perez, and E. St. Bernard Highway. Additional brochures were available at area businesses as well as at the claims center in both the main reception area and the PSC office. The brochures are clear and simple and described the deadlines, summarized eligibility, and provide a map, the steps to take to participate, and which documents may be needed to file a claim.

56.    A result of the enormous outreach has been press coverage in numerous publications, including eight articles in the *New Orleans Times Picayune*, three in the *New Orleans CityBusiness*, two in the *Arkansas Democrat-Gazette*, as well as an article in *The Wall Street Journal*, *Atlanta Journal Constitution*, *Massachusetts Telegram & Gazette*, and *National Petroleum News*, all appearing since September 28, 2006. In total, based on newspaper circulation reports from the Audit Bureau of Circulation ("ABC")[17] and newspaper readership data from Mediamark Research Inc. ("MRI"),[18] adults were exposed to information about the class action settlement more than 9.9 million times from these article appearances alone.

57.    Notably, the press coverage has included local broadcast media. For example, after the plan of allocation was filed and notices were issued, a report broadcast

---

[17] ABC is a non-profit organization that is the leading third party auditing organization in the U.S. Its publication audits are conducted in accordance with rules established by its Board of Directors. These rules govern not only how audits are conducted, but also how publishers report their circulation figures. ABC's Board of Directors is comprised of representatives *from the publishing and advertising communities.*

[18] MRI is a leading source of publication readership and product usage data for the communications industry. MRI offers comprehensive demographic, lifestyle, product usage and exposure to all forms of advertising media collected from a single sample. As the leading U.S. supplier of multimedia audience research, MRI provides information to magazines, televisions, radio, Internet, and other media, leading national advertisers, and over 450 advertising agencies – including 90 of the top 100 in the United States. MRI's national syndicated data is widely used by companies as the basis for the majority of the media and marketing plans that are written for advertised brands in the U.S.

on the noon news show of the local WWL TV station. It is estimated that this broadcast alone reached about 120,000 local New Orleans area households and 150,000 adults.

58.     All of these extra activities clearly resulted in effective outreach and incremental support for an already effective notice effort.

## RESPONSES AND CLAIMS

59.     According to GRS, the claims center set up in the heart of the Class area, received at least 3,734 proof of claim forms as of December 12, 2006, when I received an update.

60.     According to GRS, the call center has received and placed hundreds of calls. I have received no evidence of any confusion over the notices or the settlement from the call center data.

61.     In my experience, the positive response, via proof of claims received, reflects on the adequacy of notice by providing solid evidence of receipt of notice among residents and businesses, and also represents an extraordinary outpouring of support for the settlement. In my experience, it is virtually certain that additional claim forms will continue to be received up until the January 31, 2007 deadline for claims (49 more days since I received the proof of claims statistics for this report).

## CONCLUSIONS

62.     Every effort was made to reach Class members wherever they may now reside—within the Class geographic area and beyond.

63.     The ability to reach people through mailings clearly benefited from the extraordinary search and address update steps that the parties had undertaken at various stages of this litigation and settlement. With more than 80% of the originally certified

Class area individually informed of the settlement and/or Murphy's voluntary settlement by mailings, in my opinion, speaks volumes about the efforts to locate individuals, so that we need not rely on other methods of notice, despite such extraordinary circumstances. Even the reasonable percentage of undeliverable mail among the large number of Class area properties that remained unsettled (although 70% of the addresses have received at least one of the notices), seems to me to be expected, and clearly, owing to the number and type of steps taken to correct any such difficulties, perfectly appropriate.

64.    And, the reach achieved by mail was extended even further by extending efforts to remaining unknown Class members within the Class geographic area via publication notice, which lent real quantifiable support to the mailing efforts. The three papers with distribution within St. Bernard Parish had a total combined daily circulation of 44,285. Factoring in the additional or "pass along" readers, as well as the multiple insertions that appeared, adults within St. Bernard Parish had more than 117,000 opportunities to view or be exposed to the Notice.[19]

65.    The notice program clearly took adequate steps to reach unknown Class members beyond St. Bernard Parish. According to the U.S. Census, the New Orleans Metropolitan Statistical Area ("MSA")[20] consists of seven Parishes: St. Bernard, Jefferson, Orleans, Plaquemines, St. Tammany, St. Charles, and St. John the Baptist, with a total adult population of about 951,095.[21] Based on newspaper circulation reports from ABC and newspaper readership data from MRI, as well as computer software and our

---

[19] The three papers with distribution within St. Bernard Parish include the *Times Picayune, St. Bernard News,* and *St. Bernard Voice.*

[20] An MSA is a large population nucleus with adjacent communities that have a high degree of economic and social integration within the nucleus. MSAs are designated and defined by the U.S. office of Management and Budget.

[21] Editor and Publishers' *2006 Market Guide,* which uses the most recent U.S. Census data to estimate population.

industry-standard calculations that take the underlying data and factor out the duplication among audiences of various media vehicles, we have calculated the reach for newspapers alone to be about 78.1% among New Orleans MSA adults. Of course, much of the newspaper effort (i.e., placements in *Baton Rouge Advocate, Lafayette Daily Advertiser, Opelousas Daily World, Hammond Daily Star, Jackson Clarion Ledger, Biloxi-Gulfport Sun Herald, Hattiesburg American, Pascagoula Mississippi Press,* and *USA Today)* is not included in this reach calculation because the newspaper distribution for these additional newspapers goes beyond the New Orleans MSA, with *USA Today* distributing nationally, to extend reach to Class members who relocated to other areas as a result of Hurricane Katrina.

66.     Overall, the newspapers had a daily circulation within the state of Louisiana of 464,873 and provided more than 2 million notice exposures among Louisiana adults, when taking total audience including pass along readers into account. The newspapers' *total* daily circulation was 2,893,757, providing U.S. adults with over eight million opportunities to view the notice.

67.     In this instance it is mathematically impossible, given the disparity of available data and the uncertainty of the precise geographic location of the unknown Class members to combine the 70-80% reach of the mailings with the incremental reach provided by the 60-80% local reach achieved through the local media placements. Certainly, the incremental reach provided by the hundreds of thousands of readers of the other additional media outside the immediate local area but within the areas where displaced St. Bernard Parish residents most likely moved to, and the reach of the press announcements and news stories, all added immeasurably to the overall reach of the

notice program.

68.    The Notices themselves were clearly sufficient—the Court approved the inclusion of state of the art clear and concise model plain language documents—to aid the Class members' understanding of his/her rights and option in this complex litigation in simple terms.

69.    I believe that the extensive steps carefully undertaken previously by plaintiffs' Class Counsel and MOUSA during the certification stage and settlement stage of this case, have resulted in reasonable and adequate notice in order to inform affected Class members of their rights and options in the pending class action.  I further believe that these efforts follow the guidance for how to satisfy due process obligations that the notice expert gleans from the United States Supreme Court's seminal decisions which is, a) to endeavor to actually inform the class, and b) to demonstrate that notice is reasonably calculated to do so:

        a)    "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," *Mullane v. Central Hanover Trust* 339 U.S. 306, 315 (1950).

        b)    "….notice must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) citing *Mullane* at 314.

70.    Based on the information evidenced in this report, clearly more than reasonable efforts have been undertaken to notify Class members, and the calculable results are obvious.  When many practitioners might have looked at this notice situation and the inherent difficulties, and attempted to justify a "mere gesture" of a notice

program, the parties here instead stepped up and 'actually desired to inform' this Class. The efforts and data prove that they achieved that goal.

71.    In my opinion, the notice given of the settlement of this class action clearly reflects the best practicable notice under the circumstances.

72.    The efforts to identify and notify Class members reflect, in my opinion, a particularly committed counsel in the best interests of the Class the likes of which one does not always see.

73.    The reaction by the Class in that very few objections were received, while very many proof of claim forms have been and will continue to be received, is, in my opinion, an indication by the Class of strong support for the settlement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____

Todd B. Hilsee

SUBSCRIBED AND SWORN TO BEFORE ME this _22_ day of _December_, 200_6_.

_____

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
JoAnn King, Notary Public
Souderton Boro, Montgomery County
My Commission Expires Apr. 4, 2010
Member, Pennsylvania Association of Notaries

MY COMMISSION EXPIRES:

_April 4, 2010_

© 2006 Hilsoft Notifications

**AFFIDAVIT OF TODD B. HILSEE ON SETTLEMENT NOTICE PROGRAM ADEQUACY**

# Exhibit 1

# Hilsoft Notifications

*Philadelphia Area Office: 123 East Broad Street, Souderton, PA 18964, (215) 721-2120, (215) 721-6886 fax*

*Leading expert firm for large-scale notice plan design, implementation, and analysis, for claims processes, class actions and mass tort bankruptcies ❖ 1st notice expert recognized in the U.S. in published decisions, and 1ˢᵗ in Canada in published decisions ❖ Brought media audience data to courts to quantify "reach" among class members—now the cornerstone for notice adequacy determinations❖ Only notice expert to testify to Advisory Committee on Rule 23's plain language req. ❖ Asked to write and design the 'model' notices for the FJC, available at www.fjc.gov ❖ More live testimony than any other expert ❖ Court-approved notice plans withstood challenge to U.S. Supreme Court ❖ 65+ favorable judicial comments–0 unfavorable ❖ Only firm with testifying media experts qualified to perform reach calculations ❖ Numerous critiques of opposing expert inconsistencies ❖ $200 million+ in media placement experience ❖ More than 25 published articles including in law reviews ❖ Leading notice and due process speaker ❖ More than 215 cases with notices appearing in 209 countries and 52 different languages ❖ 25 MDL cases ❖ Equal work for defendants and plaintiffs ❖ Case examples include (also see www.hilsoft.com):*

- Most comprehensive notice ever in a securities class action for the $1.1 billion settlement of **In re Royal Ahold Securities and ERISA Litigation**. Hilsee received court recognition upon settlement approval.

- Largest and most complex class action in Canadian history. Designed/implemented groundbreaking notice to disparate, remote aboriginal people in the multi-billion dollar **In re Residential Schools Litigation.**

- Largest race-based pricing case with national settlement notice to 25 million policyholders in **Thompson v. Metropolitan Life Ins. Co.,** 216 F.R.D. 55, 62-68 (S.D. N.Y. 2003).

- Most complex notice program in history by providing worldwide notice in the $1.25 billion settlement of **In re Holocaust Victims Assets, "Swiss Banks,"** No. CV-96-4849 (E.D.N.Y.). Designed/implemented all U.S. and international media notice with 500+ publications in 40 countries and 27 languages.

- The largest U.S. claims process ever. Designed/implemented multi-media notice campaign for the **U.S. Dept. of Agriculture's** $10 billion tobacco growers' transition payment program.

- National settlement notice to 40 million people in **Scott v. Blockbuster**, No. D 162-535 (Tex., 136th Jud. Dist.). Withstood collateral review, *Peters v. Blockbuster* 65 S.W.3d 295, 307 (Tex. App.-Beaumont, 2001).

- Multi-national claims bar date notice **In re The Babcock & Wilcox Co.,** No. 00-10992 (E.D. La.) to asbestos personal injury claimants. Opposing notice expert's reach methodology challenge rejected by court.

- National publication notice in **Avery v. State Farm,** No. 97-L-114 (Cir. Ct. Ill.) withstood challenges to Illinois Supreme Court and U.S. Supreme Court, and re-affirmed in *Avery v. State Farm,* 321 Ill. App. 3d 269 (5ᵗʰ Dist. 2001). Notice program untouched when Illinois Supreme Court decertified Class.

- National settlement notice **In re Synthroid Marketing Litig.,** MDL 1182 (N.D. Ill.). Notice withstood appellate challenge, 264 F.3d 712, 716 (C.A.7 (Ill.), 2001).

- Scrutinized opposing notice expert opinion in **Parsons/Currie v. McDonalds** resulting in widely reported published decision, 2004 WL 40841 para. 49-58 (Ont. S.C.J. 2004); upheld on appeal **Currie v. McDonald's Rests. of Canada Ltd.,** 2005 CanLII 3360 (ON C.A.).

- **In re Dow Corning Corp.,** No. 95-20512-11-AJS (Bankr. E.D. Mich.). Designed global breast implant media plans (U.S. and foreign), ensuring that millions of additional women received effective notice of the bar date.

- Notice expertise cited in **Cox v. Shell Oil,** 1995 WL 775363, 6 (Tenn. Ch. 1995). Notice evidence cited when collateral attack rejected, *Hospitality Mgmt. Assoc., Inc. v. Shell Oil* Co., 591 S.E.2d 611, 621 (S.C., 2004).

- National settlement notice, **Williams v. Weyerhaeuser Co.,** No. 995787, "Hardboard Siding Litigation" (Cal. Super. Ct.). Notice withstood appellate challenge, 2002 WL 373578, at 10 (Cal. App. 1 Dist.).

## EXPERTS ON STAFF

**Todd B. Hilsee, President** ~ Mr. Hilsee was the first to be recognized in the U.S. and Canada as an expert on the design and adequacy of notice, as a result of his work on **In re Domestic Air Transp. Litig., 141 F.R.D. 534 (N.D. Ga., 1992),** the first of many decisions citing his pioneering use of media audience data to quantify the "net reach" of unknown class members. A leading advocate of "noticeable" notices, he was the only notice expert invited to testify before the Advisory Committee on amendments to Fed. R. Civ. Proc. 23, and subsequently collaborated to write and design the illustrative "model" plain language notices for the Federal Judicial Center, available at www.fjc.gov. Todd has authored numerous articles on notice and due process including law review and journal articles, e.g., the *Georgetown Journal of Legal Ethics,* and the *Tulane Law Review.* His due process and notice educational materials have been utilized at law schools including: Harvard, Columbia, New York University, Temple and Cleveland-Marshall. As a communications professional, he spent the majority of his advertising career with Foote, Cone & Belding, the largest U.S. domestic advertising firm, where he was awarded

the American Marketing Association's award for effectiveness. He received his B.S. in Marketing from the Pennsylvania State University. Todd can be reached at hilsee@hilsoft.com.

***Barbara A. Coyle, Executive Vice President*** ~ With 24 years of media advertising experience, Ms. Coyle specializes in complex media planning and is the leading expert in media efforts requiring global or foreign notification dissemination among highly targeted, hard-to-reach audiences, and, when necessary, broadcast media. From finding displaced holocaust survivors throughout the world to locating Aboriginal media vehicles in remote areas of Canada, from reaching minority tobacco farmers in hundreds of rural counties to prompting responses from securities class members globally, she has overcome challenges which attest to her expertise. Her hallmark negotiations in both print and broadcast media have dramatically extended media budgets, affording effective, defensible reach. She is a Cum Laude graduate of Temple University, with a B.A. in Journalism, where she also received the Carlisle Award for Journalism. Barbara can be reached at bcoyle@hilsoft.com.

***Gina M. Intrepido, Vice President, Media Director*** ~ Ms. Intrepido is the leading reach and frequency expert in the notifications field. She hails from "Madison Avenue's" BBDO Worldwide advertising agency, where she devised sophisticated media plans for major accounts such as Gillette, GE, DuPont and HBO. With over 14 years of experience in media research, planning, and buying, she has designed scores of judicially approved notice plans. Her plans include meticulous analyses and bullet-proof validation of effective reach to demographically diverse groups such as displaced Hurricane Katrina victims, homeless people, crawfish farmers, and millions of consumers, including computer purchasers, video renters and prescription drug users. Combined with intense negotiating, she crafts media programs that outperform and cost less than typical plans. Her notice plan critiques have caused other experts to revise their plans to better meet due process obligations. She has also authored articles on effective class reach, notice dissemination, and CAFA issues. She holds a B.A. in Advertising from Penn State University, graduating Summa Cum Laude. Gina can be reached at gintrepido@hilsoft.com.

***Shannon R. Wheatman Ph.D., Vice President, Notice Director*** ~ Dr. Wheatman joined Hilsoft Notifications after serving in the Research Division of the Federal Judicial Center in Washington, DC, where she worked with the Civil Rules Advisory Committee on class action studies and was instrumental in the development of model notices to satisfy the plain language notice amendment to Rule 23. Her research and notice expertise is further grounded in her education, including her doctorate dissertation: *The effects of plain language drafting on layperson's comprehension of class action notices.* At Hilsoft, she has composed dozens of court-approved notices, tackling the challenges of communicating complex legal content to distinct psychographic groups, ranging from rural, low income homeowners to affluent foreign stock investors, as well as broad sweeps of the U.S. population. She has authored numerous articles on class actions and other legal issues. Her Ph.D. in Social Psychology is from the University of Georgia; she also holds a Masters in Legal Studies from the University of Nebraska-Lincoln. Shannon can be reached at swheatman@hilsoft.com.

***Carla A. Peak, Notice Manager*** ~ Ms. Peak oversees creation, production, and appearance of all manner and form of Hilsoft Notifications' notices. She has successfully implemented notice in more than 35 languages involving thousands of media placements and millions of mailings in both national and international markets. She focuses on delivering the highest quality standards of notice production, as well as research into the effectiveness of notification efforts, and ensuring that expert reports are fully and accurately documented. Her consumer notification experience includes high profile notifications worldwide. She is a Cum Laude graduate of Temple University, with a B.A. in Sociology. Carla can be reached at cpeak@hilsoft.com.

## JUDICIAL COMMENTS

**Judge Lee Rosenthal,** *Advisory Committee on Civil Rules of the Judicial Conference of the United States* (Jan. 22, 2002), addressing Mr. Hilsee in a public hearing on proposed changes to Rule 23:

> *I want to tell you how much we collectively appreciate your working with the Federal Judicial Center to improve the quality of the model notices that they're developing. That's a tremendous contribution and we appreciate that very much...You raised three points that are criteria for good noticing, and I was interested in your thoughts on how the rule itself that we've proposed could better support the creation of those or the insistence on those kinds of notices . . .*

**Judge Marvin Shoob,** *In re Domestic Air Transp. Antitrust Litig.,* 141 F.R.D. 534, 548 (N.D. Ga. 1992):

> *The Court finds Mr. Hilsee's testimony to be credible. Mr. Hilsee's experience is in the advertising industry. It is his job to determine the best way to reach the most people. Mr. Hilsee answered all questions in a forthright and clear manner. Mr. Hilsee performed additional*

*research prior to the evidentiary hearing in response to certain questions that were put to him by defendants at his deposition . . . The Court believes that Mr. Hilsee further enhanced his credibility when he deferred responding to the defendant's deposition questions at a time when he did not have the responsive data available and instead utilized the research facilities normally used in his industry to provide the requested information.*

**Mr. Justice Cumming, *Wilson v. Servier,*** (Sept. 13, 2000) No. 98-CV-158832, "National Fen/Phen Litigation" (Ont. S.C.J):

*[A] class-notification expert, Mr. Todd Hilsee, to provide advice and to design an appropriate class action notice plan for this proceeding. Mr. Hilsee's credentials and expertise are impressive. The defendants accepted him as an expert witness. Mr. Hilsee provided evidence through an extensive report by way of affidavit, upon which he had been cross-examined. His report meets the criteria for admissibility as expert evidence. R. v. Lavallee, [1990] 1 S.C.R. 852.*

**Judge Elaine E. Bucklo, *Carnegie v. Household International,*** (Aug. 28, 2006) No. 98 C 2178 (D. Ct. Ill.):

*Class members received notice of the proposed settlement pursuant to an extensive notice program designed and implemented by Todd B. Hilsee, of Hilsoft Notifications. Mr. Hilsee has worked with the Federal Judicial Center to improve the quality of class notice. His work has been praised by numerous federal and state judges.*

**Judge William A. Mayhew, *Nature Guard Cement Roofing Shingles Cases.,*** (June 29, 2006) J.C.C.P. No. 4215 (Cal. Super. Ct.):

*The method for dissemination of notice proposed by class counsel and described by the Declaration of Todd Hilsee of Hilsoft Notifications which is attached hereto as Exhibit A, constitute the fairest and best notice practicable under the circumstances of this case, comply with the applicable California Rules of Court, and satisfy due process;*

**Judge Douglas L. Combs, *Morris v. Liberty Mutual Fire Ins. Co.,*** (Feb. 22, 2005), No. CJ-03-714 (D. Okla.):

*I want the record also to demonstrate that with regard to notice, although my experience – this Court's experience in class actions is much less than the experience of not only counsel for the plaintiffs, counsel for the defendant, but also the expert witness, Mr. Hilsee, I am very impressed that the notice was able to reach – be delivered to 97 ½ percent members of the class. That, to me, is admirable. And I'm also – at the time that this was initially entered, I was concerned about the ability of notice to be understood by a common, nonlawyer person, when we talk about legalese in a court setting. In this particular notice, not only the summary notice but even the long form of the notice were easily understandable, for somebody who could read the English language, to tell them whether or not they had the opportunity to file a claim.*

**Judge Catherine C. Blake, *In re Royal Ahold Securities and "ERISA" Litig.,*** (January 6, 2006) MDL-1539 (D. Md.):

*I think it's remarkable, as I indicated briefly before, given the breadth and scope of the proposed Class, the global nature of the Class, frankly, that again, at least on a preliminary basis, and I will be getting a final report on this, that the Notice Plan that has been proposed seems very well, very well suited, both in terms of its plain language and in terms of its international reach, to do what I hope will be a very thorough and broad-ranging job of reaching as many of the shareholders, whether individual or institutional, as possibly can be done to participate in what I also preliminarily believe to be a fair, adequate and reasonable settlement.*

**Judge John Speroni, *Avery v. State Farm,*** (Feb. 25, 1998) No. 97-L-114, "Auto Parts Litigation" (Ill. Cir. Ct. Williamson Co.) (Withstood challenge to Illinois Supreme Court, and the United States Supreme Court denied certiorari on issues including the notice issues):

[T]his Court having carefully considered all of the submissions, and reviewed their basis, finds Mr. Hilsee's testimony to be credible. Mr. Hilsee carefully and conservatively testified to the reach of the Plaintiffs' proposed Notice Plan, supporting the reach numbers with verifiable data on publication readership, demographics and the effect that overlap of published notice would have on the reach figure . . . This Court's opinion as to Mr. Hilsee's credibility, and the scientific basis of his opinions is bolstered by the findings of other judges that Mr. Hilsee's testimony is credible.

**Judge Joseph R. Goodwin, *In re Serzone Products Liability Litig.*,** (Sept. 2, 2005) MDL 1477, (S.D. W. Va.):

"The Notice Plan was drafted by Hilsoft Notifications, a Pennsylvania firm specializing in designing, developing, analyzing and implementing large-scale, unbiased legal notification plans. Hilsoft has disseminated class action notices in more than 150 cases, and it designed the model notices currently displayed on the Federal Judicial Center's website as a template for others to follow...To enhance consumer exposure, Hilsoft studied the demographics and readership of publications among adults who used a prescription drug for depression in the last twelve months. Consequently, Hilsoft chose to utilize media particularly targeting women due to their greater incidence of depression and heavy usage of the medication."

**Judge Michael Maloan, *Cox v. Shell Oil*,** (Nov. 17, 1995) No. WL 775363, at *6, "Polybutylene Pipe Litigation" (Tenn. Ch. Ct.):

Cox Class Counsel and the notice providers worked with Todd B. Hilsee, an experienced class action notice consultant, to design a class notice program of unprecedented reach, scope, and effectiveness. Mr. Hilsee was accepted by the Court as a qualified class notice expert . . . He testified at the Fairness Hearing, and his affidavit was also considered by the Court, as to the operation and outcome of this program.

**Judge Marina Corodemus, *Talalai v. Cooper Tire & Rubber Co.*,** (Oct. 30, 2001) No. MID-L-8839-00 MT (N.J. Super. Ct. Middlesex Co.):

The parties have crafted a notice program which satisfies due process requirements without reliance on an unreasonably burdensome direct notification process. The parties have retained Todd Hilsee, president of Hilsoft Notification, who has extensive experience designing similar notice programs...The form of the notice is reasonably calculated to apprise class members of their rights. The notice program is specifically designed to reach a substantial percentage of the putative settlement class members.

***Currie v. McDonald's Rests. of Canada Ltd.*,** 2005 CanLII 3360 (ON C.A.):

The respondents rely upon the evidence of Todd Hilsee, an individual with experience in developing notice programs for class actions. In Hilsee's opinion, the notice to Canadian members of the plaintiff class in Boland was inadequate . . . In response to Hilsee's evidence, the appellants filed the affidavit of Wayne Pines, who prepared the Boland notice plan . . . I am satisfied that it would be substantially unjust to find that the Canadian members of the putative class in Boland had received adequate notice of the proceedings and of their right to opt out . . . I am not persuaded that we should interfere with the motion judge's findings . . . The right to opt out must be made clear and plain to the non-resident class members and I see no basis upon which to disagree with the motion judge's assessment of the notice. Nor would I interfere with the motion judge's finding that the mode of the notice was inadequate.

**Judge Jerome E. Lebarre, *Harp v. Qwest Commc'ns*,** (June 21, 2002) No. 0110-10986, "Arbitration Litigation" (Ore. Cir. Ct. Multnomah Co.):

So, this agreement is not calculated to communicate to plaintiffs any offer. And in this regard I accept the expert testimony conclusions of Mr. Todd Hilsee. Plaintiffs submitted an expert affidavit of Mr. Hilsee dated May 23 of this year, and Mr. Hilsee opines that the User Guide was deceptive and that there were many alternatives available to clearly communicate these matters....

4

**Judge Dewey C. Whitenton, *Ervin v. Movie Gallery, Inc.,*** (Nov. 22, 2002) No. 13007 (Tenn. Ch.):

> Based on the evidence submitted and based on the opinions of Todd Hilsee, a well-recognized expert on the distribution of class notices . . . MGA and class counsel have taken substantial and extraordinary efforts to ensure that as many class members as practicable received notice about the settlement.  As demonstrated by the affidavit of Todd Hilsee, the effectiveness of the notice campaign and the very high level of penetration to the settlement class were truly remarkable . . . The notice campaign was highly successful and effective, and it more than satisfied the due process and state law requirements for class notice.

**Judge Fred Biery, *McManus v. Fleetwood Enter., Inc.,*** (Sept. 30, 2003) No. SA-99-CA-464-FB, (W.D. Tex.):

> Based upon the uncontroverted showing Class Counsel have submitted to the Court, the Court finds that the settling parties undertook a thorough notice campaign designed by Todd Hilsee of Hilsoft Notifications, a nationally-recognized expert in this specialized field . . . The Court finds and concludes that the Notice Program as designed and implemented provided the best practicable notice to the members of the Class, and satisfied the requirements of due process.

**Judge Richard G. Stearns, *In re Lupron Marketing and Sales Practice Litig.,*** (May 12, 2005) MDL 1430 (D. Mass.):

> With respect to the effectiveness of notice, in the absence of any evidence to the contrary, I accept the testimony of Todd Hilsee that the plan he designed achieved its objective of exposing 80 percent of the members of the consumer class...

**Mr. Justice Cullity, *Parsons/Currie v. McDonald's Rests. of Can.,*** (Jan. 13, 2004) 2004 Carswell Ont. 76, 45 C.P.C. (5th) 304, [2004] O.J. No.83:

> I found Mr. Hilsee's criticisms of the notice plan in Boland to be far more convincing than Mr. Pines' attempts during cross-examination and in his affidavit to justify his failure to conduct a reach and frequency analysis of McDonald's Canadian customers.  I find it impossible to avoid a conclusion that, to the extent that the notice plan he provided related to Canadian customers, it had not received more than a perfunctory attention from him.  The fact that the information provided to the court was inaccurate and misleading and that no attempt was made to advise the court after the circulation error had been discovered might possibly be disregarded if the dissemination of the notice fell within an acceptable range of reasonableness.  On the basis of Mr. Hilsee's evidence, as well as the standards applied in class proceedings in this court, I am not able to accept that it did.

**Judge Catherine C. Blake, *In re Royal Ahold Securities & "ERISA" Litig.,*** (June 16, 2006) MDL-1539 (D. Md.):

> In that regard, I would also comment on the notice.  The form and scope of the notice in this case, and I'm repeating a little bit what already appeared to me to me to be evident at the preliminary stage, but the form and scope of the notice has been again remarkable . . . The use of sort of plain language, the targeting of publications and media, the website with the translation into multiple languages, the mailings that have been done, I think you all are to be congratulated, and Mr. Hilsee and Claims Administrator as well.

**Judge Paul H. Alvarado, *Microsoft I-V Cases,*** (July 6, 2004) J.C.C.P. No. 4106 (Cal. Super. Ct., J.C.C.P. No. 4106):

> . . . the Court finds the notice program of the proposed Settlement was extensive and appropriate. It complied with all requirements of California law and due process.  Designed by an expert in the field of class notice, Todd B. Hilsee, the notice plan alone was expected to reach at least 80% of the estimated 14.7 million class members. (Hilsee Decl. Ex. 3, ¶28).  The Settlement notice plan