# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **PATRICK JOSEPH TURNER, ET AL.** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 05-4206** <br> **CONSOLIDATED CASE** |
| **MURPHY OIL USA, INC.** | * | **SECTION "L" (2)** |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**THIS DOCUMENT RELATES TO ALL CASES**

## ORDER & REASONS

The Plaintiffs' Steering Committee ("PSC") and Murphy Oil USA, Inc. ("Murphy") have settled this class action litigation involving an oil spill in the days following Hurricane Katrina. There remain some unclaimed funds that are potentially eligible for cy pres treatment. Before the Court are Claimants' Objections to the Proposed Use of Partial Cy Pres Funds. For the following reasons, the Claimants' Objections to the Proposed Use of Partial Cy Pres Funds are hereby OVERRULED.

### I.    BACKGROUND

On August 29, 2005, Hurricane Katrina made landfall on the Louisiana/Mississippi border, resulting in one of the most devastating natural disasters ever to occur in the United States. As the storm passed over southeastern Louisiana, twenty-foot storm surges rolled into the Mississippi River-Gulf Outlet ("MR-GO") and swept over and breached some fourteen miles of a levee system intended to protect St. Bernard Parish, inundating nearly all of the homes and businesses with massive flood waters and devastating the community.

Among those properties impacted by the flood waters was the Murphy Oil refinery in Meraux, Louisiana. The refinery, owned and operated by Murphy, produced approximately

125,000 barrels of refined petroleum per day. Located on Murphy's property are multiple above-ground tanks used to hold crude oil. These tanks are surrounded by earthen berms, or dikes, built to contain any oil that might escape from the tanks in the event of a leak or spill.

Murphy's Tank 250-2, designed to hold 250,000 barrels of oil, was surrounded by an eight-foot-high earthen dike. Sometime shortly following the overtopping and breaches along the MR-GO levee system, flood waters reportedly up to twelve feet in height swept over, eroded, or traveled through openings in the earthen dike, entering the containment area where Tank 250-2 was located. Though the parties debate the specific facts, time frame, and causes of this incident, there is no dispute that the flood waters quickly surrounded Tank 250-2. The Tank dislodged from its moorings, causing it to float and subsequently rupture. Water entered the Tank due to hydrostatic pressure, and it ultimately began to sink. As flood waters receded and hydrostatic pressure dropped, the crude oil mixture leaked from the Tank and escaped beyond the dike. A significant amount of crude oil escaped from the Tank, spilled into the refinery property, and traveled to the surrounding neighborhood in the days following the hurricane's arrival, contaminating homes and businesses already saturated with flood waters.

On September 3, 2005, Murphy notified the federal government that the oil spill had been detected. Federal and state environmental regulators quickly traveled to the scene to assess the scope of damage and begin recovery of spilled oil. Murphy undertook a voluntary settlement program with residents of the area neighboring its refinery. It also began cleanup and remediation efforts in public spaces and for homeowners who gave Murphy permission to test and clean their property.

After some initial discovery, motions were filed seeking class certification. Following an evidentiary hearing and extensive briefing the Court certified this matter as a class action. *See*

*Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) (certifying class action). On March 3, 2006, the Court adopted a trial plan for this litigation, which bifurcated the trial into two different phases.[1] Phase One would address common issues of liability and general causation; Phase Two would consist of successive trials on specific causation and compensatory damages. However, Phase Two would only take place if a jury found Murphy liable in whole or in part in Phase One.

Phase One of the trial was scheduled to commence on October 2, 2006. However, on September 25, 2006, the trial was cancelled because the parties reported to the Court that they had come to an amicable resolution of the case and had signed a Memorandum of Understanding to this effect.[2] On October 9, 2006, the parties presented a Final Settlement Agreement and Notice Program to the Court,[3] which was preliminarily approved on October 10, 2006,[4] pending a fairness hearing noticed to all class members. A fairness hearing was held on January 4, 2007.[5] On January 30, 2007, the Court approved the Class Action Settlement of $330,126,000 and awarded an additional sum for common benefit fees and expenses. *Turner v. Murphy Oil, USA, Inc.*, 472 F.Supp.2d 830 (E.D. La. 2007).[6] All of the claimants have been paid and $5,000,000 remains.

Murphy filed a Motion to Revert/Reallocate Surplus Compensation Funds or,

---

[1]*See* Rec. Doc. No. 257.

[2]*See* Rec. Doc. No. 588.

[3]*See* Rec. Doc. No. 742.

[4]*See* Rec. Doc. No. 731.

[5]*See* Rec. Doc. No. 1042.

[6]*See* Rec. Doc. No. 1072.

Alternatively, Reform the Settlement Agreement.[7] Murphy took the position that the Settlement Agreement is subject to equitable reformation reverting the surplus funds to the Defendant. The PSC took the position that Murphy has no legal right to the remaining funds, and urged the Court instead to establish a cy pres distribution plan for the surplus funds. On February 13, 2009, this Court issued an Order & Reasons denying the Defendant's motion and finding that the excess funds should be distributed in a manner which will benefit the community devastated by the incident giving rise to the lawsuit.[8] Murphy has appealed the Court's decision.

The Court convened a conference on April 20, 2009 to discuss out of area claims. At the conference, counsel for Murphy presented a settlement proposal to resolve these claims. Under this proposal Murphy would dismiss its appeal of the Court's cy pres decision and in return $2,000,000 of the unclaimed funds would go directly to the out of area claimants without any deduction for attorneys' fees. Claimants would receive $1,500 each, $600 each, or $250 each, depending on their zone. The settlement would be completely voluntary, and any money not used would revert to the cy pres fund. For those who participate, Murphy would pay the costs and attorneys' fees associated with the settlement, up to $800,000. This $800,000 would not come out of the cy pres fund. The remaining $3,000,000 would be used for cy pres purposes to be determined by the Court upon recommendation of a committee appointed for this purpose. Immediately after this process, Murphy intends to begin litigation of the remaining claims. This proposal was posted on the Court's website and notices were distributed to counsel of record.

Counsel for out of area plaintiffs indicated that the majority of responses have been in favor of the proposed use of the surplus funds. However, the Court has received letters from

---

[7]*See* Rec. Doc. No. 2453.

[8]*See* Rec. Doc. No. 2736.

residents of St. Bernard Parish, Jimmy and Eva Dow, Suzanne Kneal, Chris Holmes and Verna Lotz indicating their objections to the proposed distributions. Those letters have been filed into the record. The Court convened a hearing in order to provide individuals the opportunity to formally state their objections and their reasons for objecting to the proposed use of $2,000,000 of the excess funds. Notice of the hearing was filed into the record,[9] distributed to all counsel of record and was posted onto the Court's website.[10] Interested parties were duly noticed.

At the hearing, the Court heard testimony from two residents of St. Bernard Parish. The testimony indicated the residents' desire that the excess funds be used to restore or revitalize the affected area. Residents expressed the concern that as a result of the settlement, part of the funds would be used to benefit the Defendant. Residents have provided the Court with proposed uses of the cy pres funds, and indicated their desire to remain in the affected areas. A representative from the PSC and counsel for the Defendant responded and indicated their support for the proposed settlement.

The Court has carefully considered the testimony and letters submitted by all interested parties. The Court has also examined the procedural record and applied its own knowledge of the case accumulated through its active involvement in this litigation since inception. Accordingly, the Court is fully advised of the matter and is now ready to rule.

## II.      LAW AND ANALYSIS

In class action suits filed in federal court, the district court's ability to determine the use of unclaimed funds derives from the court's inherent power to manage its own docket and its

---

[9] *See* Rec. Doc. No. 2764.

[10] *See* Murphy Oil Class Action Litigation, Current Developments, May 13, 2009, http://www.laed.uscourts.gov/MurphyOil/MurphyOil.htm.

power under Rule 23(d) of the Federal Rules of Civil Procedure to make such orders as necessary to manage the class action. When a class action settlement agreement is silent as to the distribution of excess funds, or when there is an adjudicated aggregate class recovery that results in unclaimed funds, the district judge must make the determination about the appropriate distribution of the surplus. *See* 3 Newberg and Conte, Newberg on Class Actions § 10.15 (4th ed. 2002); *see also In re Lease Oil Antitrust Litigation (No. II)*, 2007 WL 4377835**,** *16 (S.D. Tex. Dec. 12, 2007), *see also Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807, 811 (5th Cir. 1989).

This distribution is usually done according to the tenets of the cy pres doctrine. This doctrine has its origin in Roman law. The term translated loosely means: as near as possible. The doctrine was first used in the charitable trust field when courts took steps to prevent the failure of trusts. *In re Lease Oil Antitrust Litigation (No. II)*, 2007 WL 4377835 at *20 (S.D. Tex. Dec. 12, 2007); *see also* Note, *Damage Distribution in Class Actions: The Cy Pres Remedy*, 39 U. Chi. L. Rev. 448, 452 (1972). For example, where a testator attempted to create a perpetuity - which is prohibited in civil law - the courts, instead of entirely voiding the bequest, would explain the will in such a way as to carry out the testator's general intention as far as the rule against perpetuities would allow. The cy pres doctrine has migrated and appeared with increased vigor in class action/multi-district litigation milieu. As used in this context a court should endeavor to distribute unused funds in a manner most consistent and compatible with the issues which gave rise to the lawsuit which created the fund.

The cy pres doctrine has been described as the "disposition of funds that have not been individually distributed, by distributing them for the next best use which is for indirect class benefit."*In re Lease Oil Antitrust Litigation (No. II)*, 2007 WL 4377835 at *20 (S.D. Tex. Dec. 12, 2007). Under the cy pres doctrine, the courts, guided by the parties' original purpose,

direct that the unclaimed funds be distributed for the indirect prospective benefit of the class. *Powell v. Georgia-Pacific Corp.*, 119 F.3d 703 (8th Cir. 1997) (citations omitted); *see also In re Lease Oil Antitrust Litigation (No. II),* 2007 WL 4377835 at *20.

        This Court has determined that the surplus funds should be used in a cy pres distribution to benefit the class as a whole. Murphy's appeal of the Order & Reasons denying Murphy's request for the reversion of the surplus settlement funds is currently pending before the United States Court of Appeals for the Fifth Circuit. If Murphy prevails on the appeal, none of the $5,000,000 will likely be used for the cy pres distribution for the benefit of the community. If Murphy loses on the appeal, the entire $5,000,000 shall be used for the cy pres distribution. Class actions are typically subject to protracted litigation. This case has been resolved in record time because of the cooperation of the parties and the hard work of the attorneys involved. Consistent with efforts to promptly resolve the claims arising from the oil spill, the settlement offer at issue presents an opportunity for the timely redress of the devastation of the community of St. Bernard Parish.

        After examining the purpose of the fund and whom it was to benefit, as well as the purpose of the litigation,[11] this Court has concluded that the funds should be used for the redress of the destruction and damage throughout St. Bernard Parish. The Court would not be in favor of use of the funds for beautification outside of the Parish. However, these funds can be used outside of the class area in a way that benefits the class. Whether damaged by water or oil, much of the area has been devastated, and the development of part of the Parish is linked to the recovery of the entire community. Many parts of St. Bernard Parish that are out of the area defined by the class serve as the gateway to the class area. The proposed use of a portion of the

---

[11]*See Wilson*, 880 F.2d at 812.

excess funds will serve to increase the tax base of the Parish and will inure to the benefit of the class members. Further, the other portion of the cy pres funds not involved in the settlement offer, $3,000,000, will be used to directly improve the quality of life of the class residents. The Court will appoint a committee to recommend a cy pres distribution of the remaining $3,000,000 consistent with the principles discussed in this Order & Reasons and this Court's Order & Reasons dated February 13, 2009. Accordingly, the Court approves the proposed partial use of the $5,000,000 and overrules the objections to the proposed use of the surplus funds.

## IV. CONCLUSION

For the foregoing reasons, the Claimants' Objections to the Proposed Use of Partial Cy Pres Funds are hereby OVERRULED.

New Orleans, Louisiana, this 27th day of May, 2009.

*Eldon E. Fallon*
UNITED STATES DISTRICT JUDGE